*In re* REFORMA JUDICIAL.

*Número:* ———  *Resuelto:* 13 de mayo de 1994

## RESOLUCIÓN

Examinado el Informe del Comité de Reforma Judicial de la Conferencia Judicial que nos fuera sometido el 18 de marzo de 1994; consideradas las deliberaciones de la Conferencia Judicial celebrada el 7 de abril de 1994, y visto el Plan de Reorganización Núm. 1 de la Rama Judicial de 1994 y su Memorial Explicativo que fueron sometidos por el Hon. Gobernador de Puerto Rico a la Asamblea Legislativa el 15 y 21 de abril de 1994 —así como el mensaje del señor Gobernador que acompaña al último de los documentos mencionados— el Tribunal Supremo adopta las determinaciones y acuerdos siguientes:

1. El Plan de Reorganización Núm. 1 de la Rama Judicial de 1994 adolece de serias deficiencias. Este es un plan de reforma meramente estructural fundado en premisas equivocadas y documentación insuficiente. Por lo tanto, este Tribunal estima que dicho plan no debe ser aceptado y que debe ser revisado de forma detenida y abarcadora. Los objetivos que aparentemente persigue dicho plan pueden fácilmente alcanzarse con facilidad, en nuestro sistema judicial unificado sin la necesidad de tales reformas estructurales.

2. Las estadísticas que acompañan al Memorial Explicativo, en las cuales se fundamenta el Plan de Reorganización Núm. 1 de la Rama Judicial de 1994, no justifican la consolidación propuesta como medio para alcanzar una justicia rápida y

1

efectiva. Aunque se invoca la jurisdicción del estado de Connecticut como modelo para el Plan de Reorganización propuesto, no se han realizado en Puerto Rico los estudios empíricos y teóricos —que fueron llevados a cabo previamente en dicho estado— para identificar los problemas existentes; determinar si la infraestructura es adecuada con énfasis especial en el número de empleados y otros recursos necesarios para lograr la reforma, así como la disponibilidad de las facilidades físicas, y proyectar el volumen de trabajo que generaría la consolidación y el impacto fiscal que tendría la reorganización. Tampoco se provee, como se hizo en dicho estado, previo a la aprobación de la reorganización de los tribunales, para el desarrollo de la capacidad administrativa y la infraestructura física necesaria para implantar cambios estructurales tan abarcadores como los que se plantean. No existe, además, base empírica o teórica alguna para justificar la eliminación del Tribunal Municipal y la sustitución de sus jueces por una nueva categoría de *magistrados* que serían nombrados por el Gobernador con el consejo y consentimiento del Senado.

3.  En estos momentos no prevemos la necesidad de variar la composición actual del Tribunal Supremo en el ejercicio de las facultades que nos confiere el Art. V, Sec. 3 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, por lo cual se rechaza la propuesta que en ese sentido formula el Memorial Explicativo del Plan de Reorganización Núm. 1 de la Rama Judicial de 1994. Las estadísticas y proyecciones sobre el funcionamiento de este Tribunal, consignadas en dicho memorial explicativo, ofrecen un cuadro irreal de los casos que se presentan ante nuestra consideración o que se presentarían de aprobarse la reforma propuesta. Este Tribunal puede atender el volumen real y efectivo de sus casos sin que sea necesario variar su composición actual.

4.  Conforme a nuestra posición histórica de defender los postulados constitucionales que garantizan una Rama Judicial autónoma e independiente, a fin de que la ciudadanía cuente con un sistema de impartir justicia que sea libre e imparcial, rechazamos la transgresión a los principios de independencia judicial y de separación de poderes en que incurren el Plan de Reorganización Núm. 1 de la Rama Judicial de 1994 y su Memorial Explicativo, lo cual tendría el efecto de colocar a la Rama Judicial bajo el control de las otras ramas del Gobierno.

5.  Nuestra posición debe quedar clara, al efecto de que los cambios simplemente estructurales no constituyen de por sí una solución eficaz a los problemas de la administración judicial en Puerto Rico. De acuerdo con nuestra posición adoptada

el 10 de octubre, *In re Conferencia Judicial*, 122 D.P.R. 420 (1988), (Sesión Especial) la verdadera reforma que necesita la Rama Judicial en Puerto Rico se logrará atendiendo, de forma integral, los reclamos históricos de ésta sobre la falta de participación en la determinación de las sedes y la competencia territorial de los tribunales, el sistema inadecuado de nombramiento de jueces a término, la instauración de la carrera judicial y la ausencia de autonomía fiscal. Ello exige conjurar, además, otros problemas apremiantes con los cuales se enfrenta hoy día la administración de la justicia; tales como: la falta de recursos para atender sus necesidades, establecer mejores condiciones de trabajo para su personal, adquirir equipos necesarios, mejorar las instalaciones físicas inadecuadas, instituir nuevos procedimientos para minimizar la congestión y demora de los casos, implantar programas de representación legal adecuada a indigentes, ampliar los sistemas mecanizados para que sean aprovechados los últimos cambios tecnológicos y crear una coordinación efectiva con los otros componentes del sistema de justicia criminal.

6. Reconocemos la labor del Comité de Reforma Judicial de la Conferencia Judicial y agradecemos la aportación y colaboración de sus miembros que hicieron posible, en un corto período de tiempo, presentar las recomendaciones que propiciaron y dieron fundamento a la discusión y participación de los miembros de la judicatura y de la Conferencia Judicial en temas de gran interés y que serán de importancia para la reevaluación abarcadora del sistema judicial que estimamos debe efectuarse.

*Publíquese.*

Lo acordó el Tribunal y certifica el señor Secretario General. La Juez Asociada Señora Naveira de Rodón emitió un voto particular, al cual se unieron el Juez Presidente Señor Andréu García y los Jueces Asociados Señores Hernández Denton, Alonso Alonso y Fuster Berlingeri. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron por separado su propio voto particular.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Voto separado del Juez Asociado Señor Negrón García.

¿REFORMA O DEFORMA? El plan de reorganización de la Rama Judicial que fue sometido por el Gobernador, Hon. Pedro Rosselló González, a la Asamblea Legislativa está plagado de múltiples premisas erróneas y limitaciones; se apuntala en la falacia de que la *consolidación*, en virtud de los cambios de la competencia, traerá *nuevamente* los beneficios que ya tenemos con el Sistema Judicial unificado. Además, plantea serias interrogantes constitucionales; no supera el GRAN MITO de una sola categoría de jueces de primera instancia, pues elimina los jueces municipales y de distrito para, injustificadamente, sustituirlos por el Juez Magistrado; ignora que la consolidación es sólo un experimento en Estados Unidos que agrava los problemas administrativos y adjudicativos; es contraria al principio de la jerarquía de los jueces; debilita la tradicional carrera judicial; genera costos exorbitantes; crea jueces de categorías económicas inferiores y compromete indebidamente futuras legislaturas. También se incurre en el error de restaurar el derecho de apelaciones civiles y, finalmente, constituye el medio para presionar al Tribunal Supremo para que se aumente el número de Jueces Asociados con el propósito de hacer realidad la hipótesis programática, como reacción a su actual composición, de que en su seno debe haber un balance ideológico político-partidista. Analicemos.[1]

---

[1] Dividimos el análisis en esta ponencia del modo siguiente: I. *Antecedentes inmediatos*, págs. 5–7; II. *Memorial Explicativo, (premisas erróneas y limitaciones)*, págs. 8–10; III. *Falacias de la consolidación*; págs. 11–13; *Tabla comparativa beneficios*, pág. 13; *Símil competencia con servicios hospitalarios*, pág. 16; *Demagogia argumento justicia segunda categoría*, págs. 17–18; *Tabla niveles adjudicativos*, pág.

# I

*Antecedentes inmediatos:*

En la Decimoséptima Conferencia Judicial de 7 de abril de 1994, en unión a una mayoría abrumadora de los miembros de la Judicatura del Tribunal de Primera Instancia, nos manifestamos contrarios a la *consolidación* de los Tribunales de Primera Instancia y a la eliminación de los jueces municipales y de distrito, propuesta en el *informe final* del Comité nombrado por el Tribunal Supremo de Puerto Rico.

El 15 de abril de 1994, el Gobernador, Hon. Pedro Rosselló González, presentó a la Asamblea Legislativa el primer Plan de Reorganización de la Rama Judicial, Oficina del Gobernador (en adelante Plan de Reorganización) conforme la Ley de Reorganización de la Rama Judicial de 1993, Ley Núm. 88 de 15 de noviembre de 1993 (4 L.P.R.A. sec. 1n), que entre otras medidas expone esa misma *consolidación y eliminación.*

¿Estamos ante un curso predeterminado e irreversible de los poderes Ejecutivo–Legislativo? ¿Será nuestra voz, una vez más, prédica en el desierto? Confesamos que esas dudas generaron pesimismo en nuestro ánimo. Sin embargo, la renuencia inicial a exponer nuestra postura quedó superada por la posibilidad de que el silencio fuese

---

18; IV. *Interrogantes constitucionales de la consolidación,* págs. 18–22; V. *Gran mito de la consolidación: una sola categoría de Juez de Primera Instancia,* pág. 22; *Juez magistrado,* pág. 23; *¿Es realmente Juez?,* pág. 23; *Tabla equivalencia funciones,* pág. 25; *Juez Municipal y Juez Magistrado,* págs. 26–28; *Anomalía adjudicativa,* págs. 29–30; *Alternativas—Crear veinte (20) plazas de Jueces Superiores y diez (10) de Distrito,* pág. 30; VI. *Consolidación es sólo un experimento de Estados Unidos,* págs. 30–32; VII. *Consolidación agrava los problemas administrativos y adjudicativos,* págs. 32–34; VIII. *Consolidación no mejora proceso administrativo,* págs. 34–35; IX. *La consolidación es contraria al principio jerarquía de los Jueces,* págs. 35–36; X. *La consolidación debilita tradicional carrera judicial,* pág. 36; XI. *Costos exorbitantes de la consolidación,* págs. 36–37; XII. *La consolidación crea jueces de categorías inferioridad económica,* págs. 37–38; XIII. *Consolidación compromete futuras legislaturas,* pág. 38; XIV. *Otros señalamientos de importancia,* pág. 38; *Función jueces comisiones electorales,* págs. 38–39; *Objeciones restaurar derecho apelación civil,* págs. 39–42; XV. *Aumento número Jueces Tribunal Supremo, objeciones,* págs. 42–45; XVI. *Conclusiones,* págs. 45–47.

malinterpretado. Más de un cuarto de siglo abrazados entera y vocacionalmente a impartir justicia y la trascendencia del asunto nos obligan —en recta conciencia— a dejar una constancia respetuosa, pero vigorosa, de nuestra oposición. Nos anima la esperanza de que los poderes Ejecutivo y Legislativo acojan favorablemente estos planteamientos. Después de todo, el "pesimismo no es un punto de llegada, sino un camino. Es preciso pasar por él, pero justamente para salir de él". M. Iglesias Corral, *El enigma del Derecho, libro-homenaje a Ramón María Roca Sastre*, Madrid, Ed. Gráficas Cóndor, 1976, Vol. I, pág. 71.

Nuestras vivencias y posturas judiciales —muchas disidentes— son testimonio de que no tememos a lo nuevo ni rehusamos ser protagonistas de los cambios sociales. "Siempre será preferible exponerse a los transitorios extravíos propios de quien busca nuevas rutas, que la fácil marcha del que se resigna a seguir por la misma huella que otros dejaron; porque, según una feliz expresión de José Ingenieros, vale más que acertar en un responso de crepúsculo, equivocarse en una visión de aurora." J. Savansky, *Moral y economía notarial: reparto de la escritura oficial*, Buenos Aires, Ed. Depalma, 1957, págs. 24–25. Convenimos en que hay áreas del sistema de administrar la justicia que pueden mejorarse. Las suspensiones de casos y las demoras en adjudicarlos es innegable. "[E]s incomprensible cómo en una época en que el hombre ha llegado a la luna y una noticia da la vuelta al mundo en un tercio de segundo, hay sentencias que se dictan después de años y años de tramitación." J.S. Ruiz Pérez, *Juez y Sociedad*, Bogotá, Ed. Temis, 1987, pág. 88. Esta cita revela lo complejo del problema y que la lógica del Legislador jamás puede desconectarse de los factores humanos y de las circunstancias de los encargados de aplicar la ley y sus destinatarios.

Para apreciar objetivamente en toda su extensión la propuesta *consolidación* es menester conocer el marco conceptual que la inspira. " 'Sin los conceptos no podríamos

captar la realidad. Sin el sistema no podríamos entenderla. Pero conceptos y sistema tiene sólo un valor instrumental y hemos de estar siempre dispuestos a mejorarlos y aun desecharlos cuando no funcionen bien, *porque estamos al servicio de la vida jurídica y no de los conceptos ni del sistema.'* " (Énfasis suplido.) Palomino González citado por J. Vallet de Goytisolo, *La misión del notario*, 16 Rev. Der. Notarial, 393, 408 (1957).

Evaluar tan ambicioso *Plan de Reorganización* no es fácil.

> ...[R]ecordamos el consejo cautelar de un estudioso del tema, a saber, que "debido a que el campo de [la administración judicial] está tan densamente influido por abogados —que por entrenamiento son defensores— tradicionalmente las propuestas de reformas han tenido mucho más de apología que de evaluación". (Traducción nuestra.) R. Wheeler, *Judicial Reform: Basic Issues and References*, 8 Policy Studies J. 134, 135 (1979). *In re Informe Com. Asesora Presidente*, 119 D.P.R. 165, 167 (1987), voto explicativo preliminar.

Adelantamos, que distinto al panacea que se le atribuye a la *consolidación*, "[e]xiste una gran cantidad de literatura, en aumento, que sugiere que hay *serias limitaciones* en los efectos que pueden esperarse de cualquier esfuerzo para mejorar las cortes mediante la *manipulación del diseño estructural del sistema judicial*". (Traducción nuestra y énfasis suplido.) T.A. Henderson y C.M. Kerwin, *The Changing Character of Court Organization*, 7 The Justice System Journal, 449, 450 (1982). También se ha demostrado que "[m]ientras más amplia sea la jurisdicción de la corte (*v.g.* más consolidada), más complejos serán los problemas de coordinar estos requisitos y funciones". (Traducción nuestra.) T.A. Henderson y C.M. Kewin, *Structurizing Justice: The Implication of Court Unification Reforms*, Nat. Institute of Justice, 1984, pág. 34. Y a corto y largo plazo, "[e]s difícil sacar conclusiones finales de los efectos de la consolidación sobre el desempeño de las cortes de instancia". (Traducción nuestra.) Íd., pág. 87.

## II

*Memorial Explicativo (premisas erróneas y sus limitaciones)*

El *Memorial Explicativo* sometido por el Primer Ejecutivo para justificar la *consolidación* es eminentemente descriptivo. La reorganización está fundada en una fe ciega al modelo *experimental* propuesto por un Comité de la *American Bar Association* (en adelante A.B.A.). Sus premisas y conclusiones principales son cuestionables; no están avaladas en un conocimiento real de la dinámica psicodecisoria en los tribunales; menos en datos empíricos. Refleja una confusión a nivel conceptual e ignora la flexibilidad que posee nuestro actual sistema judicial unificado; falla en reconocer sus logros.

Con esta perspectiva en mente, expongamos sucinta pero ordenadamente las premisas que le sirven de andamiaje. Algunas están dispersas y otras entremezcladas o inmersas con expresiones genéricas. De este modo podremos examinar mejor su veracidad, sustancia, incorrección o superficialidad.

De entrada, la *consolidación* se justifica al aludirse nuestra experiencia durante las pasadas cuatro (4) décadas y, además, de lo que el *Memorial Explicativo* caracteriza como "movimiento de avanzada en los Estados Unidos". Se propone un "sistema vertical consiste[nte] de un Tribunal de Primera Instancia consolidado, de jurisdicción original, con competencia unificada para atender todo tipo de casos y causas; de un tribunal intermedio apelativo y del Tribunal Supremo como tribunal de última instancia". Mensaje del Gobernador, pág. 3. En su abono se aduce la efectiva utilización de los jueces y la eficiencia en el funcionamiento. Íd. Otro propósito primordial es conceder el "derecho de apelación a la ciudadanía en casos civiles *y criminales*" (íd.), lo cual es *un error pues en lo penal ese derecho existe desde hace mucho tiempo.* Increíble-

mente, sin fundamento alguno, se concluye que la Ley de la Judicatura de 1952 no logró "simplifica[r] el sistema, el principio de igual y fácil acceso para el pueblo y la justicia igual para todos". Íd., pág. 4.

Pasa entonces el *Memorial Explicativo* a describir el plan de reorganización de los tribunales recomendado por la A.B.A. para exponer que la Oficina del Gobernador adoptó "su espíritu y algunos de [sus] conceptos y principios" (íd., págs. 4–5), tales como la disposición justa, rápida, efectiva y eficiente de los casos, una estructura simple y una división sencilla entre los tribunales. Como piedra angular de ese diseño se dice que la función judicial del Tribunal de Primera Instancia será "realizada por una sola categoría de jueces, auxiliados por oficiales judiciales con adiestramiento y entrenamiento técnico jurídico". Íd., pág. 5.

A tal efecto, se afirma que la A.B.A. ha concluido

> que la *experiencia* de mantener dos o más sistemas separados de tribunales de primera instancia produce *generalmente consecuencias adversas*. Tales como, reduce la flexibilidad en la asignación de jueces y de otro personal del tribunal en respuesta a la sobrecarga de casos, provoca conflictos y complica el procesamiento de casos entre los dos tribunales, *en particular entre las etapas preliminares y el juicio en casos de delito grave*. A su vez, crea problemas en alcanzar una efectiva y sana justicia apelativa, cuando se permite acudir en alzada desde un tribunal de primera instancia de jurisdicción limitada a un tribunal de primera instancia de jurisdicción general. Crea además énfasis innecesario en los rangos jerárquicos entre los jueces y entre el personal del tribunal. [Se habla de que la actual estructura, *sin criterios de especialización* implícitamente hace] una distinción entre la calidad de la justicia a ser administrada. *Ello induce a un sentimiento de aislamiento e inferioridad entre esos jueces, que son los llamados a realizar una de las más difíciles y delicadas tareas de nuestra sociedad. Memorial Explicativo*, pág. 6.

Como propuesta genérica —*veremos que tiene mucho ingrediente demagógico*— se asevera que "[t]odo caso que llegue ante los tribunales, independientemente de la cuantía,

de la materia en los casos civiles o de la gravedad del delito en los casos criminales, *tiene que recibir una debida y adecuada consideración por sus méritos, tomándose como cimiento el principio de justicia igual para todos"*. (Énfasis suplido.) *Memorial Explicativo.*

Se expone que el uso de *oficiales judiciales* ayuda a una adecuada consideración en sus méritos de todo caso pendiente ante el tribunal de primera instancia.

> Ellos podrían intervenir en asuntos interlocutorios y algunas reclamaciones, siempre bajo la dirección y supervisión del Juez; sujeta dicha intervención a que los litigantes tengan la oportunidad de tener una vista directamente ante el juez en los casos apropiados. *Este tipo de arreglo provee los medios que permiten aplicar un nivel uniforme de justicia en todo caso, reconociendo al mismo tiempo que existen diferencias en técnicas judiciales y administrativas que son requeridos para diversos tipos de casos y etapas de la litigación civil y criminal. Memorial Explicativo,* pág. 7.

El *Memorial Explicativo* subraya que "[p]erpetuar una división entre delitos graves y menos graves tiene el efecto de mantener dos niveles para manejar una carga de casos. *Esta división usualmente conduce a la ineficiencia y a discrepancias en cuanto a la mejor manera de disponer de los casos.* La unificación de *competencia* y la consolidación del tribunal de primera instancia se hace necesaria. ... [l]o más importante es que puede reducirse o eliminarse totalmente *la apariencia* de justicia de segunda categoría usualmente asociada con los tribunales inferiores". *Memorial Explicativo,* pág. 8.

En definitiva, en apretada síntesis, en abono de la *consolidación* se proclaman los beneficios siguientes: (1) eliminación de barreras de competencia; (2) accesibilidad; (3) uso más efectivo de los recursos; (4) generar economías; (5) brindar mayor prestigio a los jueces; (6) incrementar su desarrollo profesional y selección, y (7) contrarrestar la apariencia de justicia de segunda categoría.

## III

*Falacias de la consolidación*

De su faz, como primera reacción, quienes no estén familiarizados profundamente con los problemas de los tribunales, la dinámica de sus protagonistas, la psicogénesis forense y demás factores tendrían que convenir con la *consolidación*. Nadie puede oponerse, de manera responsable, a la idea de agrupar los recursos humanos y físicos, como buen principio de administración para mejorar la calidad de la justicia.

La dificultad estriba en que Puerto Rico no encaja en el cuadro negativo expuesto en el *Memorial Explicativo* que presupone el modelo de la A.B.A. Se olvida de que a nivel constitucional poseemos una estructura flexible que supera por mucho el problema de asignación de jueces y demás personal, no genera conflictos procesales ni en los traslados de casos, como tampoco frustra una justicia efectiva en primera instancia ni apelativa. Aun bajo la consolidación, los cargos jerárquicos son un imperativo de nuestro derecho constitucional.

Curiosamente el *Memorial Explicativo* reduce a un plano secundario la incuestionable prerrogativa constitucional del Juez Presidente para mover y asignar los jueces del Tribunal de Primera Instancia —Municipal, de Distrito y Superior— "a tono con las exigencias del trabajo y la necesaria distribución del mismo". *Pueblo v. Tribunal Superior*, 80 D.P.R. 504, 510 (1958). A su amparo, con miras a una eficiente y ordenada administración de justicia, según las necesidades del servicio, hoy día un juez municipal o de distrito puede presidir una sala en el Tribunal Superior, y viceversa.(²)

---

(²) En este sentido, una vez aclaremos la verdadera condición del Juez Magistrado, veremos que es cuestionable que la Asamblea Legislativa pueda imponerle al Juez Presidente restricciones a esa facultad constitucional de asignar jueces. La Asamblea Legislativa debe cobrar conciencia de que este tipo de disposiciones son

Por razón de los niveles en competencia no cabe especular una alegada diferencia en la calidad de la justicia. No existe un estudio serio, responsable y científico que avale la teoría de aislamiento e inferioridad entre los jueces municipales y de distrito del país; menos percepción ciudadana de justicia de segunda categoría. Por experiencia propia de varios años en el Tribunal de Primera Instancia nos consta que es todo lo contrario.

El *Memorial Explicativo* hace referencia a las experiencias de la A.B.A., Connecticut y otros tres (3) estados norteamericanos. Parte de una realidad *ajena* a nuestro sistema que corresponde a tribunales estaduales de jurisdicciones múltiples y dispares; a saber, son jurisdicciones exclusivas sobre tránsito, cuantías pequeñas (*small claims courts*) derecho de familia, testamentaría, comercial, criminal, etc., en las cuales el juez es nombrado para un tribunal en particular, sin poder ser designado y con exclusión de los otros.

*Ese rumbo es equivocado.* Dentro de este contexto, cuando se habla genéricamente de la consolidación de tribunales, el modelo A.B.A. vislumbra tanto la unificación jurisdiccional como la consolidación de las actuales competencias. Estos conceptos, aunque distintos, no son mutuamente excluyentes y la A.B.A. los predica en forma conjunta.

Puerto Rico introdujo en 1950 la *unificación de jurisdicción.* En 1952 la elevó a rango constitucional y la implantó coetáneamente con la Ley de la Judicatura. Por lo tanto, aquí no podemos integrar en una sola *jurisdicción* un sistema judicial ya integrado de forma muy efectiva. La referencia a las reformas de Connecticut y otros tres (3) estados y las recomendaciones del A.B.A. tienden a confundir. Tenemos que ser conscientes y deslindar bien entre *la unificación jurisdiccional y la consolidación de*

---

*directivas,* no mandatorias.

*competencias* para no caer en el error de creer que al implantar la segunda *recibiremos nuevamente* los principales beneficios de la primera. Acentuamos *de nuevo*, pues hace más de cuarenta (40) años que disfrutamos de la unificación jurisdiccional en Primera Instancia con rango constitucional. Resulta un espejismo creer que con la sola *consolidación* de competencias recibiremos más de los beneficios que solamente podramos atribuirle a la unidad jurisdiccional.

La tabla comparativa de beneficios siguiente ilustra lo expuesto:

| Beneficios | Sistema Actual Unificado | | Bajo Consolidación Propuesta | |
|---|---|---|---|---|
| | SI | NO | SI | NO |
| Flexibilidad asignación jueces y demás personal | X | | X | |
| Eliminación barreras de competencia | X | | X | |
| Prestigio a Jueces | X | | X | |
| Promueve Carrera Judicial | X | | | X |
| Instaura y mantiene rangos jerárquicos (Supremo, Apelativo, Superior, y Juez Magistrado) | X | | X | |
| Subsisten categorías para el procesamiento de las etapas preliminares en delitos graves | X | | X | |
| Fácil transferencia y Traslados de casos | X | | X | |
| Cuatro (4) niveles de Adjudicación | X | | X | |
| Especialidad de Jueces | X | | X | |

Desbordaría esta ponencia profundizar sobre las múltiples facetas de nuestro actual Sistema Judicial. Nos limitaremos a lo que parece ser la mayor ofuscación del *Memorial Explicativo*: **jurisdicción v. competencia.** Al mezclar asuntos de competencia en nuestro sistema uniju-

risdiccional, se han trastocado ambos términos. Sospechamos que los propulsores de la *consolidación* en virtud de cambios de competencia, erróneamente esperan recibir, repetimos, los beneficios de la unificación jurisdiccional.

La tarea precisa que se definan los términos. "[E]l término 'jurisdicción' en la ley comprende a aquella facultad potestativa para adjudicar controversias". (Citas omitidas.) *Ramírez v. Registrador*, 116 D.P.R. 541, 548 (1985).

> ...[*C*]*ompetencia* es la "[a]ptitud de una autoridad pública para otorgar actos jurídicos. ... la *competencia de un tribunal o corte* ... significa el *poder reconocido* a una jurisdicción para instruir y juzgar un proceso". (Énfasis suplido.) H. Capitant, *Vocabulario Jurídico*, Buenos Aires, Eds. Depalma, 1961, pág. 132. Dicho de otro modo, es la "[a]tribución *legítima a un juez* u otra autoridad *para el conocimiento o resolución de un asunto*. Couture la define como medida de jurisdicción asignada a un órgano del Poder Judicial, a efectos de la determinación genérica de los asuntos en que es llamado a conocer por razón de la materia, de la cantidad y del lugar". M. Ossorio, *Diccionario de ciencias jurídicas, políticas y sociales*, Buenos Aires, Ed. Heliasta, 1984, pág. 139. Como dijimos recientemente, "[c]ompetencia es 'la manera en que se organiza, se canaliza el ejercicio de la jurisdicción que tiene el tribunal'. M.A. Velázquez Rivera, *Jurisdicción y competencia de los tribunales de Puerto Rico*, 48 (Núm. 1) Rev. Jur. U.P.R. 27, 29 (1979). De otra parte, las *reglas de competencia* son las que establecen la ordenada tramitación de los asuntos judiciales dentro de nuestro sistema de jurisdicción unificada. Regla 3 de Procedimiento Civil, 32 L.P.R.A. Ap. III; Ley de la Judicatura, Ley Núm. 11 de 24 de julio de 1952 del Estado Libre Asociado de Puerto Rico, según enmendada, 4 L.P.R.A. secs. 61 y 62; Art. V, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1". (Énfasis suplido y en el original.) *Lemar S.E. v. Vargas Rosado*, 130 D.P.R. 203, 207 (1992). *Regl. Creac. y Func. Unidad Esp. J. Apel.*, 134 D.P.R. 670, 698 (1993), opinión disidente.

Es obvio, pues, que el modelo de la A.B.A. fundado en la prédica de unificación del Decano Roscoe Pound tiene como trasfondo un conglomerado de múltiples tribunales en jurisdicciones específicas y diferentes. Esa realidad norteamericana explica la razón de su propuesta de un tribunal

general solo y eficiente; pero no contaba con una jurisdicción integrada como la nuestra. *En Puerto Rico no podemos unificar más lo que ya es un sistema judicial unificado.* Distinto al aspecto de jurisdicción, la Asamblea Constituyente, al establecer competencias de dos (2) o tres (3) niveles dentro de nuestro sistema judicial jurisdiccional integrado, dio un gigantesco paso de avance y logró un crecimiento funcional no alcanzable con el modelo riguroso resultante del binomio *jurisdicción-competencia única.*

Somos firmes creyentes de que nuestro sistema de jurisdicción uniforme —conjugado con niveles de competencia bien logrados— es una estructura muy superior al modelo teórico de la A.B.A., que propone una competencia unijurisdiccional consolidada. Nos ha permitido la mejor y más eficiente utilización de los siempre limitados recursos. El *Memorial Explicativo* del Primer Ejecutivo no toma en cuenta que en Puerto Rico los niveles de competencia añaden un refinamiento funcional a un sistema judicial que ya disfruta de los grandes beneficios que provee la jurisdicción única; fundamento de gran avanzada sobre el cual se instala la competencia para lograr aun mayor eficacia.

*La gran falacia de la reorganización propuesta es que ilustra las principales bondades del concepto de jurisdicción única, pero irónicamente se las atribuye a la consolidación de competencias.* El sistema de jurisdicción unificada, incluso en la esfera de funcionamiento y administración, es admirable en todo el sentido de la palabra. "[D]ejó atrás los tribunales de jurisdicciones únicas y exclusivas, y permite, con razonable laxitud, la optimación del recurso humano tanto intratribunal como interregional." Ponencia del Juez Arbona Lago en *Memoria de la décimoséptima sesión plenaria*, Conferencia Judicial de Puerto Rico, 7 de abril de 1994, pág. 44.

Por otro lado, aparte de los problemas constitucionales y de otros tipos que acarrea, no es posible lograr la unificación jurisdiccional, vía eliminación de competencias; reite-

ramos que la consolidación o *eliminación de la competencia* no es aconsejable. Podemos ilustrarnos con un corto símil tomando como punto de partida la observación del procesalista argentino Oderigo, en cuanto a que "[t]odos los médicos están, más o menos, en condiciones de curar a los enfermos, pero para una operación quirúrgica el indicado es el cirujano". M.A. Oderigo, *Lecciones de derecho procesal*, Ed. DePalma, Buenos Aires, 1985, pág. 133.

El HOSPITAL UNICO, al que ha de acudir todo paciente, sea rico o pobre, equivale al Tribunal de Primera Instancia de jurisdicción unificada. Los servicios médicos de dicha facilidad están divididos en diferentes departamentos (sala de emergencias, maternidad, cirugía, intensivo, etc.) que corresponden a las distintas competencias.

La organización funcional adecuada requiere que el paciente, rico o pobre, que ingrese a la facilidad hospitalaria sea referido al departamento específico donde será atendido según su condición de salud. Es lógico pensar que una lesión cutánea será atendida por un residente en sala de emergencias y la fractura por un ortopeda en otra dependencia; ambas satisfactoriamente. *¿Por qué nuestro Sistema Judicial ha de requerir, a título de una igualdad superficial, un ortopeda y una sala de cirugía para curar ambas condiciones?*

Nadie discute que los tribunales deben estar siempre presididos por jueces competentes, independientemente de los protagonistas del drama judicial. Este postulado de calidad que se ha pregonado en el Plan de Reorganización no está reñido con la buena política pública de lograr la óptima relación en costo-beneficio de recursos. Hace años que nuestro sistema, en particular a través del Tribunal de Primera Instancia, en gran medida hizo realidad las prédicas del Decano Pound, al proveer justicia de calidad y efectiva a todos: ricos y pobres. No podemos olvidar que como motor intelectual de la reforma surgida durante este siglo en Estados Unidos visualizaba un sistema judicial sencillo, *es-*

*tructuralmente análogo al nuestro vigente*; a saber, "un tribunal superior de primera instancia de jurisdicción general para todos los casos, civiles y criminales, *sobre* el grado de causas pequeñas, ofensas menores y violaciones a las ordenanzas municipales". (Traducción nuestra.) R. Pound, *Organization of Courts*, Connecticut, Ed. Greenwood Press, 1979, pág. 277.

Esta realidad histórica nos impide aceptar, como buenas razones para el cambio, el alegato de que se pretenda proveer a toda la ciudadanía —ricos y pobres, en lo civil y en lo criminal— una calidad de justicia que alegadamente ahora sólo algunos disfrutan. Según adelantamos, el argumento es sentimental y *demagógico*. En Puerto Rico, el Tribunal General de Justicia y de Primera Instancia, de jurisdicción única, está dividido por competencias para un mejor funcionamiento; no distingue por condición económica u otras características (clasificaciones) que sean constitucionalmente sospechosas.

Basta señalar que si la causa que incoe *ACAUDALADA ENTIDAD INC.*, es una reposesión de venta condicional menor de tres mil dólares ($3,000) será atendida en el nivel de competencia correspondiente a la *cuantía*, esto es, el *Tribunal Municipal*. Del mismo modo, el reclamo en daños y perjuicios presentado por el obrero *JUAN DEL PUEBLO*, que exceda de cincuenta mil dólares ($50,000), será dilucidado en el Tribunal Superior.

*En lo penal, asimismo, todo acusado, poderoso o humilde, pasará por la Sala de Investigaciones.* Además, cabe notar que la determinación de causa probable para el arresto y monto de la fianza son de las más importantes para cualquier ser humano; determinan si la persona va a la cárcel provisionalmente mientras se ventile su juicio. *Hoy día esa decisión la adoptan los jueces municipales y de distrito; mañana será un juez magistrado. ¿Cómo puede argumentarse seriamente que la sustitución de esos jueces, producto de la consolidación, terminará con el alegado sen-*

*timiento y percepción de justicia de segunda categoría?* "Lo que ha impresionado al sentimiento, parece destruirlo por la inteligencia." Iglesias Corral, *op. cit.*, pág. 67.

No es el nombre ni la condición socioeconómica del reclamante o acusado lo que determina el nivel de la competencia dentro de nuestro tribunal de jurisdicción uniforme: la naturaleza de la causa de acción misma es el factor gobernante. *A riesgo de pecar de perogrullo, señalamos otra vez que ello es igual a cuando en la sala de emergencias de un hospital se refiera al interno o residente la atención de una laceración y al ortopeda las fracturas. Ciertamente, el ortopeda puede atender ambas situaciones, pero de la otra forma, ambos heridos quedarán bien servidos y se usarán mejor los recursos disponibles.*

Finalmente, en cuanto a los niveles adjudicativos estructurales, nada habrá adelantado la consolidación.

Una simple representación gráfica así lo refleja:

| Estructura Actual | Propuesta |
|---|---|
| Tribunal Supremo | Tribunal Supremo |
| Tribunal Superior | Tribunal de Apelaciones |
| Tribunal de Distrito | Tribunal Superior |
| Tribunal Municipal | Jueces Magistrados |

## IV

*Interrogantes constitucionales de la consolidación*

¿Oligarquía de jueces, supergobierno judicial o magistrarcado? La incógnita revela la seriedad del asunto y la

potencialidad de problemas constitucionales con la *consolidación.*

*Primero,* aun bajo la teoría central que se predica —máxima flexibilidad estructural y mejor utilización de los recursos humanos— *debe examinarse si sin una enmienda constitucional la Asamblea Legislativa puede autorizar y delegar en la Rama Judicial la "competencia y organización [de los tribunales]".* (Énfasis suplido.) Art. V, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 355.

En esta dimensión, la *consolidación* se perfila como un cambio crucial y dramático susceptible de crear un desbalance obvio en el sistema de pesos y contrapesos en el cual se apuntala nuestro actual sistema constitucional. *En este momento no nos incumbe enjuiciar su constitucionalidad.* Basta recordar que

> ...constitucionalmente el Sistema Judicial puertorriqueño se compone de "un Tribunal Supremo, y *por aquellos otros tribunales que se establezcan por ley".* (Énfasis suplido.) Art. V, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 355. A renglón seguido, la Sec. 2 del mismo Art. V, en lo pertinente, dispone que "[l]a Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá *crear y suprimir* tribunales, con excepción del Tribunal Supremo, y *determinará* su *competencia y organización".* (Énfasis suplido.) Const. E.L.A., *supra,* pág. 355.
>
> Al elevarse el Tribunal Supremo a rango constitucional y distribuirse de este modo los poderes, *se intentó evitar una alta concentración tanto en la Asamblea Legislativa como en la Rama Judicial (Tribunal Supremo), sin menoscabarse la independencia judicial ....*
>
> Elaborando un poco más en estos conceptos, y aclarando para el récord que la Asamblea Legislativa *exclusivamente* retenía las facultades antes señaladas, el delegado Lcdo. Víctor Gutiérrez Franqui explicó:
>
> "Entendemos que esta cosa de la *separación de poderes* —y es bueno que esto *se haga claro*— y de la *independencia judicial no quiere decir que nosotros estemos obligados a hacer una constitución ahora en que la Asamblea Legislativa ya no pueda hacer nada más en Puerto Rico.* Se acabó la legislatura. Se acabó el [poder] ejecutivo. Y lo que queda es el Tribunal Supremo. *Eso no* es independencia judicial ni eso es separación

de poderes. *Separación de poderes es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia. ...*

*Aquí se dispone, claramente y en palabras que no dejan lugar a dudas*, que el Tribunal Supremo de Puerto Rico será el tribunal *de última instancia*. Se *dispone asimismo* que en materia de jurisdicción el Tribunal Supremo y los demás tribunales de Puerto Rico constituirán un sistema integrado y que *solamente podrá intervenir la Asamblea Legislativa en cuestiones de competencia.*"

"Eso quiere decir que está fuera del alcance de la Asamblea Legislativa de Puerto Rico la jurisdicción del Tribunal Supremo. *Lo que está a su alcance es la competencia.* Y quiere decir además, al estipular esta proposición que nosotros hemos traído, que el Tribunal Supremo de Puerto Rico será el tribunal de última instancia, que la Asamblea Legislativa no podrá impedir que los casos judiciales en alguna forma o en otra, lleguen hasta la consideración del Tribunal Supremo. Esto es lo que quiere decir que será el tribunal de última instancia. Y cuando se dice que la Asamblea Legislativa puede reorganizar y abolir tribunales, *se dice en forma no incompatible con las disposiciones de esta constitución; que quiere decir* que lo que haga nunca podrá privar al Tribunal Supremo de su condición de tribunal de última instancia. (Énfasis suplido.) 1 Diario de Sesiones, *supra*, págs. 591–592." *Regl. Creac. y Func. Unidad Esp. J. Apel.*, supra, págs. 696–697.

En esta "formidable fórmula radica en el *entrejuego* de unificación vertical y horizontal que la aglutina *en forma compartida entre*[: 1)] *los dos poderes políticos*, [2) l]a Rama Judicial y 3) en menor escala[,] los actores mismos del foro[. H]a sido ello lo que ha permitido que al presente el sistema Judicial continúe operando[,] aún en la alarmante situación de desventaja en que se encuentra, por falta de recursos humanos y económicos". (Énfasis suplido.) Arbona Lago, *supra*, pág. 44.

Cónsono con el diseño constitucional de no concentrar demasiados poderes en una sola rama, *quaere*, si el establecimiento de un solo tribunal de récord en primera instancia al crearse sólo una categoría de jueces, no es otra cosa que una *delegación impermisible* que hace la Asamblea Legislativa al Juez Presidente y al Tribunal Supremo

de una *facultad y de un atributo inherente, atado de forma inextricable a la organización política y división de poderes constitucionales.*

> Cada acto de delegación es un acto de limitación de las propias competencias que se transmiten a otra persona u órgano. *La delegación, supone, por tanto, una estructuración jerárquica del ordenamiento jurídico, a través de la cual se van determinando las competencias de cada autoridad normativa. La jerarquía involucra una gradual limitación de la competencia ya que a medida que se va delegando el delegante va desapoderándose de parcelas de competencia en favor del órgano delegado.* La norma que autoriza la delegación no puede delegar más o igual poder o competencia del que ella posee ya que si así lo hiciese *el delegante dejaría de ser superior jerárquico respecto del delegado.* ... (Énfasis suplido.) F. López Ruiz, *Autoridad normativa y normas de competencia,* 584 Rev. Gen. Der. 4347–4358 (1993).

¿Está la Asamblea Legislativa delegando *indirectamente* lo que no puede de manera directa, esto es, renunciando —al decir del delegado Gutiérrez Franqui— "a bregar con aquellos aspectos de la organización política que son de su incumbencia". ¿No está de ese modo "desapoderándose" al no cumplir con el *imperativo* inequívoco y expreso; "determinará la competencia y organización de los tribunales", lee la Constitución?

> ...[E]l equilibrio entre los poderes se asemeja a la relación de los vasos comunicantes, donde el nivel del líquido es el mismo, pero, si con un émbolo se oprime el de uno de ellos o el de los dos, ese nivel acrecerá al o los restantes. No puede haber vacío, sin que lo llenen otro u otros, y tampoco puede darse entre los poderes. L.M. Boffi Boggero, *Reflexiones sobre el poder judicial,* B Rev. Jur. Arg. La Ley 848, 851 (1978).

Aparte de lo expuesto, el estudio minucioso de los debates en la Convención Constituyente, ¿no refleja precisamente que al adoptarse el Sistema Judicial unificado, el espíritu e intención fue descartar el enfoque vertical (consolidación) de los tribunales de primera instancia? Obsérvese que el concepto de *categorías de jueces* quedó expresa-

mente incrustado en el Art. V, Sec. 8 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.[3] Con esos antecedentes, la consolidación, ¿puede aprobarse legislativamente o requiere una enmienda constitucional?

## V

*Gran mito de la consolidación: una sola categoría de Juez de Primera Instancia*

La consolidación vertical *jamás* logra establecer una sola categoría de jueces de primera instancia, *pues exige la inmediata creación y eventual expansión de otros cargos de equivalencia funcional a los jueces abolidos. Inherentemente estamos ante una contradicción que desnaturaliza los beneficios de la consolidación y un defecto insuperable, no empece los grandes esfuerzos de sus progenitores.*

A poco examinemos, advertimos que simplemente estamos hablando de un cambio cosmético-nominal, a veces llamados "magistrados", otras "asistente del juez" o "juez auxiliar", y ahora en el proyecto, "juez magistrado". Esa tortuosa trayectoria hacia la pila bautismal legislativa revela el doloroso alumbramiento de la figura un tanto amorfa e híbrida de este nuevo funcionario. "Es elemental el principio que el *nombre o etiqueta no hace la cosa ni le da sabor. Lo importante es el contenido y la sustancia.*" (Énfasis en el original.) *Regl. Creac. y Func. Unidad Esp. J. Apel.*, supra, pág. 706, opinión disidente.

*¿Es realmente un juez? Por su génesis y prerrogativas la contestación es afirmativa.* Bajo nuestra Constitución posee todas las características de *juez*; a saber, nombra-

---

[3] En lo pertinente dispone:

"Los términos de los cargos de los demás jueces se fijarán por ley y no podrán ser de menor duración *que la prescrita para los cargos de jueces de igual o equivalente categoría existentes en la fecha en que comience a regir esta Constitución.*" (Énfasis suplido.) Art. V, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 360.

miento por el Primer Ejecutivo; confirmación por el Senado; pertenece al Sistema de Retiro *constitucional, exclusivo para miembros de la Judicatura*; le aplican los Cánones del Código de Ética Judicial; está sujeto a las disposiciones de jueces sobre separación y disciplina; goza de facultades investigativas y adjudicativas iniciales limitadas, y con la anuencia de partes puede adjudicar cualquier caso en sus méritos. Elaboremos.

*Juez* es quien "posee autoridad para instruir, tramitar, juzgar, sentenciar y ejecutar el fallo en un pleito o causa. Persona u organismo nombrado para resolver una duda, una competencia o un conflicto. ... Como señala Escriche, la palabra *juez* es genérica y comprensiva de todos los que administran justicia; pero los que desempeñan los cargos con autoridad superior, y más especialmente los que ejercen en los tribunales de alzada, se distinguen con los nombres de *magistrados, ministros*, y en algunas partes de América se les designa con el de *camaristas*". (Énfasis en el original.) G. Cabanellas, *Diccionario Enciclopédico de Derecho Usual*, 20ma ed., Buenos Aires, Ed. Heliasta, 1981, T. V, págs. 17 y 259–260.

Por su parte, M. Ossorio y Florit, *Diccionario de ciencias jurídicas, políticas y sociales*, Buenos Aires, Ed. Heliasta, 1986, pág. 401, nos dice que:

> En sentido amplio llámase así a todo miembro integrante del Poder Judicial, encargado de juzgar los asuntos sometidos a su jurisdicción. Tales *magistrados* están obligados al cumplimiento de su función de acuerdo con la Constitución y las leyes, con las responsabilidades que las mismas determinan.
> En sentido restringido, suele denominarse *juez* a quien actúa unipersonalmente, a diferencia de los que actúan colegiadamente y que suelen llamarse ministros, vocales, camaristas o magistrados. (Énfasis suplido.)

Al magistrado lo concibe como "empleo de juez o de miembro de los tribunales de justicia, especialmente si for-

man parte de un tribunal colegiado". Ossorio Florit, *op. cit.*, pág. 443.[4]

> Es evidente ninguna de estas definiciones parece ajustarse con exactitud al Juez Magistrado; pues son muy amplias o muy estrechas.[5]

Inicialmente se nos hizo muy difícil entender el significado del Juez Magistrado en el *Memorial Explicativo*. Después nos percatamos de que aparentemente hay un problema de traducción del inglés *magistrate judge* al español. "Magistrado es un título respetable en el sistema legal inglés, pero en los Estados Unidos meramente es un término genérico para un oficial judicial." (Traducción nuestra.) C.E. Smith, *From U.S. Magistrates to U.S. Magistrates Judges: Development Affecting the Federal District Court's Lower Tier of Judicial Officers*, 75 (Núm. 4) Judicature 211 (1992).

Con vista a esas características y funciones, es innegable que el Juez Magistrado *realmente es otro juez más*. Por su equivalencia funcional subordinada al Juez Superior, guarda mucha semejanza al actual Juez Municipal, y en algunos extremos al Juez de Distrito.

La siguiente tabla de equivalencia funcional lo ilustra gráficamente:

---

[4] "Desde otro punto de vista, se habla del juez como magistrado y como funcionario. A pesar de la nomenclatura legal, el juez es también un funcionario, en tanto desempeña, en virtud de una designación especial por quien constitucionalmente está legitimado para ello, una función del Estado consistente en administrar justicia." J.A. Garrone, *Diccionario Jurídico Abeledo-Perrot*, Buenos Aires, Ed. Abeledo-Perrot, 1986, T. II, pág. 363. Véase, además, R. Guillien y J. Vincent, *Diccionario Jurídico*, Bogotá, Ed. Temis, 1986, págs. 222–225 y 241.

[5] Todo lo cual nos hace pensar que ocasionalmente "[e]l jurista, como el filósofo, combinan las palabras, las ensamblan y, a veces, sin proponérselo, inventan un linaje de monstruos; pese a su esfuerzo para revestir la palabra con un significado suficiente, con una túnica de luz. El lenguaje se hace sibilino. La obra, parece de alquimistas. Al final, sólo podemos comprender, aquello que tiene sus larvas en la propia conciencia". Iglesias Corral, *op. cit.*, pág. 67.

| Juez Municipal Actual | Juez Magistrado Propuesto |
|---|---|
| 1. Nombrados por cinco (5) años por Gobernador, con consejo y consentimiento del Senado. | Nombrados por ocho (8) años por Gobernador, con consejo y consentimiento del Senado. |
| 2. Pertenecen al Sistema de Retiro de la Judicatura. | Pertenecen al Sistema de Retiro de la Judicatura. |
| 3. Les aplican los Cánones de Etica Judicial. | Les aplican los Cánones de Etica Judicial. |
| 4. Sujetos a las normas relativas de disciplina y separación. | Sujetos a las normas relativas de disciplina y separación. |
| 5. Abogado, edad mínima 21 años. (Implícita buena reputación moral, intelectual y profesional). | Abogado, edad mínima 25 años; experiencia profesional de cinco (5) años, buena reputación moral, intelectual y profesional. |
| 6. Autoridad judicial para expedir o denegar órdenes de arresto, de registro y allanamiento, adultos y menores. | Autoridad judicial para expedir o denegar órdenes de arresto, de registro y allanamiento, adultos y menores. |
| 7. Fijar y aprobar fianzas. | Fijar y aprobar fianzas. |
| 8. Dictar órdenes de excarcelación a sumariado o a quien le han cancelado fianza. | Dictar órdenes de excarcelación a sumariado o a quien le han cancelado fianza. |
| 9. Entender asuntos interlocutorios. | Entender asuntos interlocutorios. |
| 10. Con la anuencia expresa o implícita de las partes puede dictar válidamente sentencia en cualquier asunto que no tenía competencia. Ramírez v. Registrador, 116 D.P.R. 541 (1985). | "Ejerce[rá] autoridad judicial ... en aquellos otros asuntos en que todas las partes envueltas renuncien a su derecho a que su asunto sea adjudicado y dispuesto por el Juez Superior, y éste con su anuencia y por resolución decida asignárselo." Memorial Explicativo, pág. 32. |

Según nuestra Constitución, sólo los jueces podemos tomar decisiones sobre la libertad de seres humanos al determinar causa probable y ordenar su arresto. Incluso, el Juez de Paz ha sido definido como *magistrado* con esa autoridad; "[s]u función pública contiene la dignidad y majestad que en nuestro régimen constitucional y en el concepto público de nuestra gente se asocian con la administración de justicia". *In re Feliciano*, 106 D.P.R. 806, 808 (1977).

Como gran beneficio, el *Memorial Explicativo* visualiza que los Jueces Magistrados, con la autorización de las par-

tes y de los abogados, más allá de los asuntos interlocutorios puedan adjudicar cualquier caso. *Nada adelantamos*; ese propósito ya fue logrado. Hace tiempo nuestro sistema constitucional judicial unificado superó las "barreras [de competencia] en aras de lograr cumplida y cabal justicia". *Ramírez v. Registrador*, supra, pág. 546.

En esa decisión aclaramos:

> A tono con este diseño constitucional, *es incuestionable la validez* de una sentencia dictada por un tribunal sin competencia con la anuencia expresa o implícita de las partes. Esa autoridad tiene sólido apoyo. *"[E]l poder judicial para adjudicar en toda contienda* (excepto en aquellos casos especiales que deben ser llevados originalmente al Tribunal Supremo) *está conferido al Tribunal Superior y de Distrito conjuntamente, para lo cual fueron unificados como el Tribunal de Primera Instancia; y ningún caso podrá ser desestimado por ausencia de jurisdicción o falta de competencia."* (Traducción nuestra.) C.E. Clark y W.D. Rogers, *The New Judiciary Act of Puerto Rico: A Definitive Court Reorganization*, 61 Yale L.J. 1147, 1156 (1952). Como corolario, esta facultad, plasmada en la Ley de la Judicatura, *por ser esencial a la estructura básica del Poder Judicial según nuestra Constitución, no puede ser mermada por el poder legislativo.* Véase M.A. Velázquez Rivera, *Jurisdicción y competencia de los tribunales de Puerto Rico*, 48 Rev. Jur. U.P.R. 27 (1979). (Énfasis suplido.) *Ramírez v. Registrador*, supra, págs. 547–548.

Por otro lado, todos los indicadores apuntan que la intervención del Juez Magistrado podría resultar contraproducente, al punto de que más bien atrasaría la pronta adjudicación de los casos.

> Dentro del ámbito de nuestro Tribunal de Primera Instancia, es axiomático, es indispensable, que el juez se relacione de inmediato con la causa asignada y a la brevedad posible. Un magistrado que rinda funciones no adjudicativas y de carácter interlocutorio no es de mucha ayuda y posiblemente estorbará en ese proceso, enfilado a que a la más pronta oportunidad el juez —con poderes plenos adjudicativos— tome cartas en la causa asignada para evitar que el pleito se torne más difícil. Este es el enfoque fáctico y filosófico de las reglas procesales modernas, las nuestras, como las federales. Tal atención pronta por parte del juez a cargo del caso, ha resultado en la fórmula que mejor utiliza el recurso judicial y de mayor obtención de resultados

satisfactorios, tanto en calidad como en cantidad de trabajo. Ello fue ampliamente reconocido así en el Informe del Comité sobre Normas y Objetivos para Acelerar el Trámite de Casos en el Tribunal de Primera Instancia, de diciembre de 1984. Hace más de 10 años que tal recurso se utiliza con gran éxito por muchos jueces del Tribunal de Primera Instancia. Ello fue también reconocido en *Polanco* vs. *Tribunal Superior*, 118 DPR 350, a la página 357, donde se catalogó *no conveniente* al proceso judicial "quitar el control del caso al juez que dirigió la fase procesal en sus etapas iniciales, poniéndolo en manos de otro magistrado que tendrá que comenzar por familiarizarse con el mismo. Cualquier otra interpretación sería contraria a la economía procesal". Arbona, Ponencia de 7 de abril de 1994, págs. 21–22.

En la misma sintonía:

La recomendación del Comité es que este magistrado trabaje en todas las etapas preliminares de los casos civiles y criminales, asumimos que dejando entonces para los jueces en propiedad la celebración de juicios en los méritos. No creemos que exista un juez que no se haya considerado, a manera de queja, la forma en que otro compañero o compañera juez atendió un "status conference" o un "pretrial", o algo tan sencillo como el despacho diario, mientras estuvo de vacaciones o de enfermedad. Cuántos casos a punto de transacción terminaron viéndose en juicio plenario por una desacertada actuación, o por otra que aunque válida en derecho, trastocaba toda la planificación del caso que el juez a cargo había ido fomentando y formulando.

¿Quién será el responsable de que un juicio en su fondo se suspenda porque en opinión del juez a quien le correspondía ver el caso, el pleito no estaba maduro, o el descubrimiento incompleto? Si los mecanismos de evaluación de jueces que están en proceso, contemplan asignar fechas de maduración ideal de casos, ¿cómo se evaluarán los jueces y los magistrados?

Todos sabemos que ningún abogado va a negociar un preacuerdo con el fiscal, o transigir una reclamación en daños, si no tantea, no "le toma la temperatura" al juez que habrá de imponer la pena o dictar la sentencia en daños. Esa realidad es inescapable y patente, y la vemos hoy día, como señalamos, en las ocasiones en que otro juez nos atiende la sala. No es infrecuente la suspensión de una CAJ o de una vista en su fondo, para que el "juez de la sala" sea el que atienda el incidente porque "él conoce mejor el caso". Esta situación, que a diario vivimos, cobraría mayor fuerza, en especial si consideramos

que el magistrado no será visto como un juez de igual categoría que el que habrá de ver el juicio en los méritos, y ya anticipamos la renuencia de los abogados a que una persona a quienes ellos puedan no reconocerle los atributos competencia y cualificaciones profesionales, atienda interlocutoriamente un asunto, que para la clase togada siempre es de superior envergadura, aunque sea un cobro de dinero, o una ejecución de hipoteca.

Por otro lado, entendemos que el costo económico de los magistrados sería mucho mayor que nombrar jueces adicionales, o recursos adicionales a los jueces existentes, ya que tendrían que nombrarse suficientes magistrados para que atiendan todos los casos que se presenten, hasta la etapa de juicio, en que el juez en propiedad asuma las riendas. *Más jueces en propiedad, con más oficiales jurídicos y mejor equipo de trabajo, resultaría más eficiente.* (Énfasis suplido.) M.J. Vera Vera, Juez, *Ponencia Conferencia Judicial,* 7 de abril de 1994, págs. 6–7.

En el *Memorial Explicativo,* la figura un tanto escurridiza del Juez Magistrado se justifica como "auxiliar de apoyo en el trámite y perfeccionamiento *'management'* del asunto o controversia pendiente de adjudicar ante el Tribunal". *Memorial Explicativo,* págs. 24–25. Aunque se dice que su autoridad judicial es sólo para "asuntos interlocutorios, que no comprendan de forma alguna la disposición parcial o final del asunto en controversia", se les concede facultades importantes y sensitivas para la ciudadanía, en el área de lo criminal para la determinación de causa probable para el arresto de adultos y menores, y el dictar órdenes de registro y allanamiento.

Ello revela otra vez la gran confusión conceptual y el desconocimiento jurídico de sus proponentes, quienes parten de la premisa de que el Juez Magistrado determinará inexorablemente la causa probable u ordenará siempre el registro o allanamiento. ¿Qué sucederá cuando no determine la causa o niegue el registro? ¿No constituye ello una adjudicación judicial? ¿Cómo justificar que se le prive de intervenir en conferencias con antelación a juicio en lo civil, pero no lo criminal?

Adviértase que en esas situaciones, una vez culminada la abolición y desaparecidos los jueces del Tribunal Municipal y de Distrito, la utilidad práctica del magistrado juez, en términos del mejor uso del recurso humano, queda severamente en entredicho. Nos explicamos.

Por unos imperativos constitucionales, el procedimiento criminal vigente se desarrolla en etapas, a saber: vistas para la determinación de causa para el arresto, vista preliminar en casos graves y juicio en su fondo. Revisar los dictámenes negativos en las etapas de arresto y vista preliminar exige que se someta el "asunto a un magistrado de *categoría superior* del Tribunal de Primera Instancia [lo que] significa al juez del foro que *inmediatamente sigue en jerarquía* a aquél donde se originó inicialmente la determinación, y que la oportunidad existe una sola vez". (Énfasis suplido y en el original.) *Pueblo v. Cabrera González*, 130 D.P.R. 998, 1002 (1992).

Si bajo la *consolidación* no hay jueces municipales ni de distrito —sólo jueces magistrados adscritos como ayudantes de los jueces superiores— una determinación negativa para el arresto inicial, ¿quién la revisará? Por lógica, el Juez Superior. Y, ¿una subsiguiente determinación negativa de un juez magistrado en una vista preliminar? Nuevamente, el Juez Superior. ¿Y no son los jueces superiores quienes serán responsables de supervisar en primera instancia a esos "juzgadores", a la par que juzgar los méritos de tales acusaciones?

¿Hay alguna justificación para semejante *anomalía adjudicativa?* ¿No estamos ante una mala utilización del personal judicial? En este extremo la consolidación fracasa en lograr sus objetivos. Adviértase que se trata de dictámenes de carácter interlocutorio que obligan a los jueces superiores a intervenir precisamente en unos asuntos que posteriormente deberán ser atendidos por otro de igual categoría. *Aquí, el Juez Magistrado, apéndice del Juez Su-*

*perior, se proyecta como un injerto tardío y a destiempo que no encaja con el diseño procesal penal puertorriqueño.*

Como quiera, nada impide que la función auxiliadora que se describe como tabla salvadora y esgrime en favor de crear los jueces magistrados sea descargada con igual eficiencia por oficiales jurídicos y otro personal paralegal. Sabemos que la creación del Juez Magistrado tiene el efecto de desplazar a los jueces municipales y de distrito y viabilizar el nombramiento de veinticinco (25) en o antes de julio de 1995 a un costo de un millón quinientos mil dólares ($1,500,000). ¿Se imaginan cómo mejoraríamos todos los tribunales si esos fondos se destinaran para crear sesenta (60) plazas de oficiales jurídicos en funciones auxiliares subordinadas? O, en la alternativa: ¿Veinte (20) plazas de jueces superiores y diez (10) de distrito?

## VI

*La consolidación es sólo un experimento en Estados Unidos*

Aparte de la jurisdicción federal, en época reciente sólo Minnesota, Connecticut, Dakota del Norte y Washington, D.C. la han adoptado.

Con renuencia y timidez así lo reconoce el propio *Memorial Explicativo.* Sin embargo, nos expone un enfoque de avanzada y dibuja un panorama rosado muy distinto a la realidad. Para justificar la *consolidación* se hace constante referencia al modelo propuesto por la A.B.A. Hay un silencio total y nada se dice acerca de las críticas y los problemas serios que ha generado. Expongámoslo.

El profesor C. Baar, uno de los estudiosos más versados y consultor principal en la materia, recientemente apuntó que "[l]a rigidez de los modelos del A.B.A. no se justifican ni por sus propósitos ni la diversidad de prácticas efectivas en los estados". (Traducción nuestra.) C. Baar, *Trial Unification in Practice,* 76 (Núm. 4) Judicature 179 (1993).

Y   más adelante expone:

El modelo prescrito por la A.B.A. es *innecesario e insuficiente* para lograr los principios fundamentales que deben guiar un diseño de cortes de instancia. Puede ayudar a lograr beneficios secundarios de importancia, *pero aun en éstos, existen muchas otras alternativas efectivas*. Los jueces en un sistema de niveles múltiples fragmentado pueden cambiar de una corte a otra cuando surjan las necesidades locales y las presiones de casos. Las cortes de dos (2) niveles con autoridades administrativas comunes (el mismo juez presidiendo y administrador de la corte) también se han desarrollado como alternativas a un sistema fundado en la igualdad de todos los jueces. (Traducción nuestra y énfasis suplido.) Baar, *supra*, pág. 184.

Esta última descripción, ¿no guarda semejanza con nuestro diseño judicial? Del estado de Minnesota —único que ha llevado la consolidación a su fase más avanzada— expone el Profesor Baar:

...los tribunales de instancia de Minnesota fueron unificados con el propósito de lograr una sola clase de juez de sala ("trial judge"). *A todos los jueces se le paga el mismo salario*, y se les rota a través de diversos grados de casos. *Aún así, la unificación de los estrados es incompleta*. Los dos distritos más populosos son Minneapolis y St. Paul, han mantenido árbitros y otros funcionarios judiciales, añadiendo así más de 30% al complemento judicial, para atender el grueso de dichas funciones y el 30% de reclamaciones de menor cuantía. Minnesota continúa para lograr el nivel de un solo sistema y ha ido más allá que cualquier otro estado, pero no ha alcanzado esa etapa. (Traducción nuestra.) C. Baar, *One–Trial Court: Possibilities & Limitation*, 3 Canadian Report for the Judicial Council 49.

Por otro lado, pretender copiar y asimilar la *organización y estructura* federal es un error. Se trata de una jurisdicción, aunque geográficamente más amplia, muy limitada, con los mejores salarios y un presupuesto funcional muy generoso.

Todos los demás sistemas estad[ounidenses] en sus variadas formas poseen y reconocen el enfoque tradicional de los tribunales de jurisdicción limitada, de jurisdicción general y de última instancia. Ni siquiera New Jersey, jurisdicción precursora del sistema judicial unificado, ha borrado las *distinciones jerárquicas de tribunales y jueces*. Want's, *Federal–State Court Di-*

*rectory*, Washington, D.C., Want Pub. Co., 1987. Para todos los efectos prácticos, la concepción del esquema adjudicativo de instancia compuesto sólo de tribunales de jurisdicción general original pertenece al mundo teórico. (Escolio omitido y énfasis suplido.) *In re Informe Com. Asesora Presidente*, supra, págs. 182–183, voto explicativo preliminar.

VII

*La consolidación agrava los problemas administrativos y adjudicativos*

Crear una sola categoría de jueces conllevaría abrir una caja de pandora de la cual saldrán graves problemas no susceptibles de ser superados mediante la simple y utópica solución de un calendario maestro y de una distribución rotativa administrativa de labores judiciales. Se ha señalado que

> [p]ara algunos jueces, el quemarse (*burnout*) puede ser consecuencia de demasiadas rotaciones, como parte del sistema de circuito que sigue vigente en numerosas cortes superiores. El costo y los beneficios de los sistemas de circuitos requieren un serio examen, para determinar si un sistema concebido para mejorar la justicia, a través de un territorio, está logrando en la práctica ese propósito o si existen otros medios para alcanzar ese fin, menos costosos en términos humanos. (Traducción nuestra.) C. Baar, *Judicial Appointments and the Quality of Adjudication: the American Experiense in a Canadian Perspective*, 20 La Revue Juridique Thémis 2, 22 (1986).

El señalamiento no es especulativo; así lo demuestra la experiencia. Del Juez Arbona citamos in extenso:

> ¿Cómo se conjugarían esas salas del Tribunal General de Justicia de único nivel?, esos jueces generales que en teoría serán responsables, en forma rotativa, de causas civiles generales, en salones mixtos o especializados; desde estados provisionales de derecho hasta casos graves de asesinatos múltiples (las llamadas masacres de moda), incluyendo también determinaciones de causa, vista preliminar, grave, menos grave, tránsito, etc., etc., etc.
> Ello obligaría, en sedes judiciales como las de San Juan, a prohibir que los jueces instalen cuadros o diplomas en sus ofi-

cinas, pues al poco tiempo habría que mudarles de piso para tomar turnos en sala de investigaciones, salas de vista preliminar, salas de tránsito, etc. y salas equipadas para atender juicios por jurado. En regiones extendidas, ello también implicaría rotaciones continuas dentro de las regiones, que incluyen pueblos distantes, y dificultad de contar con una oficina y secretaria asignada. ¿Cómo evitar que en tal rotación el juez de lo criminal no se tope en juicio, con causas que atendió en vista preliminar o que antes investigó?

Implica que el juez del Tribunal de Primera Instancia "Mononivel" sólo podrá presidir anacrónicos salones mixtos de civil, criminal, familia, tránsito, etc. permanentemente, o especializados, en cuyo último caso luego que cumpla un destaque como juez instructor, tendrá dificultad en rendir la próxima encomienda en el área de lo criminal, en la mayoría de las sedes dentro de la misma región. Ello es así por la consabida razón que el debido proceso de ley impide que el mismo juez que atiende una etapa preliminar del proceso criminal está impedido de atender alguna siguiente en dicha causa. Para evitar la posibilidad de tal conflicto, dentro de un sistema tan sobrecargado como el nuestro, tal juez tendrá que cumplir la próxima encomienda en lo civil o ser trasladado de región judicial antes de poder volver a rendir servicio en lo criminal, para dar tiempo a que las causas que investigó transiten totalmente por el sistema. Igual sucederá cuando cumpla lo propio en vista preliminar, etc.

Este flujo y reflujo obligado en el ámbito de lo criminal, que comprenderá el 60% del taller combinado de tal Tribunal consolidado, causará mayor trastorno en los salones de lo civil, que por ser menos recibirán un impacto mayor en tal sentido.

Lo que resulta necesario segmentar en lo criminal, repercute negativamente en lo civil, dada la naturaleza distinta de su trámite. Tal inestabilidad causará estragos mayores e insalvables en la buena marcha de los salones de lo civil; entorpecerá el ideal procesal afincado en la máxima de que el mismo juez que inició el proceso lo termine. Con ello también se dificulta el sistema de asignación de causas, que ahora delega en un sólo juez el calendario total del salón; evitando responsabilidades compartidas, tan poco aconsejables en nuestro medio e idiosincrasia.

Si ahora resulta traumático para el Juez Presidente el espinoso asunto de los traslados regionales, ¿cómo será cuando a ello se añada la continua rotación de salas?; porque o vemos cómo podrá integrarse de otra forma un calendario totalmente mixto, que comprenda de todo el menú judicial, o un calendario maestro, en torno al cual rote la plantilla judicial.

Por definición, un Tribunal General de Primera Instancia, que tenga como meta un calendario central ("Master Calendar") o rotar toda la plantilla judicial entre todo el taller judicial, *como ocurrirá con la consolidación,* no puede atender intereses particulares de jueces y es totalmente contrario a la especialización, que muy bien nos ha servido para ayudar a mantener a flote el abusado sistema. Por ello la consolidación y el calendario maestro están reñidos con la especialización que es importante en muchas sedes judiciales de Puerto Rico. Arbona, *op. cit.,* págs. 14–16.

## VIII

### *Consolidación no mejora proceso adjudicativo*

Los jueces existimos para servirle a la ciudadanía, adjudicar sus casos e impartir una justicia rápida. Toda la estructura organizacional y el aparato burocrático, las reglas procesales, el personal, las facilidades, los recursos y demás factores deben viabilizar ese fin. Aceptamos que existen fallas.

No hay la más mínima experiencia o evidencia empírica que sostenga el propósito primordial que anima la consolidación, a saber, mejorar la eficiente administración de la justicia. "[E]s claro que, aun cuando los sistemas judiciales y cortes de instancias pueden organizarse de amplias y concisas formas, *el proceso adjudicativo opera más o menos igual independientemente de su ubicación o construcción."* (Traducción nuestra.) C.M. Kerwin, T. Henderson y C. Baar, *Adjudicatory Processes and the Organization of Trial Courts,* 70 (Núm. 2) Judicature 103 (1986).

Los estudiosos en la materia coinciden en que *es el proceso adjudicativo* y no el modelo organizacional lo que verdaderamente controla los efectos de la unificación de las cortes. "El carácter del proceso adjudicativo mitiga el impacto de los cambios formales en la estructura y en las líneas de jurisdicción legal —aun ante la consolidación total de los tribunales de instancia o el aumento centralizado de asignación de los casos y los servicios administrativos

de soporte." (Traducción nuestra.) T.A. Henderson, *et al.,* *The Significance of Judicial Practice: The Effect of Unification on Trial Court Operations,* Washington, D.C., U.S. Department of Justice, 1984, págs. 66–67.

## IX

*La consolidación es contraria al principio de jerarquía de jueces*

El principio de la jerarquía de los jueces, *columna vertebral de nuestro actual diseño constitucional judicial,* queda comprometido con la consolidación. Aun los más fervientes propulsores de la *consolidación* admiten que no todo asunto o controversia judicial son igualmente clasificables; por el contrario, su adjudicación precisa de un sistema de competencia y jerarquía judicial.

La categoría de jueces es esencial. En lo penal, es imposible legislar y medir a través de una sola norma jurídica toda acción delictiva. Las clasificaciones de delitos —llámense graves, menos graves, o de otro modo— subsistirán. Alguien tendrá que adjudicar los casos de infracciones menores de tránsito y ordenanzas municipales. Otros jueces deberán ventilar los casos graves ante jurados. En lo civil, no podemos atribuirle las mismas consecuencias legales a las distintas omisiones o acciones de la conducta. *Por ende, siempre será necesario que algún juez realice las funciones que al presente recaen sobre los Jueces Municipales y los Jueces de Distrito.* Es inevitable la asignación más o menos permanente de jueces en las salas de investigaciones. También se requiere que muchos residan en ciertos municipios de la isla y atiendan los asuntos que surjan en éstos y en las demarcaciones territoriales colindantes. (Énfasis suplido.) *In re Informe Com. Asesora Presidente,* supra, pág. 189.

El mismo modelo de la A.B.A. reconoce que un sistema unificado "debe tener un marco de funcionarios judiciales para asistir a los jueces ... presidiendo causas cortas y mociones, todas las cuales están sujetas a revisión judicial". (Traducción nuestra.) *Standard Relations to Court Organi-*

*zation*, Section 1.12 (1990). Según Baar, "esta práctica sugiere que, lo más seguro persisten adjudicadores subordinados aún en un sistema unificado dedicado fuertemente al principio de igualdad judicial". (Traducción nuestra.) Baar, *Trial Unification in Practice*, supra, pág. 182. Las categorías de jueces "son un elemento ineludible de toda organización de diseño piramidal realmente pragmática y balanceada". Íd.

## X

### *La consolidación debilita la tradicional carrera judicial*

Al respecto, un reputado jurista, Raúl Serrano Geyls, nos ha dicho que

> ... el sistema actual ha creado valiosas tradiciones y prácticas que, salvo argumentos concluyentes en su contra que no conozco, le sirven de sólido fundamento. Permite, además, que en Puerto Rico pueda existir una carrera judicial de dos pasos que se inicia en el Tribunal de Distrito y termina en el Tribunal Superior, y que culmina, en muy contados casos, en el Tribunal Supremo. Esta clasificación jerárquica, con sus diferencias de sueldos, importancia en los asuntos a juzgar, prestigio en la profesión y la comunidad y oportunidad, aunque pequeña, de llegar al Tribunal Supremo, tiene necesariamente que ser un gran atractivo para muchos candidatos a jueces. *In re Informe Com. Asesora Presidente*, supra, pág. 184, voto explicativo preliminar.

## XI

### *Costos exorbitantes de la consolidación*

*La consolidación requiere un aumento sustancial y dramático —innovador y recurrente— del presupuesto funcional de las ramas judicial y ejecutiva.*

Crear una sola categoría de jueces implica varias alternativas. El proyecto sometido sube los sueldos al Juez Presidente, Jueces Asociados del Tribunal Supremo, Jue-

ces de Apelaciones y Jueces Superiores. Al nuevo cargo de magistrado-juez le asigna cincuenta mil dólares ($50,000). Bajo esas escalas salariales actuales, el impacto inmediato es sustancial y conlleva los gastos incidentales tales como aportaciones y beneficios marginales al Fondo del Seguro del Estado y al Sistema del Retiro, a razón de un 22.10% anual por cada juez.

Desconocemos cuántos cientos de miles de dólares más conllevará para los fiscales en el Departamento de Justicia —seguro social entonces incluido— al igual que todo el personal auxiliar de los jueces y fiscales que irían a desempeñar funciones y labores análogas a la de los jueces del Tribunal Superior. De hecho, la Ley Núm. 92 de 5 de diciembre de 1991 (4 L.P.R.A. secs. 35, 61, 121(a), 181(a), 191, 301, 307n y 32 L.P.R.A. sec. 2872) —que autoriza al Juez Presidente a conceder una compensación especial separada del sueldo a los jueces que ejerzan, durante más de treinta (30) días, funciones correspondientes a una categoría superior— es un atisbo de esta realidad.

Desde 1987 destacamos que ello "sería un área a evaluarse separadamente y de manera macroscópica, para incluir los efectos indirectos originados en reclamos económicos de igual trato, que razonablemente cabe esperar que surjan entre los Fiscales del Tribunal de Distrito y los abogados de las entidades dedicadas a la defensa gratuita a los pobres. *In re Informe Com. Asesora Presidente*, supra, pág. 186, voto explicativo preliminar.

## XII

*La consolidación crea jueces de categorías inferioridad económica*

Inexplicablemente, la consolidación mantiene a los jueces de distrito y municipales con los mismos sueldos, situándolos de inmediato —y potencialmente por los próxi-

mos cinco (5) y ocho (8) años, respectivamente— *en una categoría de inferioridad económica.*

Su abolición paulatina, ¿significa que no se les aumentará más el sueldo? De serlo, bajo el espíritu de la Constitución, ¿es válido y puede prevalecer un diseño remuneratorio en el cual un juez municipal devengue un salario menor al de un alegado oficial judicial subordinado, el Juez Magistrado? Mantener esa escala salarial, ¿no es un modo sofisticado de reducirle sus sueldos?

## XIII

*La consolidación compromete futuras legislaturas a unos efectos permanentes en la duración de los cargos de los jueces*

Ambas consecuencias —salariales y en los términos— una vez se conviertan en ley, *son pasos irreversibles no susceptibles de ser superados por un estatuto.* Recuérdese que nuestra Constitución, en su Art. I, Sec. 13, y Art. VI, Sec. 11, L.P.R.A., Tomo 1, *prohíbe* tajantemente toda reducción de sueldos y en los términos de nombramientos de los jueces.

## XIV

*Otros señalamientos de importancia*

A. *Función de los jueces en las comisiones electorales*

Ha sido motivo de preocupación constante la utilización de los miembros de la Judicatura del país en funciones no judiciales relacionadas con los organismos electorales. *Se trata de una tarea con profundas raíces históricas —a nuestro juicio necesarias— y uno de los más elocuentes tributos a su integridad y honestidad.*

No importa los sacrificios que ello conlleve, creemos

...que la naturaleza *casi sagrada* del procedimiento electoral exige que sus organismos sean presididos por personas libres de toda sospecha, duda o presión, y que el sistema represente la mayor pureza procesal. En este sentido, las enmiendas en los términos de duración en los cargos de jueces contribuyen y afianzan ese legítimo reclamo.

Anticipamos que toda objeción, fundada sobre la actual práctica de presidir las comisiones locales electorales, puede superarse si a esa tarea —que hoy *no es judicial*— mediante legislación expresa, se le imparten todas las características de una función de naturaleza judicial. Bajo este enfoque, las intervenciones de los jueces en esas comisiones dejarían de ser meramente ejecutivas y administrativas. Toda determinación tendría el imprimátur de una adjudicación judicial. Las variantes procesales que necesitaren ajustarse a ese diseño podrían implantarse mediante enmiendas legislativas a la Ley Electoral de Puerto Rico. *In re Conferencia Judicial*, 122 D.P.R. 420, 461 (1988), voto explicativo.

Con ese tipo de enfoque, solucionar este problema no requiere que la consolidación sustituya a los jueces municipales y de distrito por el juez magistrado.

### B. *Objeciones a restaurar el derecho de apelación civil*

El 29 de abril de 1992 sometimos a las respetables Cámaras Legislativas la ponencia en torno a los méritos y deméritos del propuesto *Tribunal de Apelaciones*. Reiteramos ahora esa posición, con especial énfasis en el criterio de que

... [l]a reinstalación de la apelación civil como derecho constituye un *retroceso*. Demostradamente, equiparar a todo litigante en una etapa postsentencia —independientemente de los méritos de su causa— ha sido el factor que ha llevado a que los tribunales intermedios apelativos y de última instancia estén sobrecargados de apelaciones frívolas. La apelación compulsoria implica que los foros apelativos no pueden dedicarle el tiempo necesario a los recursos meritorios que verdaderamente lo exigen.

. . . . . . . .

Se ha dicho que la "creación de nuevos tribunales parece que promueve la presentación de más casos nuevos. '[L]os sistemas *de las cortes son como las carreteras, mientras más se construyen, mayor es el tránsito vehicular*' ". Flango y Blair, *op. cit.*,

pág. 77. En este sentido debemos evitar que el remedio sea peor que la enfermedad. Irónicamente, en otras jurisdicciones la burocratización de los procesos judiciales ha sido el resultado de reformas bien intencionadas como la propuesta ... diseñadas teóricamente para hacer justicia rápida y económica. (Énfasis suplido.) *In re Informe Com. Asesora Presidente,* supra, págs. 237–239.

Merece reproducirse parte del informe preparado por el Lcdo. José Trías Monge a la Comisión de lo Jurídico de la Cámara en 1958, al eliminarse el derecho de apelación civil.

Uno de los métodos clásicos de descargar la labor de un tribunal de última instancia consiste en la creación de un *tribunal intermedio de apelaciones.* Diversas razones militan *contra* esta forma de intentar solucionar en Puerto Rico el actual problema de excesiva acumulación de casos en nuestro Tribunal Supremo: *el alto costo* envuelto, tanto para el erario público como para los litigantes; la casi certeza de *demorar* aún más la decisión final de nuestras controversias; y la indeseabilidad de *crear una nueva jerarquía de jueces* en vez de mejorar las condiciones de trabajo y elevar al máximo el prestigio de los actuales cargos de juez superior y juez de distrito. La creación de un tribunal intermedio de apelaciones en Puerto Rico no correspondería, a mi juicio, a las particulares necesidades de nuestro medio. Nuestras circunstancias de vida, así como el general dinamismo de nuestra sociedad, *exigen una organización sencilla de tribunales que facilite la pronta impartición de la justicia, en vez de una organización complicada, a cuatro niveles, en que la inversión en tiempo y dinero que se exigiría de los litigantes podría cerrar las puertas de nuestro tribunal de última instancia a buena parte de nuestra población.*

. . . . . . . .

La creación de tribunales intermedios de apelación o de divisiones apelativas del tribunal de jurisdicción original general como medio de limitar la jurisdicción de un tribunal de última instancia *obedece normalmente al deseo de rendirle pleitesía al concepto de que cada litigante debe tener derecho a por lo menos una apelación.* Tal concepto, a mi juicio, no se funda en una base realista. Es simple *ficción* suponer que los intereses de los litigantes están mejor protegidos mediante el reconocimiento de un derecho a apelar ante un tribunal que tiene sus calendarios congestionados que mediante el establecimiento de su derecho a recurrir por vía de *certiorari* ante un tribunal de calen-

darios despejados. Independientemente del estado de los calendarios, además, es ficticio suponer que el recurso de apelación garantiza de por sí una revisión más cuidadosa que el recurso de *certiorari* o cualquier otro método de revisión que descanse en la discreción del Tribunal. *En ambos casos las partes tienen amplia oportunidad para presentar sus puntos de vista y convencer al Tribunal de los méritos de los mismos. Si el Tribunal no considera que el fallo cuya revisión se solicita es erróneo poco ha de importar el nombre que se le dé al recurso, si apelación o [certiorari].* (Énfasis suplido.) 10 Diario de Sesiones de la Asamblea Legislativa, T. 3, págs. 1565–1566 (1958).

Al presente, las quejas que habían contra el dictamen de *no ha lugar* han quedado superadas con la práctica adoptada por el Tribunal Supremo de explicar sus resoluciones al denegar todo auto de revisión.

El derecho a apelación en casos civiles conjuntamente con el Tribunal de Apelaciones, a corto y largo plazo, conllevará los males siguientes:

1) Institucionalización de un sistema que promueve el mal de la doble apelación e incrementa las frívolas.

2) La apelación civil automática elevará el número de apelaciones, sobrecargará al Tribunal de Apelaciones y demorará sustancialmente la solución final de los casos.

3) En virtud del fenómeno y efecto de la "Torre de Babel", el funcionamiento del Tribunal de Apelaciones en siete (7) salas aumentará la inestabilidad intra e intersalas y afectará constantemente la certeza del precedente judicial.

4) Atrasará de nueve (9) meses a un (1) año el perfeccionamiento de los casos. Requerirá una Exposición Narrativa o una Transcripción de la Prueba. Aumentará sustancialmente los costos de apelación en cantidades que oscilan razonablemente entre quinientos dólares ($500) a tres mil dólares ($3,000).

5) Requerirá aumentar el presupuesto significativamente, al igual que la burocracia judicial. A la postre, beneficiará mayormente a los abogados (jueces, fiscales, etc.) y muy poco a la ciudadanía.

6) No aliviará sustancialmente las labores del Tribunal Supremo; el propio *Memorial Explicativo* acepta que las aumentará.

## XV

*Aumento en el número de Jueces Asociados del Tribunal Supremo (objeciones)*

Como consecuencia de la consolidación y reinstauración del derecho apelativo en causas civiles, el *Memorial Explicativo*, págs. 57–58, vaticina *"una carga extraordinaria"* sobre el calendario del Tribunal Supremo. Por tal razón se expresa:

> La necesidad de que el Tribunal Supremo ejerza su facultad constitucional de reevaluar su funcionamiento y composición como complemento de esta reorganización integral se sugiere muy respetuosamente como imprescindible para el beneficio del Pueblo de Puerto Rico.

Nos preocupa profundamente esta "sugerencia". Es contraria a toda sana lógica, incluso a las múltiples premisas que alegadamente animan la reorganización. Sobre todo, las cuestionables estadísticas sobre la proyección y movimientos de casos y recursos que la apoyan. "Al respecto, nos viene a la memoria la expresión —un tanto humorística pero imaginativa— de que las '[e]stadísticas no deben usarse del mismo modo que una persona ebria utiliza un poste de alumbrado público, para aguantarse en vez de iluminarse. Muchas veces, con los números se hace demasiado'. (Traducción nuestra.) T.E. Baker, *A Compendium of Proposals to Reform the United States Courts of Appeals*, XXXVII Univ. of Florida L.Rev. 225, 234 (1985)." *In re Informe Com. Asesora Presidente*, supra, págs. 207–208, voto preliminar.

Bajo la conocida hipótesis *programática* de que debe haber un balance ideológico político-partidista en el Tribunal

Supremo, en reacción a su actual composición aflora un crudo intento de sobrecargar nuestro calendario con el único propósito —lo sabe el pueblo y campo— de forzarnos a aumentar la composición numérica. Incluso, públicamente se han mencionado nombres de personas respetables, pero en cuyas candidaturas sobresalen las credenciales político-partidistas. ¿Contribuye ello a realzar el prestigio de este Tribunal? ¿Dónde queda la carrera judicial proclamada en el *Plan de Reorganización?* ¿Por qué descartar así a los reputados y experimentados Jueces del Tribunal de Primera Instancia?

Ya en el pasado rechazamos semejante visión al declarar que "los cargos de jueces no existen para ser llenados mediante movidas en el ajedrez político, cuyas jugadas responden exclusivamente a intereses egoístas partidistas inmediatos, a resolver futuras posibles candidaturas electorales, o a proyectar hacia años venideros un poder político presente ... [e]*l tribunal ideal es el judicial; no el ideológico.* Aquel simpatiza con *todos* los litigantes. En lugar de meramente favorecer uno solo, se empeña en hacerle justicia a *todos". Palabras en ocasión del juramento a los Jueces Superiores,* 10 de enero de 1992, págs. 5 y 8.

*Ni el Poder Ejecutivo ni la Asamblea Legislativa deberían atentar así contra la independencia judicial; menos debilitar nuestros procesos democráticos. Todo lo contrario, deberían retomar conciencia de las más sanas tradiciones constitucionales y de buen gobierno olvidadas por quienes hasta hace poco detentaron esos poderes.* Por ello recordamos nuestras reflexiones en ocasión de la ceremonia de juramentación de los jueces de primera instancia el 25 de enero de 1990:

> En un foro colegiado —como lo es este Tribunal— compuesto de personas de conciencias libres, es natural y saludable la pluralidad de juicios y enfoques. Por ende, no tienen cabida criterios aprioristicos basados en un reclamo de *solidaridad institucional,* y mucho menos la prevalencia de un mutismo individual

sobre un asunto cardinal que directamente atañe a la eficiente administración de justicia: *la independencia judicial.*

Esta, como ideal constitucional, más que una *prédica ocasional,* es vivencia y experiencia vocacional diaria, producto de una constante e irreductible voluntad de un sentimiento inspirado en la mayor SINDERESIS y PASION DE HACER JUSTI-CIA; —en palabras de nuestro padre, Luis Negrón Fernández— 'la única pasión que en la igualdad y aplicación del Derecho le es permitido a un magistrado en todas las dimensiones de su responsabilidad pública'.

Ese sentido de justicia inmerso en la conciencia del juzgador, a veces no es comprendido por los otros dos poderes constitucionales que intervienen en el proceso de nominación, renominación y confirmación de los jueces del país. *En los últimos años hemos observado una peligrosa variación de enfoques y una devaluación en el reconocimiento de esta realidad. Algunos de ustedes —y otros ausentes— fueron irrazonablemente mantenidos por años en la angustiosa y precaria situación de ver sus nombramientos vencidos. Otros experimentaron un enjuiciamiento basado en consideraciones extrañas a sus méritos, algunas de naturaleza revanchista. Ello constituye una seria erosión de los valores y premisas legítimas en que tradicionalmente se apuntalaba el sabio y prudencial ejercicio de las facultades Ejecutivas y Senatoriales.* El inventario final ha sido dificultar grandemente el reclutamiento y retención de una judicatura de excelencia —representada por ustedes, en detrimento de una sana administración de la justicia.

ES LAMENTABLE COMO A VECES, SE OBSERVA LA *LE-TRA* DE LA CONSTITUCION, PERO SE *MATA* SU ESPIRITU. (Énfasis suplido.)

Cualquier cambio en el número de los Jueces Asociados en el Tribunal Supremo tiene que estar precedido de un estudio reflexivo y completo sobre los efectos reales, no teóricos, de la reorganización en nuestro calendario. Ese estudio deberá evaluar la dinámica decisoria durante un período de tiempo razonable, esto es, de veinticuatro (24) a treinta y seis (36) meses. *Actuar a la ligera sería irresponsable. Alterar la composición es un remedio extremo para situaciones extremas. Es menester examinar los hábitos de estudio de los jueces, su índice de laboriosidad y, además, ensayar otras medidas tales como el funciona-*

*miento en las salas, el incremento en* el *personal auxiliar y otras.*

## XVI

*Conclusiones*

El inventario final de la consolidación propuesta es *negativo*; contiene demasiadas lagunas e interrogantes para tener en cuenta su implantación, máxime en sustitución de un sistema judicial que, aunque muy sobrecargado, por regla general funciona eficientemente.

Inquieta cómo de la noche a la mañana surgen en el país propuestas a ultranza para que importemos un modelo norteamericano experimental. Sus propulsores intentan echar por la borda las virtudes de nuestro sistema judicial unificado y su estructura flexible. Nos preocupa que hayamos caído como "víctimas del 'análisis del libro de cocina para viajeros que muchas veces falla en reflejar la realidad en la medida que puede ser un buen análisis'. Los problemas de los tribunales ya no se definen en términos de las necesidades de los litigantes o la norma de derecho, sino en términos de soluciones estructurales disponibles". (Traducción nuestra.) C. Baar, *The Scope and Limit of Court Reform*, 5 Just. Sys. J. 274, 284 (1979–1980).

No podemos recomendarle, de manera responsable, a la Asamblea Legislativa que exponga a la Rama Judicial a semejante riesgo en las dimensiones constitucionales, organizacionales y operacionales. *Acabemos con la falacia de algunos teóricos de continuar achacando los problemas de los tribunales a sus estructuras.* Variarlas "sin cambiar nuestras actitudes es meramente una permuta de fácil apariencia, sin substrato ético alguno". *In re Informe Com. Asesora Presidente*, supra, pág. 240.

Desde 1991 en adelante, la Asamblea Legislativa y el Ejecutivo *trastocaron la sintonía funcional del Sistema Judicial* mediante una serie de modificaciones importantes,

tales como la integración del Tribunal Municipal al de Primera Instancia, la creación y posterior derogación del Tribunal de Apelaciones e incluso unos cambios dramáticos en la competencia.

En la Conferencia Judicial pasada dimos la

> ... voz de alerta sobre los *verdaderos móviles que subyacen en muchas de estas reformas, algunas con unos superávits de dinero y otras sin presupuesto*. Tenemos la impresión de que se han creado *artificialmente crisis* que han servido para justificar nuevos puestos de jueces. Aparentemente esa estrategia aún subsiste.
>
> Así se explica por qué ciertas de esas soluciones, al igual que las que ahora se proponen a título de "reorganización", se revelan como absurdas, contraproducentes, contradictorias y de dudosa validez constitucional. Han generado y continúan ejerciendo una insoportable presión sobre el sentido común que al poco tiempo —somos testigos de ello— provoca otra "reforma" o "reorganización de la reforma".
>
> Exhortamos públicamente a los poderes políticos del país integrados por los miembros de todos los partidos que cesen de usar a los jueces municipales, de distrito y superiores, como *peones* en un juego de ajedrez político-partidista, que entre otros nombres, se llama *consolidación*. ¡Hasta cuándo va a someterse a la judicatura puertorriqueña y al país a reformas o reorganizaciones siguiendo el peligroso y perjudicial método de *ajuste y error* ("trial & error")!
>
> Orientemos nuestros mejores esfuerzos y talento fuera de meros ejercicios de nomenclatura y de aspectos externos a la verdadera función de hacer justicia, que con independencia de criterios partidistas, es la que en resumidas cuentas debemos reformar. Negrón García, *Ponencia Conferencia Judicial*, 7 de abril de 1994, págs. 9–10.

Conscientes de las fallas de los tribunales, necesitamos más jueces y recursos; menos reformas que continúen la subversión del esquema actual y la independencia judicial. Dejamos constancia de nuestra reserva a cualquier pretensión de "experimentar" la consolidación en una sola región judicial. Esa alternativa podría presentar escollos constitucionales por razón, precisamente, del Sistema Judicial unificado. Si los tribunales "se encuentran abrumados de trabajo, no sólo se torna lenta la justicia, sino que pierde

en calidad; a ello se suele atribuir el fracaso o la inadecuación de muchas reformas procesales, por cuanto, en definitiva, el funcionamiento de las instituciones depende de los hombres que han de hacer las funciones". Ruiz Pérez, *op. cit.*, pág. 90.

El Plan de Reorganización de la Rama Judicial: ¿REFORMA o *DEFORMA?*

**— O —**

Voto separado emitido por el Juez Asociado Señor Rebollo López.

Independientemente del hecho de que, en el momento jurídicamente apropiado, pudiéramos estar de acuerdo con algunas de las determinaciones a las que llega una mayoría de los integrantes del Tribunal —compuesta dicha mayoría por cinco (5) de sus integrantes— en la *resolución* que se emite en el día de hoy, en relación con la propuesta Reforma del Sistema Judicial de Puerto Rico, *no podemos suscribir la misma.*

Tampoco, por razones obvias, podemos suscribir el "mecanismo procesal dual", *único en la historia de este Tribunal,* mediante el cual esos cinco (5) Jueces no sólo emiten una resolución mayoritaria sino que un voto separado de uno de sus integrantes al cual se unen cuatro otros de los Jueces.

Somos del criterio, en primer lugar, que la referida resolución y el "voto mayoritario del Tribunal" no sólo resultan ser erróneos sino que los mismos *constituyen un acto ultra vires de este Tribunal en menosprecio de las prerrogativas constitucionales de las otras dos (2) Ramas del Gobierno de Puerto Rico, realizado el mismo con total desatención a los parámetros de nuestro ordenamiento que limitan el poder de la Rama Judicial.* En fin, somos de la opinión que la mencionada actuación no es propia, o digna, de esta

Institución, que es la que regenta la Rama Judicial de Puerto Rico.

I

Resulta, cuando menos, curioso que ni en la mencionada resolución ni en el "voto del Tribunal" la Mayoría hace mención del hecho relevante de que las *principales recomendaciones* que contiene el Plan de Reorganización Núm. 1 de 1994 sobre la Rama Judicial sometido por el señor Gobernador a la Asamblea Legislativa de Puerto Rico —esto es, la consolidación de los tribunales de primera instancia, la creación del cargo de magistrado y la creación de un tribunal de apelaciones— *son exactamente las mismas que nos hiciera el Comité de Reforma Judicial y de Administración del Tribunal de Primera Instancia*; comité compuesto por distinguidos abogados a quienes *este Tribunal* les encomendó la tarea de estudiar el Sistema Judicial y hacernos unas recomendaciones con miras a mejorar el Sistema Judicial puertorriqueño.([1]) En cuanto a este Comité, y en forma sumamente diplomática, el Tribunal meramente "reconoce" la labor de sus miembros y "agradece" la aportación de éstos. De manera, pues, que la mayoría del Tribunal, al tajantemente rechazar las recomendaciones que hiciera el Poder Ejecutivo, *igualmente está rechazando las recomendaciones que hiciera el Comité de Reforma Judicial que el propio Tribunal designara*. Tal parece que es este Tribunal el que tiene no sólo el monopo-

([1]) Dicho Comité de Reforma Judicial estuvo presidido por el Ex Juez Asociado de este Tribunal, Hon. Carlos Irizarry Yunqué, y compuesto por: el Presidente del Colegio de Abogados de Puerto Rico, Lcdo. Carlos R. Noriega Rodríguez; los Decanos de las Escuelas de Derecho, los licenciados Antonio García Padilla, Carlos E. Ramos González y José I. Irizarry Yordán; cuatro (4) distinguidos miembros de la judicatura puertorriqueña, Honorables Ygrí Rivera de Martínez, Gilberto Gierbolini Rodríguez, Aurelio Gracia Morales y Reinaldo Franqui Carlo; cinco (5) distinguidos miembros de la profesión, los licenciados Héctor Reichard de Cárdona, Virgilio Ramos González, José M. Biaggi Junquera, Samuel T. Céspedes y Rafael J. Torres Torres; y por un distinguido profesional, en representación del interés público, el Sr. Pedro A. Galarza.

lio de la verdad sino de lo que resulta conveniente para nuestro Sistema Judicial.

En segundo lugar, la resolución emitida, y el "Voto del Tribunal", parecen cerrarle las puertas a todo plan *inmediato* de reorganización del sistema judicial puertorriqueño, condicionando el mejoramiento del sistema a que se hagan unas concesiones que se enumeran y haciendo así caso omiso del cada día mayor clamor, a esos efectos, de los ciudadanos de este País. Parece ser que la mayoría entiende que el referido sistema sólo puede ser mejorado conforme al criterio personal y particular de los integrantes de este Tribunal.

Resulta, cuando menos, sorprendente la aseveración de la Mayoría a los efectos de que se reafirma en su "posición histórica de defender los postulados constitucionales que garantizan una Rama Judicial autónoma e independiente, a fin de que la ciudadanía cuente con un sistema de impartir justicia que sea libre e imparcial ...". Resolución, pág. 2. Tal parece que las situaciones varían dependiendo del color del cristal con el que se miren. Preferimos abstenernos de enumerar las ocasiones en que esa misma mayoría, en el pasado, ha permanecido muda e inmutable ante ataques y embestidas a esa independencia judicial; ello por razón de que el *mero* recuerdo de dichas situaciones resulta ser sumamente doloroso.

Por otro lado, la resolución y el "Voto del Tribunal" que se emiten en el día de hoy tienen los visos de una "opinión consultiva"; toda vez que por medio de los mismos este Tribunal —al señalar que el Plan del Primer Ejecutivo vulnera los principios de independencia judicial y de separación de poderes y que el mismo tendrá el efecto de colocar a la Rama Judicial bajo el control de las otras dos (2) Ramas del Gobierno— declara, ipso facto y *sua sponte*, la inconstitucionalidad de *un proyecto de ley*, esto es, del Plan de Reorganización Núm. 1 de 1994 sobre la Rama Judicial. *Esta determinación que hace el Tribunal no sólo se realiza en total ausencia de una controversia real y contenciosa, y sin siquiera haberse radicado acción alguna ante los tribu-*

*nales, sino que es una jurídicamente errónea.* Dicha actuación podría tener la indeseable consecuencia de amedrentar a las otras dos (2) Ramas de Gobierno en su legítimo propósito de mejorar el sistema de administración de la justicia en nuestro País en beneficio de la ciudadanía del mismo, para lo cual están constitucionalmente facultados.

No podemos terminar sin expresar que la resolución y el "voto del Tribunal" tienen el transparente y obvio propósito de calmar los exaltados ánimos de los Jueces de Instancia; funcionarios que, con razón, se sienten abandonados por este Tribunal desde hace mucho tiempo. La coincidencia de que las referidas ponencias se certifiquen a menos de veinticuatro (24) horas de la celebración de una Asamblea Extraordinaria de la Asociación Puertorriqueña de la Judicatura, en la cual se discutirá la reforma judicial, no puede ser pasada por alto. *Mediante resoluciones y "votos mayoritarios" como los presentes no se defiende al juez puertorriqueño. Se necesita algo más que mera palabrería.*

Dejamos para una ocasión apropiada el expresarnos sobre los méritos de las antes mencionadas propuestas de reforma.

## — O —

Voto particular emitido por la Juez Asociada Señora Naveira de Rodón, al cual se unen el Juez Presidente Señor Andréu García y los Jueces Asociados Señores Hernández Denton, Alonso Alonso y Fuster Berlingeri.

## I

*Introducción*

### A. *Ideología del cambio*

El mundo contemporáneo se enfrenta a diversos y complejos problemas y, como es tradicional, los gobiernos y sus

sistemas institucionales son los llamados para enfrentarse a éstos. Sin embargo, hoy se cuestiona si estos sistemas tradicionales son adecuados para atenderlos y solucionarlos y, a su vez, para enfrentar los nuevos retos. Existen teorías que sostienen que los sistemas burocráticos del Gobierno no tienen la capacidad para ello; que se han convertido en obsoletos, en un estorbo en la consecución de objetivos y acciones. Fundado en dichas teorías, surge un pensamiento de que es imperativo cambiar los sistemas existentes para lograr acciones que atiendan los nuevos problemas económicos, sociales y políticos, y los nuevos reclamos y las necesidades de la ciudadanía. D. Osborne y T. Gaebler, *Reinventing Government*, Nueva York, Ed. Plume, 1993, págs. 1–24. No cabe duda de que todos los sistemas institucionales presentan problemas burocráticos y de otra naturaleza que deben ser atendidos. En ese sentido, la teoría del cambio, bien estudiada y aplicada, es una oportunidad al presentar opciones para enfrentar los problemas cambiantes y cada vez más complejos. Claro está, el cambio no puede constituir un fin en sí mismo. Es decir, cambiar por cambiar.

En realidad, esta teoría sobre el cambio se ha convertido, equivocadamente, en una "ideología" y no en un proceso fundado en los estudios empíricos y en la experimentación controlada para evaluar sus efectos y tomar las medidas correctivas correspondientes. Landau, *On the Concept of a Self Correcting Organization*, 33 Pub. Admin. Rev. 533–542 (nov.-dic. 1973); A. Wildavsky, *The Self-Evaluating Organization*, 32 Pub. Admin. Rev. 509–520 (sept.-oct. 1972); C. Argyris y D. Schön, *Organizational Learning; A Theory of Action Perspective*, Ed. Addison Wesley Pub. Co.,1978, págs. 139–142; Helberg, Nystrum y Starbuck, *Camping on Seesaws, Prescription for a Self–De-*

*signing Organization*, 21 Admin. Sci. Q. 41–65 (Marzo 1976); Weick, *Educational Organization as Loosely Coupled Systems*, 21 Admin. Sci. Q. 112–115 (Marzo 1976). Es fundamental recordar que el cambio fundado en problemas y elementos inestables o erróneos incrementa el riesgo del desplome institucional. Herbert, *The Architecture of Complexity*, The Sciences of the Artificial, págs. 193–229.

No se puede perder de vista o minimizar el principio fundamental de la administración pública de que la confiabilidad del sistema es tan importante como la eficiencia del mismo. Por lo tanto, la búsqueda de mayor eficiencia no puede menoscabar la confiabilidad del propio sistema. Landau, *Redundancy, Rationality and the Problem of Duplication and Overlap*, 77 Pub. Admin. Rev. 346–358 (Julio-Agosto 1969). Por otra parte, hay que tener presente que eficiencia no es sinónimo de efectividad. Tratar de lograr mayor eficiencia, per se, podría producir inefectividad en el funcionamiento del sistema y, por consiguiente, el desplome del mismo, dejando una ciudadanía huérfana de servicios. Sanger, *The Challenger Disaster: A case of Discouraged "Feedback" from Engineers Tell of Punishment for Shuttle Testimony*, The New York Times Co., 11 de mayo de 1986.[1]

Como cuestión de realidad, la mayor parte de las reorganizaciones institucionales generales abarcadoras llevadas a cabo durante el siglo XX en Estados Unidos no han funcionado y se han convertido en una "historia de retórica". March y Olson, *Organizing Political Life: What*

---

[1] El preámbulo del artículo —Sanger, *The Challenger Disaster: A Case of Discouraged "Feedback" from Engineers Tell of Punishment for Shuttle Testimony*, The New York Times Co., 11 de mayo de 1986— expresa lo siguiente:

"Many organizations discourage feedback and learning especially when powerful members become committed to the achievement of predetermined goals at almost any cost. One of the most famous recent examples is found in the case of the ill-fated space shuttle, Challenger. In the following article, David Sanger of the New York Times gives us a glimpse of aspects of the corporate culture, power politics, and misinformation systems that lay behind the disaster on 28 January 1986."

*Administrative Reorganization Tell Us about Government,*
77 Am. Pol. Sci. Rev. 281–296 (1983).

B.  *El compromiso de la Rama Judicial con una verdadera reforma*

Al evaluar el Plan de Reorganización propuesto por el Ejecutivo, quisiéramos dejar claramente establecido que estamos conscientes de que los servicios que ofrece la Rama Judicial, al igual que su eficiencia, pueden ser mejorados. No cabe duda de que los tribunales de Puerto Rico encaran serios problemas que requieren una atención adecuada de modo urgente. La mayor parte de tales problemas existen desde hace mucho tiempo y la propia Rama Judicial los ha denunciado reiteradamente sin conseguir para su solución la acción correspondiente de las ramas políticas del gobierno, que son quienes tienen la autoridad para disponer remedios efectivos para los mismos.

Uno de esos graves problemas, a modo de ilustración, es la inmanejable carga de trabajo que recae año tras año sobre el limitado número de jueces del sistema. En 1992, por ejemplo, los jueces del Tribunal de Distrito y del Tribunal Superior, que sumaban doscientos siete (207) ese año, tuvieron que encarar juntos un total de cuatrocientos ochenta y cinco mil con tres (*485,003*) casos, para un promedio de dos mil trescientos cuarenta y tres (*2,343*) *casos por juez.* Esa carga no es sólo onerosa en extremo, sino que es realmente inmanejable, sobre todo cuando se considera que la mayor parte de esos casos traen consigo innumerables procesos, trámites y gestiones particulares que requieren una cuidadosa y prolongada atención del juez y de su escaso personal de apoyo. Haciendo esfuerzos de gran laboriosidad, que exceden con gran frecuencia el horario regular de trabajo de otros servidores públicos, estos jueces lograron resolver trescientos cuarenta y siete mil seiscientos treinta y siete (347,637) de los casos en cuestión, casi 72% de ellos, o sea, mil seiscientos setenta y nueve (1,679) casos por juez. Se resolvieron tantos casos a costa de gran-

des sacrificios que a la larga desgastan los recursos humanos de la judicatura e impiden el mantenimiento de una estructura judicial permanente y plenamente productiva. Se resolvieron, además, a veces con una premura que no es ideal tratándose de asuntos de tanta importancia como los que se atienden en los tribunales. Aun así quedaron pendientes, para el próximo año, miles de casos sin resolver, dando lugar a demoras que la ciudadanía con razón no tolera; dando lugar también a una justicia tardía, que no es la justicia ideal.

Son graves problemas como éste, y otros que identificaremos más adelante, los que claman una impostergable y prioritaria atención. Una consideración responsable de éstos, con miras a desarrollar soluciones, cuenta con nuestro más decidido respaldo y apoyo.

### C. *Reforma sin dislocación*

Ahora bien, cualquier propuesta de cambio que se haga y cualquier plan de reorganización que se vaya a implantar no puede, bajo circunstancia alguna, menoscabar la estabilidad y confiabilidad del sistema. Ante la crisis de violencia que estamos viviendo y los serios problemas sociales que confrontamos, Puerto Rico no puede darse el lujo de no tener una Rama Judicial fuerte y vigorosa que enfrente estos retos con valentía. Con el espíritu de lograr lo mejor para nuestro Pueblo es que haremos el análisis de la propuesta.

### D. *Plan de Reorganización de la Rama Judicial propuesto por la Rama Ejecutiva*

El 15 de abril de 1994 el Gobernador de Puerto Rico, Honorable Pedro Roselló González, presentó a la Asamblea Legislativa el Plan de Reorganización Núm. 1 de la Rama Judicial de 1994 (en adelante plan de Reorganización). Con el beneficio de dicho plan, del Mensaje del Gobernador al someterlo, del Memorial Explicativo del plan, del Informe Final de la Reforma Judicial del Comité de Reforma Judi-

cial y de la Administración del Tribunal de Primera Instancia de 18 de marzo de 1994 (en adelante Comité de Reforma Judicial); de las deliberaciones sobre dicho informe llevadas a cabo por los participantes en la Conferencia Judicial celebrada el 7 de abril de 1994,[2] y tomando en consideración los parámetros establecidos por la Ley Núm. 88 de 15 de noviembre de 1993 —conocida como la Ley de Reorganización de la Rama Judicial de 1993 (4 L.P.R.A. sec. 1n)— para la reorganización de la Rama Judicial y sin pretender ser exhaustivos, expresamos nuestro parecer institucional sobre el Plan de Reorganización.

## II

*Trasfondo general de algunas reorganizaciones de sistemas judiciales encaminadas hacia un sistema unificado*

Durante las últimas décadas, los sistemas judiciales de los cincuenta (50) estados de la Nación americana han estado involucrados en procesos de evolución y desarrollo. Con el fin de realizar sus responsabilidades eficientemente, a través de una mejor administración de los tribunales, algunos han pretendido robustecer la calidad de la justicia desarrollando reformas inspiradas en las propuestas de Roscoe Pound sobre la unificación de los tribunales.[3]

La reestructuración hacia la unificación de los sistemas judiciales de los estados surge como una solución a problemas tales como la excesiva fragmentación, la autonomía disfuncional de numerosas cortes con jurisdicciones limitadas y concurrentes, los jueces con diversas cua-

---

[2] Resulta importante señalar que al rendir su Informe Final, el Comité de Reforma Judicial no tuvo el beneficio de contar con el Plan de Reorganización Núm. 1 de la Rama Judicial de 1994 (en adelante Plan de Reorganización). Éste tampoco estuvo disponible cuando se celebró la Conferencia Judicial.

[3] T.A. Henderson y C.M. Kerwin, *The Changing Character of Court Organization*, 7 Just. Sys. J. 449 (1982).

lificaciones y preparación profesional (en ocasiones legos que presiden procesos civiles), y las diferentes fuentes presupuestarias.[4] Por lo tanto, los propósitos principales de la unificación de los tribunales son reducir la fragmentación organizacional que permea en los sistemas judiciales tradicionales de los estados y centralizar las funciones y responsabilidades administrativas a nivel estatal para proveer un centro de autoridad judicial.[5]

El *National Institute of Law Enforcement and Criminal Justice* ha identificado cuatro (4) ingredientes principales necesarios para crear la unificación de un sistema estatal de tribunales: (1) consolidación y simplificación de la estructura de los tribunales; (2) administración centralizada del sistema; (3) adopción de reglas procesales uniformes a nivel central, y (4) presupuesto centralizado y financiado por el Gobierno estatal.[6]

La administración centralizada del sistema de justicia, a su vez, incluye, por lo menos, cuatro (4) preceptos: (1) aprobación de leyes que autoricen al Tribunal Supremo del estado a formular todas las reglas de procedimientos con o sin la retención del veto legislativo; (2) el derecho del Tribunal Supremo estatal (o del Juez Presidente o del Administrador de los Tribunales) a nombrar el personal administrativo del Sistema Judicial; (3) el derecho del Tribunal Supremo estatal (o del Juez Presidente o del Administrador de los Tribunales) a ubicar y reubicar todo el personal del sistema de acuerdo con las necesidades del mismo, y (4)

---

[4] S. Carbon, L. Berkson y J. Rosenbaum, *Court Reform in the Twentieth Century: A Critique of the Court Unification Controversy*, 27 Emory L.J. 559–560 (1978); R. Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice*, discurso ante la convención anual del American Bar Association en St. Paul, Minnesota de 29 de agosto de 1986, *reproducido en* 20 J. Am. Jud. Soc'y. 178 (1987); R. Pound, *Organization of Courts*, Boston, Ed. Little, Brown and Co., 1940, págs. 247–294.

[5] Carbon y Rosenbaum, *supra*, pág. 560 esc. 4.

[6] Lawson, *State Court System Unification*, 31 Am. U. L. Rev. 273, 274 (1982); T.A. Henderson y C. Kerwin, *Structuring Justice: The Implications of Court Unification Reforms*, Washington, D.C., Department of Justice, 1984, pág. 4.

la asignación presupuestaria proveniente de fondos estatales.[7]

Por otra parte se ha reconocido que la unificación de los tribunales a nivel estatal requiere la creación de un tribunal de apelaciones y de un tribunal de primera instancia. A nivel apelativo, un tribunal unificado combina las funciones de revisión de los casos civiles y criminales. A nivel del Tribunal de Primera Instancia se han desarrollado varios patrones: (1) consolidación de todos los tribunales en algunos condados o ciudades; (2) establecimiento de un Tribunal de Primera Instancia de jurisdicción general y reducción del número de niveles de tribunales con jurisdicción civil y criminal, limitada o especializada; (3) creación de un tribunal general de primera instancia y una red unificada de tribunales menores para operar a través del estado (un estado puede tener un tribunal de primera instancia que no incluya en su jurisdicción asuntos municipales, ej., Kansas, Missouri, Oklahoma y Wisconsin); (4) creación de un solo tribunal de primera instancia con jueces del mismo nivel y la abolición de todo tribunal menor (*ej.*, Connecticut y Washington D.C.), y (5) establecimiento de un solo tribunal de instancia pero con dos (2) o tres (3) niveles de jueces (ej., Illinois y Oklahoma tienen jueces y jueces asociados, Art. 6, Sec. 8, Const. Ill.; Art. 7, Sec. 8(a), Const. Okla.; Idaho tiene jueces y magistrados, Idaho Code, secs. 1–702, 1–2203; Kansas tiene jueces y jueces asociados, Kan. Stat. Ann., secs. 20–101, 20–301, 20–1423, 20–2501, y South Dakota tiene Jueces de Circuito, magistrados abogados y magistrados legos, S.D. Codified Laws Ann., secs. 16–6–1, 16–12A–12.1).[8]

De la experiencia de otras jurisdicciones se desprende que determinar qué tipo de estructura, procedimientos o

---

[7] J.A. Gazell, *The Future of State Court Management*, N.Y., Kenikat Press Corp., 1978, págs. 6–7.

[8] Gazell, *op. cit.*, págs. 7–8; y, para un análisis sobre los grados y patrones de unificación de los estados de la nación americana, véanse las págs. 10–23. Véase, además, Lawson, *supra*, pág. 275 esc. 6.

grado de unificación es deseable para determinada juris-
dicción es una tarea complicada. Requiere que se tomen en
cuenta las diferentes y diversas características, circuns-
tancias y recursos de cada estado.(⁹) Hoy no todos los sis-
temas judiciales de los estados de la Nación norteameri-
cana están totalmente unificados. Algunos aspectos de las
operaciones judiciales de unos estados reflejan mayor uni-
ficación que otros. Mas esto no es necesariamente un
problema.

> A system that is too unified may become inflexible and lose
> advantages offered by local adaptability to changes and respon-
> siveness to unique needs. Consequently, the optimum degree of
> court unification is a matter of balance between state and local
> interests, and that balance will vary according to the characte-
> ristics of each state.(¹⁰)

Todo lo antes reseñado demuestra que resulta indispen-
sable que antes de proponer y adoptar algún plan de reor-
ganización de la Rama Judicial se realicen los estudios em-
píricos pertinentes. De esta forma se podrán identificar, de
forma fehaciente, los problemas, las características y las
necesidades particulares del sistema y los recursos dispo-
nibles, para luego trazar las metas y los objetivos. No obs-
tante, hay que tener presente que no existe un modelo or-
ganizacional ideal que resulte adecuado para todos los
sistemas judiciales. Nuestra Asamblea Legislativa así lo
reconoció en la Ley Núm. 88, *supra*, que establece los cri-
terios para realizar reformas de la Rama Judicial. En la
Exposición de Motivos se indica que la reforma que se pro-
ponga será "el resultado de estudios realizados por distin-
tas entidades y personas producto de la actual estructura y
funcionamiento de la Rama Judicial, dentro de nuestro
marco constitucional, a través de los años". 1993 Leyes de
Puerto Rico 420, 421. Igual sentido recogió la Exposición

---

(⁹) K.G. Pankey, *The State of the Judiciary (The Book of the States)*, Kentucky,
The Council of State Governments 1992, Vol. 29, pág. 210.

(¹⁰) Pankey, *op. cit.*, pág. 213; Henderson y Kerwin, *supra*, págs. 84–86 esc. 6.

de Motivos de la Ley Núm. 11 de 2 de junio de 1993 (4 L.P.R.A. secs. 1, 2n, 35, 37, 61an, 301), que enmendó la Ley de la Judicatura, Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. secs. 1–2, 31, 33, 35, 37–37b, 61–62r, 91–92, 121–122, 151a–152, 181, 201n–202, 231–232, 301–304, 330–334, 362–362b, 381), cuando expresó que las reformas que son indispensables para mejorar la calidad de la justicia "deben resultar de un análisis minucioso de los problemas de la Judicatura y los remedios completos a tales problemas, cónsonos con el mandato de nuestra Constitución, que salvaguarden la independencia de la Rama Judicial y que garanticen un sistema judicial unificado, justo, rápido, eficiente y económico". 1993 Leyes de Puerto Rico 32, 33. Allí enfáticamente se aseveró que no se querían repetir los errores del pasado al imponer "a la Rama Judicial y al Pueblo en general, una estructura judicial sin consulta previa y en contra de los deseos y mejores intereses de la Judicatura y de la comunidad". Íd., pág. 33.

En Puerto Rico no hemos estado ajenos a los movimientos de la reforma y unificación de los tribunales. Con la aprobación de la Primera Ley Orgánica de la Judicatura de 1950 se inició la reforma del sistema judicial puertorriqueño y con ella la unificación de los tribunales, proceso que culminó con la adopción de la Constitución del Estado Libre Asociado y de la Ley de la Judicatura de 1952.[11] El Art. V, Sec. 2 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 355, creó una Rama Judicial integrada para los efectos de "jurisdicción, funcionamiento y administración". De otra parte, la Convención Constituyente delegó en la Rama Legislativa las determinaciones de competencia y organización. No obstante, según el Ex Juez Presidente Señor Trías Monge, "[l]a enumeración que se hacía [sobre un sistema integrado] de tales

---

[11] C. Delgado Cintrón, *Antecedentes históricos de la reforma judicial de 1950 en Puerto Rico*, 31 Rev. C. Abo. P.R. 283, 303 (1970). Véase, además, J. Trías Monge, *El Sistema Judicial de Puerto Rico*, Río Piedras, Ed. Universitaria, 1978.

aspectos cubría ... todos los necesarios para el logro de una unificación total".([12])

De hecho, Puerto Rico es líder en los intentos de unificación de los tribunales de Estados Unidos. Cuando se aprobó e implantó nuestro sistema en 1952, "tan sólo un estado, Nueva Jersey, contaba con un sistema judicial totalmente unificado, aunque California, Connecticut, Maryland y Missouri y algunos condados en otras jurisdicciones, experimentaban con elementos de la integración de tribunales". (Escolio omitido.)([13])

Hoy tenemos un solo Tribunal de Primera Instancia con tres (3) secciones: Tribunal Superior, Tribunal de Distrito y Tribunal Municipal. Para canalizar de forma ordenada los asuntos a través del Tribunal de Primera Instancia, la Asamblea Legislativa ha aprobado una serie de leyes que establecen la competencia de estas secciones utilizando los criterios de materia, cuantía y territorio. Aunque tenemos varias categorías de jueces con diferentes cualificaciones en cuanto a edad y experiencia profesional para atender asuntos que presentan diferentes grados o niveles de dificultad, no tenemos los problemas de múltiples jurisdicciones y competencias que aquejaban a algunos estados de la unión americana cuando comenzaron a unificar sus tribunales. En cuanto a la administración centralizada de los tribunales, en Puerto Rico el Juez Presidente dirige la administración de éstos y tiene la facultad para, de ser necesario, asignar a un juez, no importa su categoría, para atender cualquier asunto presentado ante el Tribunal de Primera Instancia.

De todas formas, a partir de 1952 en Puerto Rico no hemos estado estáticos respecto a la búsqueda de alternativas para mejorar y agilizar el funcionamiento y la administración de los tribunales, de manera que éstos respon-

---

([12]) Trías Monge, *op. cit.*, pág. 118 esc. 11.

([13]) Trías Monge, *op. cit.*, pág. 117.

dan mejor a las cambiantes necesidades de nuestro Pueblo. Se han realizado estudios, propuestas y reformas encaminadas a tales fines.[14] Se propuso en el pasado[15] y se propone ahora la consolidación del Tribunal Superior, de Distrito y Municipal siguiendo los modelos de los estados de Connecticut, Dakota del Norte, Minnesota y de la capital federal, Washington, D.C. Ya que el Plan de Reorganización hace referencia a estos sistemas y los utiliza como modelos, procede que, a *grosso modo*, examinemos los problemas que confrontaban estas jurisdicciones y las soluciones autóctonas que se le encontraron a éstos a través de la reestructuración de los sistemas judiciales.[16] Por ser la jurisdicción de Connecticut la que más influenció el Plan de Reorganización ante nuestra consideración, la discutiremos aparte y de forma más extensa en el Acápite III.

A. *Minnesota*

Actualmente el Sistema Judicial de Minnesota consta de un Tribunal Supremo,[17] un Tribunal Apelativo[18] y un Tribunal de Primera Instancia compuesto por once (11) distritos judiciales con jurisdicción general.[19] La administración de los tribunales está centralizada en la Oficina del Administrador de los Tribunales (*Court Administrator*)

---

[14] Trías Monge, *op. cit.*, págs. 157–184. Véanse, también: *Reorganización del Tribunal de Primera Instancia*, Oficina de Administración de los Tribunales, 1985; Consideraciones en Torno a Posibles Cambios en la Estructura y Funcionamiento de los Tribunales, 1986; Informe de la Comisión Asesora del Juez Presidente sobre la Estructura y Funcionamiento del Tribunal de Primera Instancia, marzo 1987; La Independencia Judicial en Puerto Rico, Secretariado de la Conferencia Judicial, 1988, y las Leyes, Núm. 92 de 5 de diciembre de 1991 (4 L.P.R.A. secs. 35, 61, 121(a), 181(a), 191 y 301) y Núm. 21 de 10 de junio de 1992 (4 L.P.R.A. secs. 1, 35, 37, 61–61a, 121, 191, 231(a)–231(d)).

[15] Íd.

[16] Acompañamos como Anejo I una tabla comparativa de los sistemas judiciales y las condiciones prevalecientes en los estados de Connecticut, Minnesota, Dakota del Norte, Washington, D.C. y Puerto Rico.

[17] Minn. Stat. Ann. sec. 480.01.

[18] Minn. Stat. Ann. sec. 480A.01.

[19] Minn. Stat. Ann. sec. 484.01.

quien es nombrado y supervisado por el Tribunal Supremo.[20]

Antes de la reorganización del sistema judicial, Minnesota tenía problemas de excesiva fragmentación de los tribunales y de sus respectivas jurisdicciones; presupuesto y administración descentralizada, y preparación, experiencia y salarios desiguales para los jueces.

Mediante la consolidación, Minnesota unificó las cortes de distrito, de los condados y de los municipios. Ahora, cada distrito canaliza los asuntos que le son sometidos a través de las divisiones de asuntos criminales, civiles, de familia y de menores, entre otras. También eliminó salas especializadas como, por ejemplo, la que atendía violaciones de tránsito (*Traffic Violations Bureau*) y la que veía casos relacionados con ordenanzas municipales (*Ordinance Violations Bureau*).[21] A pesar de la unificación realizada, todavía hay —en dos (2) distritos— un tribunal de testamentaría o sucesorio (*Probate Court*)[22] y un Tribunal Municipal en los condados de Hennepin y Ramesy.[23] El estado cuenta, además, con un programa de arbitraje llamado Resolución de Disputas de la Comunidad (*Community Dispute Resolution*) que sirve para resolver disputas entre partes que se someten voluntariamente a dicho programa.[24] Por último, se creó, para resolver reclamaciones de menor cuantía, un Tribunal de Conciliación (*Conciliation Court*) como una división del Tribunal de Distrito.[25]

## B. *Dakota del Norte*

Antes de la reforma judicial, Dakota del Norte tenía un

---

[20] Minn. Stat. Ann. sec. 480.13.

[21] Minn. Stat. Ann. secs. 493.01–493.04, derogados por Leyes 1983, C. 20, sec. 1, efectivo 7 de abril de 1983.

[22] Minn. Stat. Ann. sec. 484.011.

[23] Minn. Stat. Ann. secs. 488A.01–488A.34.

[24] Minn. Stat. Ann. secs. 494.01–494.04.

[25] Minn. Stat. Ann. secs. 491A.01–491A.03.

sistema judicial totalmente fragmentado. Habían tribunales de distrito, tribunales del condado con jurisdicción amplia o general, tribunales del condado con jurisdicción limitada, Jueces de Paz y tribunales municipales. Solamente los jueces de los tribunales de distrito y de los condados con jurisdicción limitada tenían que ser abogados.

Contrario a Puerto Rico, los móviles de la reorganización incluían resolver los problemas sobre la diversidad en los requisitos en la educación y/o adiestramiento de los jueces, la disparidad en los sueldos de los jueces, el alto número de plazas judiciales comparado con la densidad poblacional del estado y la movilización de los jueces a través del estado debido a la fragmentación de tribunales y jurisdicciones.

La reforma judicial en Dakota del Norte consolidó los tribunales de distrito, de los condados y de las cortes municipales en un Tribunal de Primera Instancia con jurisdicción general. Este tribunal está compuesto por siete (7) distritos.[26] La consolidación fue paulatina y culminará en 1995.

Por otra parte, se redujeron las plazas de jueces, aunque aún existen las de magistrados, funcionarios judiciales con responsabilidades adjudicativas (*judicial referees*) y jueces temporeros.[27] El Tribunal Supremo de Dakota del Norte es responsable de la administración de los tribunales.[28]

## C. *Washington, D.C.*

A través de su historia, la capital de la Nación ha tenido muchos tribunales y ha sufrido cambios continuos en el Sistema Judicial, lo que ha creado una gran confusión.[29]

---

[26] N.D. Code Ann. secs. 27-01-01 y 27-05-06 (1974).

[27] N.D. Code Ann. sec. 27-02-05.1 (1974).

[28] Véanse: N.D. Code sec. 27-01-26-26; Hon. B.E. Bohlman, *Court Unification for North Dakota-Shiboleth or Reality?*, 66 N.D. L. Rev. 1 (1990); Hon. F.L. Racek, *The Present Ad Hoc Commission Unification Plan*, 66 N.D. L. Rev. 35 (1990).

[29] T. Voorhees, *The District of Columbia Courts: A Judicial Anomaly*, 29 Cath. U.I. Rev. 917 (1980).

El sistema judicial del Distrito de Columbia estaba carente de coherencia, visión y planificación.[30] No fue sino hasta 1970 que el Congreso norteamericano inició la reorganización planificada de los tribunales del Distrito de Columbia, aprobando el *Court Reform and Criminal Procedure Act*.[31] Mediante esta ley se consolidaron tres (3) tribunales: el Tribunal de Asuntos Generales (*Court of General Session*), el Tribunal de Distrito de Menores (*District's Juvenile Court*) y el Tribunal de Asuntos Contributivos (*Tax Court*), en un tribunal general llamado el Tribunal Superior del Distrito de Columbia (*Superior Court of the District of Columbia*). Este tiene jurisdicción sobre todos los asuntos civiles y sobre los casos criminales bajo las leyes del Distrito, excepto aquellos que son de jurisdicción exclusiva de los tribunales federales. Dicho tribunal tiene cinco (5) secciones: Criminal (*Criminal*), Familia (*Family*), Testamentaría (*Probate*) y Contribuciones (*Tax Divisions*) y puede ser dividido en todas aquellas secciones que el Tribunal Superior considere necesarias.[32] Además, cuenta con una división para atender reclamaciones de menor cuantía (*Small Claims and Conciliation Branch*).[33] Para poner en vigor el principio de unificación, el Congreso eliminó las numerosas cortes especializadas con jurisdicción limitada que existían y aumentó el número de jueces del Tribunal Superior.

La Corte de Apelaciones del Distrito de Columbia (*District of Columbia Court of Appeals*) es el más alto tribunal del foro.[34] Las decisiones de este tribunal las puede revisar el Tribunal Supremo de Estados Unidos.[35]

En cuanto a la administración de los Tribunales del Dis-

---

[30] Voorhees, *supra*.

[31] D.C. Code secs. 11-101 a 11-2504 y 23-101 a 23-1705 (1992).

[32] D.C. Code sec. 11-902 (1992).

[33] D.C. Code sec. 11-1301 (1992).

[34] D.C. Code sec. 11-102 (1992).

[35] D.C. Code sec. 11-102 (1992).

trito de Columbia, el Congreso delegó esta función a un comité (*Joint Committee on Judicial Administration in the District of Columbia*) compuesto por el Juez Presidente del Tribunal de Apelaciones, un Juez Asociado de este Tribunal, el Juez Presidente del Tribunal Superior y dos (2) Jueces Asociados de este Tribunal. Este comité tiene bajo su supervisión al Oficial Ejecutivo de los Tribunales de Distrito de Columbia, funcionario a cargo de la administración.[36]

## D. *Observaciones generales*

En los sistemas judiciales de los estados que hemos examinado y que fueron tomados como modelo para la propuesta reforma no se adoptó un modelo de unificación uniforme. Los diferentes tribunales de primera instancia que se crearon tenían jurisdicción general y divisiones para canalizar los asuntos en términos de materia y cuantía. En algunos de los estados también se crearon otros funcionarios judiciales con responsabilidades adjudicativas (*referees*), magistrados, etc., para la tramitación de los casos. En otros aún subsisten tribunales especializados para cierto tipo de asuntos. Todo lo cual demuestra que las reorganizaciones mediante la unificación de los distintos sistemas judiciales se hicieron de forma autóctona y estaban encaminadas a resolver los problemas específicos que habían sido previamente identificados a través de estudios empíricos.

Cabe señalar que ninguno de los estados en los que se ha fundado la actual propuesta para la reforma judicial tenía el grado de unificación alcanzado en Puerto Rico tras la adopción de la Constitución del Estado Libre Asociado en 1952. Por lo tanto, los problemas de dichos estados no eran ni son los que enfrentamos actualmente en nuestro sistema.

---

[36] D.C. Code sec. 11-1703 (1992).

III

*Expresiones generales sobre el Plan de Reorganización de la Rama Judicial de 1994*

Primeramente quisiéramos reconocer que existen en nuestro Sistema Judicial serios problemas de acumulación de casos, retraso en los señalamientos, en el envío de las notificaciones por las Secretarías y en la solución de los casos, y que nos hace falta modernizar el ofrecimiento de los servicios utilizando lo que la tecnología moderna tenga que ofrecer y que en muchos sitios carecemos del personal de apoyo y de las facilidades adecuadas. Debemos, pues, examinar si el Plan de Reorganización también atiende estas áreas que nos preocupan. La solución de estos problemas resulta indispensable para lograr el objetivo básico del Plan de Reorganización de que los tribunales puedan disponer de forma "justa, rápida, efectiva y eficiente de los [casos] sometidos ante [su] consideración". Mensaje del Gobernador, pág. 2.

Para colocar el plan propuesto en correcta perspectiva, comenzaremos por auscultar cómo fue que se realizó la reorganización en el estado de Connecticut. Éste fue uno de los estados en donde se implantaron los estándares de administración judicial establecidos por la A.B.A. y en el que más se apoyaron los autores del Plan de Reorganización. A.B. Fisser, "Structural change and its Implementation in the Connecticut Court System", en *Court Reform in Seven States*, Virginia, Ed. A.B.A., 1980, págs. 57–86.

En Connecticut, *antes de llevar a cabo los cambios en la estructura del tribunal*, se identificaron los problemas existentes *mediante estudios empíricos y teóricos*. Se encontró que el principal problema en ese estado era la ramificación que había en el sistema de justicia. Es decir, existían alrededor de trece (13) tribunales, cada uno con jurisdicción exclusiva en determinadas materias. Ello provocaba, entre otras cosas, acumulación y atraso en la solución de los

casos. También existía una gran cantidad de jueces, multiplicidad de sistemas administrativos y diversas reglamentaciones y procedimientos para los distintos tribunales.

La consolidación allí realizada, distinto a lo que ahora se pretende en Puerto Rico, fue el producto de varios estudios, tanto teóricos como empíricos, llevados a cabo por organizaciones públicas y privadas. En la reforma realizada en Connecticut, la Rama Judicial tuvo una participación activa y determinante. Mucho antes de llevarse a cabo la unificación se realizó un desarrollo administrativo consistente en la centralización de las funciones de los distintos componentes de la Rama Judicial. Entre los asuntos estudiados estuvo el determinar la adecuación de la infraestructura con especial énfasis en el número de empleados y otros recursos necesarios para lograr la reforma y la disponibilidad de facilidades físicas. La Oficina de Análisis Gerencial de la Rama Judicial llevó a cabo estudios sobre el funcionamiento de los tribunales y se hicieron proyecciones en cuanto al volumen de trabajo que generaría la consolidación. De igual forma se estudió el impacto fiscal que tendría la restructuración del Sistema Judicial.

Los artículos que se han escrito sobre la reorganización del estado de Connecticut señalan como logros importantes, aun antes de culminarse el proceso de unificación, los siguientes:

1. La creación de un director administrativo de los tribunales.

2. La presentación de un informe anual al Gobernador y a la Legislatura sobre las facilidades requeridas para la reforma.

3. La creación de un sistema computadorizado de procesamiento de datos para brindar información estadística que ha de ser utilizada en la implantación de los planes y para realizar proyecciones sobre el movimiento de casos que produciría la unificación.

4. La creación de una oficina de planificación.

5. La centralización de todos los asuntos de personal.

6. El otorgar poder a la Rama Judicial para aprobar sus reglas de funcionamiento.

7. La creación de una oficina que estudiara las reglas procesales existentes y ver como se afectarían con los cambios estructurales que deben realizarse.

8. El establecimiento de doce (12) distritos judiciales unificados en una sola jurisdicción.

9. La creación de jueces administradores para las distintos distritos judiciales.

10. La autoridad concedida al Juez Presidente para la flexible utilización de las facilidades, el personal y las asignaciones judiciales.

11. La eliminación gradual de la jurisdicción exclusiva de los distintos tribunales y el establecimiento de una jurisdicción general.

12. El establecimiento de un control administrativo centralizado.

Una de las dificultades con que se confrontó y tuvo que superar el estado de Connecticut para llevar a cabo la unificación fue lo relacionado con las facilidades físicas. Muchas de éstas eran inadecuadas y estaban subdesarrolladas o mal ubicadas. Esto surgió del estudio evaluativo que se hizo de las facilidades existentes. Hubo que planificar para adecuar, de forma ordenada, las facilidades existentes a las necesidades de la reorganización proyectada antes de aprobarla e implantarla. Como podrá observarse, antes de llevarse a cabo la consolidación se realizaron una serie de estudios y se dieron varios pasos preliminares que sirvieron para ofrecer una idea clara de qué era lo que se quería lograr y la forma efectiva de hacerlo.

El artículo de Fisser destaca que hubiese sido muy difícil, sino imposible, llevar a cabo los cambios estructurales necesarios para el éxito de la reorganización si a la Rama Judicial se le hubiese requerido que los realizara simultáneamente con la implantación de la unificación y los cam-

bios administrativos que ésto entrañaba. La capacidad administrativa y la infraestructura física de la Rama Judicial se desarrolló adecuadamente, antes de aprobar la legislación que consolidaba los distintos tribunales. Los cambios estructurales fueron sustentados y avalados por estudios en los cuales se recogió y evaluó evidencia empírica.

Fue luego de realizar las gestiones antes reseñadas que el Sistema Judicial de Connecticut quedó establecido de forma consolidada y centralizada. En la actualidad su judicatura está considerada como la que más se acerca a un sistema unificado en Estados Unidos.[37] Este estado tiene un solo tribunal de primera instancia, una sola clase de jueces y un sistema administrativo centralizado.

La Oficina Administrativa Central se encarga de supervisar y controlar todos los aspectos del Sistema Judicial. Todo lo relacionado con asuntos judiciales y administrativos se maneja desde dicha oficina. El Sistema Judicial de Connecticut es un organismo simple que combina todos los aspectos administrativos y judiciales en una estructura directiva central.

Existe un solo Tribunal de Primera Instancia —el Tribunal Superior— que opera con una sola clase o categoría de juez. Los jueces son asignados, después de un tiempo predeterminado, a una nueva localización. Todas las cortes funcionan bajo un sistema unificado de reglas y procedimientos. Existen tres (3) divisiones del Tribunal Superior: civil, criminal y familia. Cada una de las cuales tiene un Juez Presidente (*Chief Justice*). Cada distrito judicial tiene un Juez Administrador con autoridad sobre todos los Jueces Superiores. Éste actúa en coordinación con el Director Administrativo de los Tribunales. También hay una oficina administrativa de los tribunales que tiene amplias facultades relacionadas con los aspectos administrativos de la Rama Judicial.

La aprobación de reglas de procedimientos para el tri-

---

(37) Henderson y Kerwin, *supra*, págs. 28–29 esc. 6.

bunal, así como la asignación de los jueces se realizan de forma central. Asimismo, la mayoría de los servicios administrativos tales como educación judicial, presupuesto, personal y relaciones con la comunidad son responsabilidad de la administración central de los tribunales. La relación entre la administración y los niveles locales está bien definida. Las salas tienen su propia Secretaría enlazada directamente con la oficina central. También la Secretaría responde a unas dependencias de la oficina central tales como servicios fiscales, administración de recursos y sistemas de información. Se ha destacado que aunque el Sistema Judicial de Connecticut es relativamente simple, en realidad es un sistema complejo, orientado hacia un fuerte control centralizado con escasa autonomía local.

Utilizando esta experiencia, mediante el Plan de Reorganización que hoy se encuentra ante la consideración de la Asamblea Legislativa, se pretende establecer un "sistema vertical que consiste en un Tribunal de Primera Instancia consolidado, de jurisdicción original con competencia unificada para atender todo tipo de casos y causas; de un tribunal intermedio [de] apela[ciones] y del Tribunal Supremo". Mensaje del Gobernador, *supra*, pág. 3. En el Tribunal de Primera Instancia habrá una sola sección y una sola categoría de juez, el Juez Superior, "auxiliados por oficiales judiciales con adiestramiento y entrenamiento técnico jurídico denominados Jueces Magistrados". En cuanto a la competencia en sí, el Plan de Reorganización expone que sea la Rama Judicial la que organice "los calendarios, según el tipo de casos y su estimada complejidad, en lugar de la cuantía en controversia, en casos civiles, o la gravedad del delito, en casos criminales". Finalmente, el Plan de Reorganización incluye el derecho de apelación en casos civiles y criminales. Para esto se crea un tribunal intermedio, el Tribunal de Apelaciones, y se amplía la competencia del Tribunal Supremo. Mensaje del Gobernador.

Estos cambios, de acuerdo con los autores del Memorial Explicativo del Plan de Reorganización,(38) se hacen necesarios porque la Ley de la Judicatura de 1952 nos apartó de los principios fundamentales del concepto de unificación discutidos en la Asamblea Constituyente. Concluyen que los objetivos de dicha pieza legislativa no fueron alcanzados debido a que no se logró la *simplificación del sistema, la eficiencia, la óptima utilización de los recursos, el principio de igualdad y acceso fácil para el pueblo a los tribunales y la justicia igual para todos.* Véase, también, Mensaje del Gobernador.

Distinto a lo que ocurrió en las jurisdicciones estatales que se tomaron como modelo y a lo expresado por la Asamblea Legislativa y las Leyes Núms. 88 y 11, *supra,* los cambios propuestos en el Plan de Reorganización no están fundados en estudios empíricos. En el Memorial Explicativo ni siquiera se identifican las fuentes de donde se deriva la conclusión de que existe el determinado problema que de forma general y conclusoria se señala.(39)

*Resumiendo.* El análisis del Memorial Explicativo, del Mensaje del Gobernador, de la información recopilada sobre lo ocurrido en Connecticut, de los criterios establecidos por la A.B.A. y de la Ley Núm. 88, *supra,* refleja que el estudio que sirve de fundamento a la legislación propuesta

---

(38) Existen algunas diferencias entre el contenido del Memorial Explicativo y el proyecto de ley sobre la reorganización de la Rama Judicial que fue sometido a la Asamblea Legislativa. En el memorial estas diferencias no se señalan como enmiendas al mismo, por lo cual suponemos que serán objeto de discusión en el trámite de aprobación de dicha medida.

(39) De igual falla adolece el Informe Final de la Reforma Judicial del Comité de Reforma Judicial y Administración de los Tribunales por razón del corto período de tiempo que tuvieron los miembros de dicho comité para realizar su encomienda.

En lo que respecta al Plan de Reorganización, aparentemente lo que hizo la Oficina del Gobernador fue realizar un análisis de los estándares establecidos por la *American Bar Association* (A.B.A.) para la reorganización de los tribunales aprobados en 1974 y complementarlo con estudios sobre los desarrollos ocurridos en las jurisdicciones norteamericanas donde se han llevado a cabo reformas en los sistemas judiciales, en particular, el estado de Connecticut; utilizar algunos estudios e informes previos sobre la Rama Judicial de Puerto Rico, que tampoco estaban fundados en estudios empíricos, y usar incorrectamente algunas estadísticas de la Oficina de Administración de los Tribunales. Véase Anejo II.

adolece de serias deficiencias, de las cuales se pueden des-
tacar las siguientes:

1. No se identifican claramente cuáles son los proble-
mas que confronta actualmente la Rama Judicial. El Me-
morial Explicativo hace unas menciones generales de las
deficiencias que, de acuerdo con los autores, tiene en estos
momentos nuestro Sistema Judicial. Mas, sin embargo, no
surge cómo y a base de qué se identificaron estos proble-
mas, ni se explica en qué consisten, ni se acompaña estudio
empírico alguno para sustentar la existencia de los
mismos.

2. Tampoco se ha hecho un estudio del desarrollo de
las capacidades administrativas y físicas que debe llevarse
a cabo en la Rama Judicial antes de realizar cualquier
cambio estructural, ni de los recursos que se necesitarán
para viabilizar el cambio.

3. No se explican detalladamente cuáles son los crite-
rios establecidos por la A.B.A. para lograr la unificación de
los tribunales. Tampoco se señalan con cuáles de éstos he-
mos cumplido ya y cuáles son incompatibles con nuestras
necesidades y con nuestro actual sistema.

A pesar de estas importantes deficiencias, y partiendo
del fundamento de que todo sistema es susceptible de ser
mejorado, y de que tenemos el deber de ofrecer los servicios
más eficientes y justos posibles, y enfrentarnos con mente
abierta a los retos que ofrece una sociedad en constante
cambio, con problemas nuevos ni siquiera planteados hace
algunos años, discutiremos el Plan de Reorganización
propuesto y haremos ciertas observaciones y recomenda-
ciones.

Como puntualizamos anteriormente, en Puerto Rico,
desde hace más de cuarenta (40) años, es decir desde la
aprobación de nuestra Constitución, teníamos la mayor
parte de los logros alcanzados por Connecticut al unificar
sus tribunales. Desde esa época nuestros tribunales cons-
tituyen un sistema judicial unificado en cuanto a jurisdic-

ción, funcionamiento y administración. Art. V, Sec. 2, Const. E.L.A., *supra*. El Tribunal Supremo tiene la facultad para adoptar las Reglas de Evidencia, de Procedimiento Civil y Criminal. Art. II, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1. La Sec. 7 del Art. II de la Constitución, L.P.R.A., Tomo 1, establece que el Tribunal Supremo adoptará las reglas para la administración de los tribunales y que el Juez Presidente dirigirá la administración del sistema judicial y nombrará al Director Administrativo de los Tribunales. El Juez Presidente tiene amplia discreción y flexibilidad para utilizar las facilidades, el personal, la asignación y la ubicación de los funcionarios judiciales. Administrativamente, la Oficina de Administración de los Tribunales (O.A.T.) ofrece apoyo a las operaciones judiciales en los Centro Judiciales, tales como la Secretaría. También, los Alguacilazgos han sido unificados.

Nuestra amplia experiencia con un sistema unificado centralizado podría resultar de gran beneficio y utilidad a aquellas jurisdicciones que recién comienzan a experimentar en esta área. Pasemos ahora a examinar, de manera general, los aspectos principales de la reorganización que se propone, con excepción de la figura del Juez Magistrado que la discutiremos en el Acápite IV.

A. *Consolidación de Tribunales*

La premisa básica de la reorganización propuesta es que la consolidación simplifica la estructura de los tribunales porque crea una sola categoría de juez, un solo tribunal de primera instancia (el Tribunal Superior), una sola sección con jurisdicción general y competencia unificada en cuanto a materia, cuantía y gravedad del delito. Esta teoría señala que al hacerse la reorganización y establecerse tribunales con muchos jueces de una misma clase y categoría con amplia jurisdicción y competencia unificada permite asignaciones flexibles, lo cual, a su vez, tiene como resultado el reducir el atraso y la acumulación de casos. Se continúa razonando que esto, a su vez, produce economías,

ya que se hace una utilización más eficiente de las facilidades y equipo al eliminar las compras duplicadas y consolidar el personal de apoyo. En Puerto Rico no tenemos estos problemas.

Nosotros ya poseemos la flexibilidad en las asignaciones de jueces centralizada en el Juez Presidente y la Administración de los Tribunales. Lo que no poseemos es la competencia unificada con la distribución de casos a través del sistema fundada en la estimada complejidad del caso, no en materia, cuantía o gravedad del delito y jueces de una sola categoría, entiéndase que tengan la misma experiencia profesional. Más adelante en el Acápite V discutiremos en detalle cómo el Plan de Reorganización trata este concepto de competencia unificada.

De acuerdo con el Memorial Explicativo, los Jueces de Distrito, que son ascendidos de categoría, a Jueces Superiores, al no estar designados para realizar las tareas de tribunales inferiores ampliarán la capacidad de los tribunales para hacer justicia. Ahora bien, la principal diferencia sobre este particular entre el sistema actual y el propuesto consiste en la falta de competencia unificada y en que no todos los jueces en Puerto Rico son de la misma categoría, o sea, no tienen la misma experiencia profesional y clasificación. A aquellos de menor experiencia, como norma general, se les otorga competencia sobre asuntos que conllevan un menor grado de dificultad y claro está devengan un salario más bajo y tienen un término de nombramiento menor. Para flexibilizar las normas de asignación de casos mediante la creación de una competencia vertical unificada administrada por la Rama Judicial no es necesario alterar la estructura del sistema actual.

B. *Administración centralizada*

La administración centralizada implica crear una estructura jerárquica que le ofrece la responsabilidad administrativa primaria al Juez Presidente y al Administrador de los Tribunales. También aumenta la eficiencia de los

tribunales al eliminar la doble planificación y asegura que ésta se lleve a cabo por personal especializado. Además, la administración centralizada permite una planificación sistemática, fomentándose el uso más eficiente de los recursos de la Rama Judicial. La facultad de asignar los jueces y el personal de apoyo para balancear la carga de trabajo es su eje central.

En fin, la administración centralizada contribuye a lograr la eficiencia, uniformidad e igualdad en la operación de los tribunales y de esta forma mejorar la calidad de la justicia que se imparte. Esto ya lo tenemos en Puerto Rico. Lo que hay que auscultar es por qué en ocasiones no arroja los resultados deseados y qué se puede hacer para corregir estas fallas.

C. *Reglamentación centralizada*

La reglamentación centralizada implica conferir, en nuestro caso, al Tribunal Supremo, la autoridad para reglamentar materias administrativas y procesales. Esta facultad, al uniformar los procedimientos, promueve la eficiencia y la percepción de justicia igual para todos, al mismo tiempo que sirve de apoyo a la independencia de la Rama Judicial al concederle a ésta la autoridad para gobernar sus asuntos internos. El peritaje que tiene esta rama sobre las operaciones de los tribunales hace que su reglamentación sea más efectiva que si ésta proviniera de la Asamblea Legislativa. Por último, la reglamentación que establece el Tribunal Supremo está menos propensa a influencias político-partidistas y otros factores irrelevantes. Esto es básicamente así en Puerto Rico, con la excepción de que aquí la facultad de "crear y suprimir tribunales, con la excepción del Tribunal Supremo, y [de determinar] su competencia y organización" la tiene la Rama Legislativa. Art. V, Sec. 2, Const. E.L.A., *supra*, pág. 355. Esto, a tenor con lo que reflejan las estadísticas recopiladas por la Administración de los Tribunales, ha tenido en ocasiones, como resultado, la mala distribución de los

limitados recursos de la Rama Judicial, créandose sedes donde no son necesarias y desatendiendo necesidades urgentes en otras áreas.

## D. *Presupuesto unificado*

El presupuesto unificado concede a la cabeza administrativa de la Rama Judicial la capacidad para preparar y administrar un presupuesto que incluya todos los gastos operacionales del Sistema Judicial. Éste está diseñado para aumentar la eficiencia en la operación de los tribunales de varias formas. Entre otros beneficios, a través de la centralización se reducen los costos de la preparación del presupuesto; se asegura que personal especializado prepare el mismo, y se puede realizar una mejor distribución de los recursos con la visión de planificar para atender las necesidades presentes y futuras del sistema.

La unificación presupuestaria facilita la adopción de otras reformas administrativas y la recopilación de información sobre las necesidades de los tribunales y sus gastos. Ello permite que el director administrativo judicial pueda distribuir los fondos de forma equitativa y asegura la adecuada administración de los programas. Esto es esencialmente así en Puerto Rico.

## E. *Financiamiento estatal*

El financiamiento estatal de las cortes, con autonomía presupuestaria, hace que la responsabilidad fiscal de todos los aspectos de la operación de los tribunales, tales como aranceles y multas, esté contenida en el tesoro estatal, al mismo tiempo que promueve la independencia judicial. El financiamiento estatal asegura que exista paridad en cuanto a los servicios de los tribunales a través de todo el estado. También ayuda a la integración del Sistema Judicial porque facilita la planificación y la administración judicial a nivel estatal. Ésta es nuestra situación prevaleciente.

Como se habrá podido observar, en cuanto al financia-

miento, en Puerto Rico ya existen la mayor parte de los elementos mencionados, con excepción de la autonomía presupuestaria. También tenemos la consolidación jurisdiccional y administrativa de los tribunales, con excepción de la creación de una sola categoría de juez y de una competencia unificada en cuanto a cuantía, materia y gravedad del delito a tenor con las normas adoptadas por la Rama Judicial.

## IV

*Comentarios sobre el Plan de Reorganización de la Rama Judicial*

Constituyen principios básicos elementales de sana administración el que toda reorganización que se proponga vaya dirigida a resolver algún problema y que el personal esté cualificado a tono con sus funciones y que, tanto la subcualificación como la sobre cualificación del personal empleado produzca efectos detrimentales que menoscaban la posibilidad de éxito de las metas y los objetivos que se persiguen mermando la efectividad del sistema y constituyendo una mala utilización de los recursos disponibles. Además, se corre el riesgo de que se desestabilice todo el sistema causando su desplome.

Para evaluar el Plan de Reorganización resulta indispensable que primero identifiquemos los problemas del Sistema Judicial, para así poder analizar si los cambios propuestos realmente van encaminados a resolverlos.[40] Del Memorial Explicativo y del Mensaje del Gobernador surgen como metas de la reorganización las siguientes:

(1) La simplificación del sistema mediante la creación

---

[40] Independientemente de que estos problemas resulten ser meras alegaciones conclusorias sin data empírica que las sostenga, examinaremos el Plan de Reorganización para determinar si lo que se propone va encaminado a resolver los problemas que se señalan.

de una estructura simple, con divisiones sencillas entre los tribunales, lo cual, concluyen logrará una mayor eficiencia.

(2) Lograr la óptima y más efectiva utilización de los recursos de la Rama Judicial.

(3) Lograr igual y fácil acceso para el Pueblo a los tribunales y lograr que éstos impartan justicia—"justicia igual para todos".

(4) Crear un derecho de apelación tanto para casos civiles como para casos criminales.

El Informe Final del Comité de Reforma Judicial y de la Administración del Tribunal de Primera Instancia, a su vez, identificó como las críticas más comunes al sistema actual las siguientes: (1) un sistema judicial de jerarquías que resulta ineficaz en la utilización de los recursos disponibles; (2) ausencia de poder de la Rama Judicial para establecer las sedes de los tribunales; (3) ausencia de autonomía presupuestaria de la Rama Judicial; (4) el procedimiento para los nombramientos y la renominación de jueces, y (5) la falta de accesibilidad de la justicia apelativa.[41]

De otra parte, la Administración de los Tribunales nos informa, y surge de las estadísticas que allí se recopilan, que el sistema se enfrenta con una distribución desbalanceada de los casos entre las diferentes sedes. Además, nos indican que algunos tribunales tienen serios problemas de falta de personal de apoyo y facilidades inadecuadas, especialmente en los de menor jerarquía. También nos identificaron como problemas la acumulación de casos, las tardanzas en los señalamientos y en las notificaciones que hacen las secretarías, una falta de atención adecuada a los ciudadanos que acuden al tribunal en busca de ayuda. Por otra parte, nuestra experiencia nos ha demostrado que los ciu-

---

[41] El Comité de Reforma Judicial, por el corto tiempo del que dispuso, tampoco contó con estudios empíricos para apoyar estas observaciones. Sin embargo, la vasta experiencia de los distinguidos miembros del comité en cuestiones judiciales y el hecho de que contaron con la colaboración de la Administración de los Tribunales nos mueve a brindarle a estas observaciones un gran peso.

dadanos se quejan de las prórrogas que se otorgan, las que consideran excesivas, especialmente en casos criminales. Cabe señalar que estos ciudadanos a veces carecen de una cabal comprensión del rol de los tribunales y de cuáles son sus atribuciones y limitaciones. En ocasiones, esta falta de conocimiento produce grandes insatisfacciones con el sistema, ya que éste no llena, ni puede llenar, sus expectativas. Resulta evidente también que el sistema no se ha podido aprovechar de las ventajas que ofrece la tecnología moderna para modernizar y mejorar los servicios que ofrece. Con todo esto en mente, analizaremos el Plan de Reorganización.[42]

## A.  *Consolidación del Tribunal de Primera Instancia*

### 1. *Creación de una sola sección*

Del Plan de Reorganización surge que el logro de las primeras tres (3) metas previamente señaladas gira alrededor del concepto de la consolidación del Tribunal de Primera Instancia, siendo su puntal de lanza la creación de una sola sección y de un solo nivel de juez, el Juez Superior, para atender todos los casos y las controversias que ante dicho tribunal se presenten, no importa el nivel de dificultad, junto con la paulatina eliminación de los Jueces de Distrito y Municipales, y la creación de un nuevo funcionario sui generis que tendrá algunas de las facultades de un juez y se le conocerá con el nombre de "Juez Magistrado", aunque realmente no es un juez. Esto va acompañado de una unificación de las competencias por razón de cuantía, materia y gravedad de los delitos (competencias verticales), que han sido tradicionalmente fijadas por la Asamblea Legislativa. Se le traspasa a la Rama Judicial la facultad para establecer las normas sobre la asignación de

---

[42] Para entender mejor nuestro análisis, hemos preparado una tabla comparativa que refleja la estructura actual de la Rama Judicial, los cambios que el Plan de Reorganización propone, los objetivos que se persiguen y si los cambios propuestos los logran o no. Véase Anejo III.

casos. La Asamblea Legislativa mantiene, sin embargo, las competencias territoriales y la fijación de las sedes, por la Asamblea Legislativa. Pasemos a discutir las disposiciones del Plan de Reorganización que específicamente van encaminadas a lograr esta consolidación.

El Art. 5.001 establece que el Tribunal de Primera Instancia estará compuesto de una sola sección. *Plan de Reorganización de la Rama Judicial*, Oficina del Gobernador, 28 de febrero de 1994, pág. 25. El Art. 5.002, titulado "Jurisdicción; transferencia de casos", a su vez, le otorga al Tribunal de Primera Instancia jurisdicción original para actuar en todo procedimiento civil o criminal que se presente, sin embargo, hace el siguiente *caveat* "según se dispone en este Plan de Reorganización". (Énfasis suprimido.) Íd., pág. 24. En ese mismo artículo se ratifican las competencias territoriales actuales al disponer que en términos territoriales los casos se presentarán en aquella sala en la que bajo la previa legislación se hubiesen presentado. Entonces, inexplicablemente, se añade que "no se desestimará caso alguno fundado en haberse sometido a una sección sin jurisdicción o autoridad". Íd. Esta disposición no es necesaria pues *TODOS* los tribunales tienen la misma jurisdicción y sólo se puede desestimar un caso por falta de jurisdicción cuando *NINGÚN* Tribunal de Primera Instancia en nuestro Sistema Judicial tenga jurisdicción para verlo. Con relación a la mención de más de una sección en distintas disposiciones del Plan de Reorganización, su Art. 9.006, *supra*, dispone que cualquier mención a más de una sección "permanecerá en vigor como subsecciones del Tribunal Superior" durante el período de abolición de los Tribunales Superior y de Distrito.

En el Art. 5.003 del Plan de Reorganización, *supra*, pág. 24, titulado "Competencia del Tribunal Superior", se hace un listado de ocho (8) asuntos sobre los cuales el tribunal "conocerá". Aunque en el título se indica que se está hablando de competencia, debido a su contenido y a que sólo

existirá una sola sección parece que se está refiriendo a jurisdicción sobre la materia. O sea, que en vez de simplificar la materia de jurisdicción y competencia, al hacer un listado, el cual aparenta ser enumerativo, no exhaustivo, se está complicando la determinación sobre si el tribunal puede o no conocer de un asunto en particular. Todo esto se complica, aún más, si se toma en cuenta que se le está otorgando al Tribunal Supremo facultad para adoptar normas de competencia vertical. Art. 5.002, *supra*.([43])

Con respecto al sistema de competencia unificada que se establece en el Plan de Reorganización, en el Mensaje del Gobernador se expresa que éste es "imprescindible en el manejo de toda la carga actual de trabajo de los tribunales". Continúa diciendo que "[l]a división de competencia en tres (3) secciones que actualmente tiene el Tribunal de Primera Instancia usualmente conduce a la ineficiencia y a la discrepancia en cuanto a la mejor manera de disponer de los casos". Concluye que la creación de una sola sección "podría eliminar la ineficiencia de mantener sistemas separados de disposición de casos, organizando los calendarios, según el tipo de casos y su estimada complejidad, en lugar de la cuantía en controversia, en casos civiles, o la gravedad del delito, en casos criminales".

Al implantar un sistema de esta naturaleza, hay que tomar en cuenta que la determinación de la estimada complejidad de un caso con el propósito de asignarlo se tendrá

---

([43]) Con el propósito de que por lo menos surja con mayor claridad la intención de crear un tribunal de una sola sección, hacemos la siguiente sugerencia, sin que se entienda que con ello estamos endosando favorablemente su creación.

En el Plan de Reorganización todo lo que hay que decir es que el Tribunal Superior tendrá jurisdicción general sobre todo caso y controversia que surja dentro de la demarcación territorial de Puerto Rico, con excepción de aquellos que, por disposición específica de ley, sean de la jurisdicción exclusiva de otro foro. También tendrá jurisdicción sobre aquellos otros casos y controversias que, aunque no hayan surgido dentro de nuestra demarcación territorial, por disposición expresa estatutaria se les confiera jurisdicción. Los casos se tramitarán en el Tribunal de Primera Instancia de acuerdo con las normas que sobre competencia adopte el Tribunal Supremo.

En cuanto al inciso (7) del Art. 5.003 del Plan de Reorganización, *supra*, pág. 24, aun si se decidiera conservar en la ley el listado, que consideramos innecesario y que se presta a confusión, habría que atemperarlo. En Puerto Rico, constitucionalmente los tribunales sólo pueden entender en casos y controversias y no en todo tipo de asuntos. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

que hacer al inicio; es decir, al momento de presentarse la demanda en los casos civiles y al momento de presentarse la denuncia o acusación en los casos criminales.

En el procedimiento civil moderno se acepta que una demanda tiene simplemente la misión de notificar a la parte contraria, a grandes razgos, la reclamación que se hace en su contra. *Moa v. E.L.A.*, 100 D.P.R. 573, 586 (1972); *Sierra v. Tribunal Superior*, 81 D.P.R. 554, 560 (1959). De igual forma, el pliego acusatorio tiene como función básica informarle al acusado que se ha iniciado un proceso judicial en su contra para que, prontamente, gestione y ponga en acción los elementos de defensa con los cuales enfrentar la acusación. *Rabell Martínez v. Tribunal Superior*, 102 D.P.R. 39, 42 (1974).

De lo anterior surge que la determinación de la complejidad del caso tendrá que hacerse a priori fundándose en la información que surge de los antedichos documentos. Esto llevará, inevitablemente, a que se tengan que desarrollar reglas o criterios de competencia fundados en lo que la experiencia ha demostrado que, como regla general, resultan ser los casos de mayor o menor complejidad. Esto es precisamente lo que recogen actualmente las normas procesales de competencia a fin de evitar la anarquía. *Lemar S.E. v. Vargas Rosado*, 130 D.P.R. 203 (1992). Tendrá, por ende, que identificarse la complejidad de los asuntos de forma sencilla utilizando básicamente los criterios tradicionales de cuantía y materia en los casos civiles y la gravedad de los delitos en los casos criminales.

A pesar de lo antes señalado, consideramos que la flexibilización de las normas de competencia mediante la unificación de las mismas y el traspaso a la Rama Judicial de la facultad para adoptarlas podría arrojar los resultados positivos que se persiguen, siempre y cuando se unifiquen todas las normas de competencia, incluyendo las territoriales, y se le dé injerencia activa a la Rama Judicial en la creación de las sedes. Esto es así, pues muchos de los problemas de acumulación de casos ocurren porque existe un

desbalance en la cantidad de casos generados por las distintas regiones. La rígida estructura de la competencia territorial actual, junto con la inadecuada distribución de las sedes, impide la efectiva utilización de los recursos, tanto humanos como físicos. Una verdadera unificación de todas las competencias, acompañada de una redistribución de las sedes, con especial atención a las necesidades generadas por los reclamos de servicios de la ciudadanía en las distintas regiones, si se enfrenta con los problemas de acumulación de los casos, así se logra una mejor utilización de los recursos.

Si se facilita la distribución de los casos a través del sistema sin las cortapizas de las competencias territoriales y sedes que no respondan a las verdaderas necesidades del mismo, estaríamos, de forma realista, confrontándonos con uno de los problemas más serios que se está tratando de corregir. Para lograr una completa efectividad, la Rama Judicial tendría que utilizar, como parte de su facultad para asignar los casos, el redistribuirlos cuando, por haberse hecho una determinación inicial equivocada, se congestione el calendario de algún juez, provocando así atrasos en la resolución de los asuntos en los casos ante su consideración.

Ahora bien, para lograr este resultado no es necesario que se eliminen las tres (3) secciones hoy existentes. Basta con que se le otorgue a la Rama Judicial la facultad para distribuir entre estas secciones los casos que se presenten. Estimamos que sería irresponsable implantar un cambio en la estructura del sistema de la naturaleza del que se propone, sin que realmente sea necesario y sin que previamente se hayan hecho estudios empíricos, y los cambios administrativos, desarrollando la capacidad administrativa y la infraestructura física del sistema. Crearía, sin justificación alguna, inestabilidad y mermaría la confiabilidad en la Rama Judicial, todo esto en un momento cuando universalmente se reconoce la gran importancia

que tiene el que la judicatura sea fuerte y vigorosa.

### 2. *Creación de una sola categoría de juez*

Por indicarse en el Memorial Explicativo como una de las razones primordiales para la eliminación de los Jueces de Distrito y Municipales y la creación de una sola categoría de Juez —el Juez Superior— la supuesta percepción por la ciudadanía de falta de "igualdad en la justicia" y la necesidad de "igual acceso" a ésta, según estos conceptos los entienden los autores del Plan de Reorganización, hemos creído importante hacer algunos comentarios sobre el particular.

Quisiéramos hacer constar, de forma categórica, que *No* compartimos este criterio. Entendemos que la calidad de la justicia y la igualdad con que se administra no depende de que todos los jueces sean de igual categoría, entiéndase por esto jueces que tienen el mismo número de años de experiencia profesional[44] para entender en asuntos que implican distintos grados de dificultad. Nuestros Jueces de Distrito y Municipales están plenamente capacitados para llevar a cabo las funciones propias de su competencia. No existe evidencia empírica que demuestre que hay una insatisfacción de parte de la ciudadanía sobre este particular. Tampoco hay evidencia de que estos jueces no estén cumpliendo satisfactoriamente con los asuntos que les son encomendados.

A lo sumo lo que refleja, tanto el Memorial Explicativo como el Informe del Comité sobre Reforma Judicial y las

---

[44] Al enfocar un problema que no existe en nuestra jurisdicción, tanto el Memorial Explicativo como el Plan de Reorganización sometido a la Asamblea Legislativa discuten y definen lo que significa la "experiencia profesional" que hay que tomar en cuenta al determinar si un abogado posee las cualificaciones que se requieren para ser nombrado Juez. En el Art. 1.002(a) del Plan de Reorganización, *supra*, pág. 1, se define como aquella que se adquiere luego de haberse graduado de abogado. Hemos consultado con la Oficina de Administración de los Tribunales y allí nos informaron que de sus récord surge que a todos los abogados que han sido nombrados para ocupar el cargo de juez, con excepción de los Jueces de Paz que podían ser legos, siempre se les ha requerido que reúnan las cualificaciones que ahora se establecen en el Art. 1.002(a), *supra*.

leyes que se han aprobado sobre este particular,[45] es que en algunos casos se ha manifestado un cierto grado de insatisfacción por los ciudadanos y abogados usuarios del sistema cuando el Juez Presidente se ha visto precisado, en un momento dado por la falta de Jueces Superiores o de Distrito, a designar a un juez de menor jerarquía para atender asuntos que *no* son de su competencia. La solución a este problema, sin embargo, no es la drástica eliminación de los Jueces de Distrito y Municipales, sino una reevaluación de las sedes y/o la creación de nuevas plazas de juez, ya sea de Superior o de Distrito, cuando esto fuese necesario.

Cabe señalar que durante la Conferencia Judicial celebrada el 7 de abril de 1994, el rechazo al sistema consolidado que hoy se propone de parte de las diferentes regiones judiciales fue prácticamente unánime. Los Jueces Administradores señalaron los diferentes problemas con que se confrontarían las regiones si se implanta el sistema tal y como ha sido concebido.

3. *Eliminación del Juez Municipal y creación del Juez Magistrado*

La otra innovación importante en el Plan de Reorganización para lograr la consolidación del Tribunal de Primera Instancia es la creación de un funcionario que aunque lleva el nombre de juez, ya que se le conocerá como Juez Magistrado, no lo es. Este funcionario, *como regla ge-*

---

[45] La Ley Núm. 11 de 2 de junio de 1993 (4 L.P.R.A. secs. 1, 2n, 35, 37, 61an, 301), entre otras cosas, reconoció la facultad constitucional del Juez Presidente del Tribunal Supremo para designar administrativamente a un juez del Tribunal de Distrito para ejercer funciones de juez superior o a un juez municipal para ejercer funciones de juez de distrito, dispuso para compensar administrativamente al juez cuando la designación durase más de treinta (30) días y limitó estas designaciones administrativas al término de un (1) año.

La Ley Núm. 20 de 26 de mayo de 1982 (4 L.P.R.A. sec. 213) dispuso para la ampliación de los poderes de los jueces municipales. En la Exposición de Motivos de dicha ley se expresó que el propósito de ampliar estas facultados era "aprovechar la preparación y experiencia de estos jueces, a la vez que se logra gradualmente el establecimiento de Tribunales Municipales". 1982 Leyes de Puerto Rico 44. Esta ley también reconoció la autoridad del Juez Presidente para designar jueces municipales para actuar como jueces de distrito.

*neral*, no podrá ejercer las funciones adjudicativas propias de un juez. Hacemos énfasis en que esta falta de autoridad es relativa, debido a que la institución del Juez Magistrado está plagada de excepciones y en muchas circunstancias contradicciones.

La figura de Juez Magistrado que se estructura en el Plan de Reorganización es complicada, compleja y confusa, e incluye un número considerable de limitaciones y prohibiciones específicas que dan al traste con el objetivo de simplificación y unificación que se persigue.[46] Al inyectarle al proceso judicial la posibilidad de que por falta de autoridad y poder, en otras palabras, falta de jurisdicción, se puedan cuestionar y anular los procedimientos y las determinaciones de un funcionario judicial que ostenta, por lo menos en parte, atribuciones de juez, se está restableciendo en nuestro sistema la problemática que hace más de cuarenta (40) años ya habíamos superado: la jurisdicción limitada. Esta vez se está restableciendo, en su mayor parte, para atender ciertos incidentes interlocutorios dentro de un caso. Cabe señalar que uno de los logros más importantes y significativos que destacan, tanto el American Bar Association como los estados que sirvieron de base al Plan de Reorganización propuesto es, precisamente, el que se eliminaron los problemas que creaban las jurisdicciones limitadas, estableciendo tribunales con jurisdicción general.

El inciso (b) del Art. 5.203 del Plan de Reorganización, *supra*, pág. 40, establece para casos civiles un listado de veintiocho (28) asuntos procesales, la mayor parte de naturaleza interlocutoria, sobre los cuales el Juez Magistrado no tendrá autoridad, o sea que carecerá de juridicción para "conocer" de estas materias. Aun dentro de esta lista se visualizan excepciones. (ej., Art. 5.203(b)(23), *supra*). Este inciso autoriza al Tribunal Supremo para que, mediante

---

[46] El Plan de Reorganización al crear y reglamentar la institución de Juez Magistrado, por la cantidad de referencias y contra referencias de unas disposiciones a otras y a otras leyes, se asemeja y nos recuerda legislaciones innecesariamente complicadas que parecen estar hechas para que nadie las entienda.

reglamento, pueda modificar y/o eliminar algunas de las prohibiciones o limitaciones allí establecidas. Los incisos (c) y (d) resultan aún más problemáticos. Éstos se entrelazan y modifican, tanto en cuanto a la autoridad concedida a este funcionario, como en cuanto a las limitaciones y prohibiciones que se le imponen en los incisos anteriores, a tenor con lo que pueda disponer el Tribunal Supremo mediante reglamento o por una orden dictada por el Juez Superior a quien esté supeditado el Juez Magistrado.[47] Esto crea una compleja madeja de facultades y falta de autoridad que, sin lugar a dudas, complicará los casos y creará más problemas de los que se pretenden resolver, teniendo como consecuencia la creación de inevitables retrasos en un ya sobrecargado calendario. Esta probabilidad la han reconocido los autores del Plan de Reorganización al proveer en el Art. 3.002(d)(4) para la revisión ante el Tribunal Supremo, mediante auto extraordinario de certificación, de "cuestiones relacionadas con interpretaciones sobre la autoridad judicial del juez Magistrado y aquellas facultades delegadas a éste por el Juez; así como cualquier cuestionamiento a la validez o constitucionalidad de la institución de juez auxiliar". (Énfasis suprimido.) Plan de Reorganización, *supra*, págs. 8–9.

El Art. 5.203, Parte II, *supra*, versa sobre la autoridad del Juez Magistrado en casos criminales. Éste presenta, en cuanto a su complejidad, problemas similares a los previamente discutidos. En el inciso (a) de este artículo se enumeran veintiséis (26) incidentes en el proceso criminal en los que puede intervenir el Juez Magistrado y en el inciso (b) se hace una lista de veinte (20) trámites procesales en los que este funcionario carece de jurisdicción para intervenir. Al igual que en el inciso (b) de la Parte I del Art. 5.203, *supra*, dentro de los incisos sobre autorización para actuar se crean excepciones. Lo mismo ocurre en cuanto a

---

[47] En el inciso (d) por error se hace mención al inciso (I), cuando en realidad se tiene que estar refiriendo al inciso (a).

los incisos sobre las prohibiciones. Para añadir a la confusión y complejidad del trámite procesal establecido en esta segunda parte del Art. 5.203, los incisos (c), (d), (e) y (f), *supra*, modifican, tanto la autoridad concedida al Juez Magistrado, como las prohibiciones que se le imponen en los incisos (a) y (b).

No se necesita mucha ponderación para llegar a la conclusión de que la institución de este funcionario, que es y no es juez, que ejerce funciones judiciales limitadas[48] y carece de jurisdicción en un sinnúmero de asuntos, choca con el eje central del concepto de tribunal unificado de jurisdicción general. Sin lugar a dudas desvirtúa el próposito del Plan de Reorganización de proveer una estructura simple, al subvertir el objetivo primordial de todo sistema judicial de proveer justicia rápida, económica e igual para todos los ciudadanos. Además, la delegación en este funcionario de autoridad para atender y resolver algún asunto crea la situación de percepción de desigualdad que los autores del Plan de Reorganización encuentran altamente nociva y que el plan pretende eliminar.[49] Entendemos que la situación que crea el plan, bajo los criterios esbozados por sus autores, es aún peor que lo que existe actualmente, pues el asunto o caso no sólo no lo estaría resolviendo un juez de igual experiencia profesional, sino que quien estaría resolviendo ni siquiera es propiamente un juez.

De todo lo antes expuesto surge con meridiana claridad que la institución de Juez Magistrado no puede lograr los

---

[48] Resulta curioso que el Juez Magistrado que crea el Plan de Reorganización, en ocasiones resulta tener menos autoridad que el Secretario del Tribunal, quien, a tenor con lo dispuesto en la Regla 45.2(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III, bajo las circunstancias allí dispuestas, tiene autoridad para dictar sentencia y adjudicar la controversia.

[49] Por ejemplo, a pesar de la gran importancia que revisten los asuntos tratados en la Ley de Protección a Menores, Ley Núm. 75 de 28 de mayo de 1980, según enmendada, 8 L.P.R.A. sec. 401 *et seq.*, y en la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989 (8 L.P.R.A. sec. 601 *et seq.*), el Plan de Reorganización le da autoridad a este funcionario, que ni siquiera es juez, a pesar de su nombre, para "considerar, atender y resolver" lo que allí se dispone. Art. 5.203(f)(3) y (4), *supra*.

objetivos del Plan de Reorganización (simplificar los procedimientos, lograr la óptima utilización de los recursos y proveer a la ciudadanía "justicia igual"), según este término es utilizado por los proponentes del Plan de Reorganización, que se refiere a justicia impartida por un juez con igual experiencia profesional. No le vemos virtud alguna a esta institución según está concebida.

Estamos firmemente convencidos de que no se debe crear la institución de Juez Magistrado ni eliminar la figura del Juez Municipal. No albergamos la menor duda de que un estudio empírico refrendaría nuestra convicción de que el Juez Municipal es un eslabón importantísimo y clave en nuestro sistema de impartir justicia. Éste es el funcionario judicial con quien el ciudadano usualmente tiene su primer contacto al acudir al tribunal en busca de una solución para los pequeños problemas que surgen de día a día y que necesitan rápida atención y solución para impedir que se conviertan en la semilla de grandes males sociales. Ese ciudadano tiene derecho a que sus quejas y problemas, de tener solución judicial, se las resuelva un juez. Para bien o para mal, la visión de la justicia que en este primer encuentro con el sistema tenga este ciudadano matizará su concepto del sistema de administrar justicia y ejercerá una gran influencia en su determinación de aceptar o no este medio pacífico de resolver disputas y será el mensaje que le transmitirá a sus conciudadanos.[50]

Si se ha de mejorar la imagen y la calidad de la justicia, hay que mejorar la infraestructura que le brinda apoyo a estos jueces, no eliminarlos y sustituirlos con la figura de un funcionario que no es juez, con todas las atribuciones que esto implica, a pesar de que se le conozca por el nombre de Juez Magistrado. Éste es un funcionario cuya autoridad no sólo es limitada, sino que está inmersa en una complicada madeja de autorizaciones y prohibiciones.

---

[50] Acompañamos como Anejo IV la tabla comparativa de las funciones y los deberes de los jueces municipales y los jueces auxiliares.

B. *Derecho de apelación, tanto en casos civiles como en casos criminales*

Para atender la meta de otorgar el derecho de apelación, tanto en casos criminales como en casos civiles, el Plan de Reorganización en el Cap. 4, Arts. 4.001–4.003 crea un tribunal intermedio, el Tribunal de Apelaciones compuesto por veintiún (21) jueces. Plan de Reorganización, *supra*, págs. 15–22. Luego de analizarlas estimamos que las disposiciones sobre este particular están razonablemente encaminadas a lograr la meta trazada. Sin embargo, creemos, según señalara la Asamblea Legislativa en la Exposición de Motivos de la Ley Núm. 11, *supra*, que la determinación del número de jueces que serían necesarios debería hacerse luego de que se lleve a cabo un estudio de las necesidades proyectadas. 1952 Leyes de Puerto Rico 31.

## VI

*Consolidación—Creación de una sola sección y competencia unificada*

La proyectada eliminación de los Jueces de Distrito y la creación de una sola sección y de una sola categoría de juez, el Juez Superior; el establecimiento de competencias unificadas en cuanto a cuantía, materia y gravedad de delito, sin que se consolide también la competencia territorial y se le otorgue a la Rama Judicial injerencia activa en la creación y eliminación de las sedes, no podrá lograr los objetivos que se persiguen.

Al no reconocerle a la Rama Judicial la facultad de determinar las sedes, el Plan de Reorganización no podrá lograr su propósito de mayor eficiencia y óptima utilización de los recursos porque adolece del defecto de no reconocerle a la Rama Judicial la facultad de determinar las sedes. Es esta rama la que cuenta con toda la información necesaria para tomar decisiones racionales tomando en cuenta los cambios demográficos y sociales. Ella es quien tiene una

mejor percepción de lo que hace falta para lograr un funcionamiento integral del sistema. Éste está determinado por la carga del trabajo, la distribución de los recursos humanos, la accesibilidad a través de las rutas de transportación pública, las vías de acceso, las condiciones de las carreteras y el tiempo de recorrido, entre otros.

La participación de la Rama Judicial en el proceso de determinación de sedes es fundamental para cualquier reorganización. A pesar de que es la Rama Judicial la que va a tener las consecuencias administrativas de la creación de las sedes, el plan no provee para que se le dé la participación que corresponde en el proceso. A través del tiempo las sedes se han establecido según la percepción que ha tenido el poder legislativo de las necesidades particulares de algunos municipios, lo cual se ha podido corroborar no es necesariamente lo que requiere el sistema para funcionar eficientemente.

El reclamo de esta facultad para la Rama Judicial no es nuevo. En 1974, por ejemplo, el Consejo sobre la Reforma de la Justicia recomendó que se delegara dicha facultad en el Juez Presidente, sujeto a la aprobación por parte de la Asamblea Legislativa, mediante un mecanismo similar al que rige para la adopción de las reglas procesales. Art. V, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1. Véase el Informe del Consejo sobre la Reforma de la Justicia de la Comisión para el Estudio de los Tribunales, Vol. 1, 1974, págs. 91–92, según citado en el Informe de la Comisión Asesora del Juez Presidente sobre la Estructura y Funcionamiento del Tribunal de Primera Instancia de marzo de 1987, págs. 48–49. El Informe de 1987, previamente citado, recogió esta recomendación y así fue incluida en el Informe Final sobre Reforma Judicial del Comité de Reforma Judicial y del Tribunal de Primera Instancia de 1994. Apéndice I del Memorial Explicativo.

Téngase presente que la consolidación de tribunales, propuesta en los estudios anteriores, presuponían la parti-

cipación activa de la Rama Judicial en la determinación de las sedes. El Plan de Reorganización, por el contrario, establece las sedes específicamente por ley y no brinda flexibilidad alguna en comparación con el sistema actual. Arts. 5.004 y 9.101 del Plan de Reorganización, *supra*, págs. 27 y 70. Por el contrario, el lenguaje que utiliza tiende a mayor injerencia legislativa que la que actualmente se ejerce en esta determinación. Aparte de ello, el lenguaje utilizado en cuanto a la reorganización de las sedes es sumamente confuso. Véanse: Arts. 9.001, 9.002, 9.006, 9.007 del Plan de Reorganización, *supra,* págs. 70–71 y 76–77, y Memorial Explicativo, págs. 12–13, 25–26, 27–30 y 66.

A pesar de que la facultad para fijar las sedes puede hacerse de manera más flexible, sin que sea necesario la consolidación, ya sea la propuesta en este plan o cualquier otro tipo, consideramos que los propósitos que expresa el Plan de Reorganización propuesto sólo se lograrán con efectividad si se otorga a la Rama Judicial la facultad real para reorganizar las sedes.

## VII

*Recomendación*

Por todo lo antes expresado, recomendamos que no se apruebe el Plan de Reorganización tal y como se ha presentado a la Asamblea Legislativa.

Sin embargo, si a pesar de todos los problemas que hemos señalado se determina aprobar una medida de esta naturaleza, por la gran importancia que tiene para el país conservar y fortalecer la estabilidad y confiabilidad de la institución que tiene a su cargo la solución de controversias y que sirve de factor legitimador de las otras dos (2) ramas del Gobierno, recomendamos que esta reorganización se haga primeramente mediante la implantación de un plan piloto experimental en uno de los distritos judicia-

les que sea representativo, y que sea luego de una evaluación de su funcionamiento, con todos los datos empíricos que esto arrojará, que se tome la determinación de si se debe o no realizar la reforma del sistema en su totalidad. Si no funciona, sólo se desestabilizaría una región judicial, no todo el sistema. Si funciona, al implantarlo en el resto del sistema se tendría el beneficio de una experiencia que facilitará los ajustes necesarios tales como el requerido desarrollo de la infraestructura administrativa y la adecuación de las facilidades físicas.

Entendemos que el Juez Presidente tiene autoridad para establecer un plan piloto de esta naturaleza en una región judicial, sin que esto menoscabe el concepto de tribunal unificado. Sin embargo, para viabilizar el propuesto experimento habría que otorgarle a la Rama Judicial la facultad de establecer todas las competencias y ofrecerle los recursos para el previo desarrollo de la infraestructura administrativa y de la adecuación de las facilidades físicas.

# ANEJO I

| | Connecticut | Minnesota | Dakota del Norte | Washington D.C. | Puerto Rico |
|---|---|---|---|---|---|
| Área Territorial (Millas²) | 4,845 | 79,617 | 68,994 | 61 | 3,421 |
| Población | 3,287,116 | 4,375,099 | 638,800 | 606,900 | 3,336,000 |
| Densidad por milla² | 678.40 | 54.95 | 9.26 | 9,882.76 | 975.15 |
| Tribunal Última Instancia | Tribunal Supremo 7 Jueces Término de 8 años nominados por el gobernador, consentimiento y aprobación legislativa | Tribunal Supremo 7 Jueces término de 8 años | Tribunal Supremo 5 Jueces término de 10 años | "Court of Appeals" 9 Jueces término de 15 años | Tribunal Supremo 7 Jueces hasta los 70 años |
| Tribunal Intermedio Apelaciones | Tribunal Apelaciones 9 Jueces término de 6 años | Tribunal de Apelaciones 16 Jueces término de 6 años | Tribunal de Apelaciones 35 Jueces | ... | ... |
| Tribunal Primera Instancia | Tribunal Superior 150 Jueces | Tribunal de Distrito 242 Jueces término de 6 años | Tribunal de Distrito 24 Jueces término de 6 años | Tribunal Superior 59 Jueces término de 15 años | Tribunal Superior y de Distrito 111 Jueces Superiores 96 Jueces de Distrito |
| Otros | "Probate Court" 131 Jueces | "Conciliation Division" | "County Court" 26 Jueces Municipal Court 51 Jueces | | |
| Administración de los Tribunales | Chief Court Administrator | Tribunal Supremo Court Administrator | Tribunal Supremo | Joint Committee on Judicial Administration Executive Officer | Juez Presidente Tribunal Supremo (OAT) |

## ANEJO II

## ANALISIS Y COMENTARIOS SOBRE LAS ESTADISTICAS PRESENTADAS EN EL INFORME MEMORIAL EXPLICATIVO — PLAN DE REORGANIZACION NUM. 1 DE 1994 — RAMA JUDICIAL

*Introducción*

Durante varios meses la División de Estadísticas de la Oficina de Administración de los Tribunales (OAT) ha estado proveyendo, a solicitud, cuadros estadísticos a los Asesores del Gobernador para asuntos de la Reforma Judicial. Estas estadísticas se refieren al movimiento de casos en el Tribunal Supremo, en el Tribunal de Apelaciones y en las salas del Tribunal de Primera Instancia. Algunos de estos datos fueron utilizados por los asesores del Gobernador para sustentar o justificar planteamientos y propuestas sobre diferentes aspectos considerados en el Plan de Reorganización de la Rama Judicial.

Nos preocupa la utilización inadecuada que se ha hecho de estas estadísticas para justificar o sustentar cambios en el sistema judicial. El uso acomodaticio y en ocasiones falaz e incorrecto de los datos, distorsiona la realidad y conduce a conclusiones erróneas. Esta situación se evidencia con mayor intensidad cuando se proyecta la carga de trabajo que habrá de tener el Tribunal Supremo y el Tribunal de Apelaciones bajo el esquema de organización propuesto.

A fin de aclarar toda esta distorsión presentamos nuestros comentarios sobre las estadísticas presentadas en el mencionado documento, y las proyecciones sobre casos a presentarse desarrolladas por la División de Estadísticas de la O.A.T.

## I. Análisis de las estadísticas del Tribunal de Primera Instancia

Se presentan las estadísticas sobre el movimiento de casos en las salas del Tribunal Superior, de Distrito y Municipal. A los fines de sustentar el argumento de que una gran mayoría de la población no se beneficia de la justicia de "mayor calidad", que según se plantea es la del Tribunal Superior, se destaca a través de todo el análisis el hecho de que el Tribunal de Distrito y Municipal en conjunto resuelven cuantitativamente mas casos que el Tribunal Superior. Sin embargo cuando se presentan las estadísticas sobre los casos civiles resueltos en el Tribunal Superior no se toman en consideración los casos de relaciones de familia, que son una materia civil y que constituyeron en el año 1992–93 el 47% de los casos civiles resueltos en ese Tribunal. Los casos civiles resueltos fueron 25,993 y los de relaciones de familia fueron 23,075 para un total de 49,068. (véase cuadro estadístico provisto por la O.A.T., Apéndice 3, pág. 58). Da la impresión de que se quisiera disminuir o minimizar la cifra de casos civiles resueltos en el Tribunal Superior.

Utilizando esos datos incompletos arriban a una relación de casos civiles resueltos en el Tribunal de Primera Instancia, de 3.6 a 1. La interpretación de esto es que por cada caso civil que se resolvió en el Tribunal Superior, se resolvieron 3.6 en los Tribunales de Distrito y Municipal (véase Apéndice 3, Tablas y Gráficas, pág. 15). Haciendo el cálculo correctamente, la relación es de 1.9 a 1.

$$\frac{\text{Casos civiles resueltos T. Distrito y T. Municipal}}{\text{Casos civiles resueltos Tribunal Superior}} = \frac{94{,}211}{49{,}068} = 1.92$$

Mas adelante (véase Apéndice 3, pág. 51), utilizando la misma cifra incompleta de casos civiles resueltos en el Tri-

bunal Superior (25,993) y tergiversando el concepto de casos presentados vs. volumen de casos, calculan un por ciento de casos civiles que fueron al Tribunal Supremo mediante el recurso de revisión civil.

Es importante aclarar que en un movimiento de casos, el volumen de casos representa los casos presentados en un período dado, sumados a los que quedaron pendientes del período anterior. Cuando se habla de demanda por servicios judiciales en un período dado, el concepto que debe utilizarse es el de casos presentados y no el de volumen de casos.

Erróneamente se utilizó el concepto de volumen en lugar de casos presentados, para concluir que 3.77% de los casos civiles resueltos en el Tribunal Superior fueron apelados al Tribunal Supremo, mediante el siguiente ejercicio aritmético:

$$\frac{\text{Revisiones civiles presentadas T. Supremo}}{\text{Casos civiles resueltos T. Superior}} = \frac{980}{25,993} \times 100 = 3.77\%$$

La cifra de 980 constituye el volumen de revisiones civiles en el Tribunal Supremo (casos pendientes del año anterior + casos presentados en 1992–93). El cálculo correcto de esta relación es como sigue:

$$\frac{622}{49,068} \times 100 = 1.27\%, \quad \text{donde:}$$

622 = revisiones civiles presentadas en el Tribunal Supremo en 1992–93.

49,068 = total de casos civiles resueltos en el Tribunal Superior en 1992–93.

Igualmente ocurre con las apelaciones civiles para las que, utilizando el volumen de apelaciones en lugar de los casos presentados y el número incompleto de casos civiles resueltos en el Tribunal Superior, se concluye que.54% de

los casos civiles resueltos en el Tribunal Superior, fueron apelados ante el Tribunal Supremo. (véase pag. 53, apéndice 3). El cálculo correcto es:

$$\frac{\text{Apelaciones civiles presentadas T. Supremo}}{\text{Casos civiles resueltos T. Superior}} = \frac{76}{49,068} \times 100 = .15\%$$

Del mismo modo se tergiversan las estadísticas para concluir que .88% de los casos criminales resueltos en el Tribunal Superior fueron apelados al Tribunal Supremo. El cálculo correcto es:

$$\frac{\text{Apelaciones criminales presentadas T. Supremo}}{\text{Casos criminales resueltos T. Superior}} = \frac{41}{43,061} \times 100 = .095\%$$

Para corroboración de las estadísticas del Tribunal Supremo véase Apéndice 3, pág. 85.

## II. Análisis de las estadísticas del Tribunal Supremo y proyecciones de la carga de trabajo del Tribunal Supremo y del Tribunal de Apelaciones.

El cálculo de los índices y por cientos anteriormente discutidos no tienen otro propósito que de servir de preámbulo para realizar unas proyecciones de lo que sería la carga de trabajo del Tribunal Supremo una vez se implante la reorganización propuesta. Por supuesto, es evidente la intención de magnificar dicha carga de trabajo a fin de justificar la desafortunada sugerencia que sobre el funcionamiento y composición del Tribunal Supremo se plantea en el memorial explicativo, pág. 58, la cual no nos compete discutir en este análisis de las estadísticas.

### A. PROYECCION 1

Con este ejercicio se proyectan los casos civiles que tendría el Tribunal Supremo ante su consideración para el 1994–95, incluyendo las apelaciones civiles y las revisiones civiles. Nuevamente mediante el uso incorrecto de las estadísticas y utilizando supuestos totalmente equivocados y carentes de fundamento, se concluye que en el 1994–95, el Tribunal Supremo tendría ante su consideración 5,152 apelaciones civiles, que comparadas con 1,120 que tuvo en 1992–93, equivale a un aumento de 360% o lo que es igual, que aumentará el volumen de casos 4.6 veces.

Veámos en detalle. La fórmula "mágica" para llegar a esa cifra es la siguiente:

$X = Y + Y(n)$, donde:

$X$ = apelaciones civiles que tendrá el Tribunal Supremo ante su consideración en 1994–95.

$Y$ = volumen de apelaciones civiles y revisiones civiles en 1992–93.

$n$ = relación de casos civiles resueltos en el Tribunal de Distrito y Municipal VS. los resueltos en el Tribunal Superior.

Así pues:

$X = 1,120 + 1,120 (3.6)$

$X = 5,152$

a–Primeramente, en este ejercicio se parte de la base del volumen de casos (1,120) que como mencionáramos anteriormente, equivale a casos presentados en un período dado, sumados a los casos pendientes del período anterior. Esto ciertamente representa los casos que el Tribunal tuvo ante su consideración. Sin embargo, como tambien mencionamos, las proyecciones sobre la demanda por servicios se basan en los casos presentados (698) y no en el volumen. En esta proyección no solo se está multiplicando por 3.6 veces los casos presentados, sino también los pendientes del año anterior.

b–En segundo término se adopta un supuesto totalmente desenfocado, introduciendo un elemento que no tiene ninguna relación con la propensión a apelar los casos civiles ni con el posible aumento en las apelaciones civiles del Tribunal Supremo. Esta es la relación entre los casos civiles resueltos en el Tribunal de Dis-

trito y Municipal vs. los resueltos en el Tribunal Superior; cálculo, que dicho sea de paso, está erróneo, ya que no es 3.6, sino 1.9. Este indice es el que se utilizó para calcular el aumento en las apelaciones civiles, lo cual es totalmente incorrecto.

c–Se asume que una vez se consolide el Tribunal de Primera Instancia e instituído el derecho de apelación en casos civiles provenientes del Tribunal de Distrito y del Tribunal Municipal, "cabe esperar que el número de apelaciones civiles aumente dramáticamente". Este es un argumento fácilmente debatible por las siguientes razones:

1. Actualmente existe el derecho de apelación civil del Tribunal de Distrito y del Tribunal Municipal al Tribunal Superior. En el año 1992–93, se apelaron 155 casos civiles al Tribunal Superior lo que implica un 0.2% del total de casos civiles resueltos en el Tribunal de Distrito y el Tribunal Municipal (94,211).

2. Esta es una cifra sumamente discreta, tomando en cuenta que la apelación en el Tribunal Superior es mas accesible ya que es mas económica que en el Tribunal Supremo. Aún cuando se consolide el Tribunal de Primera Instancia y no haya diferencias en la competencia determinadas por la cuantía, siempre habrá casos de menor cuantía, que son los que actualmente se atienden en el Tribunal de Distrito y Municipal. ¿Estaría el ciudadano dispuesto a apelar al Tribunal Supremo con esos casos de menor cuantía cuando probablemente ganando, pierda?. ¿Cabría entonces suponer, que aumentarán "dramáticamente las apelaciones civiles del Tribunal de Distrito y Municipal?. No parece muy probable.

Cabe concluir que la proyección de 5,152 apelaciones civiles en el Tribunal Supremo no solo es una cifra exagerada sino que la metodología y supuestos utilizados carecen de validez científica.

## B. **PROYECCION 2**

Con este ejercicio se proyectan las apelaciones criminales que tendría ante sí el Tribunal Supremo para el 1994–95. Nuevamente mediante el uso incorrecto del concepto volumen en lugar de casos presentados y fundamentado en supuestos de cuestionable validez se proyectan 722 apelaciones criminales lo que implica un aumento de 90% en el volumen de apelaciones criminales como producto de los casos que ahora se resuelven en el Tribunal de Distrito.

Se aduce nuevamente que producida la consolidación e instituído el derecho de apelación en todo tipo de caso cri-

minal proveniente del Tribunal de Distrito, "cabe esperar que el número de apelaciones criminales aumente dramáticamente".

Esta es una apreciación de bases incorrectas ya que actualmente existe el derecho a apelación de todos los casos criminales.

La realidad es que durante el año 1992–93 se apelaron 170 casos criminales del Tribunal de Distrito al Tribunal Superior, lo que equivale a un 0.44% del total de casos criminales resueltos en el Tribunal de Distrito. Por otro lado se apelaron, no 380 casos como se dice en la explicación de la proyección, ya que esta cifra es el volumen de casos, sino 109 casos criminales, (41 en el Tribunal Supremo y 68 en el Tribunal de Apelaciones) lo que equivale a.25% de los casos criminales resueltos en el Tribunal Superior. En total, en el año 1992–93 se apelaron 279 casos criminales, o sea, 0.34% del total de 81,727 casos criminales resueltos en el Tribunal de Primera Instancia. Consideramos poco probable que la propensión a la apelación en los casos criminales aumente dramáticamente como se asume en el documento de referencia. Las mismas consideraciones de costo que mencionamos anteriormente, aplicarían en esta situación.

## C. **PROYECCION 3**

Con este ejercicio se proyectan los recursos de Certiorari que se presentarían en el propuesto Tribunal de Apelaciones en el 1994–95.

Tal cual ha sido la tónica a través de todos los ejercicios, en éste también se toma como base el volumen de recursos de Certiorari (760) en el Tribunal Supremo en el 1992–93. Lo correcto sería tomar los casos presentados que ascendieron a 488, mas los presentados en el Tribunal de Apelaciones, para un total de 961.

Para la proyección se dividió el volumen de recursos de Certiorari entre 1.16, que es la relación entre casos pen-

dientes del Tribunal Superior y los casos pendientes en el Tribunal de Distrito.

Al igual que en la Proyección 1, se utilizó un supuesto desenfocado ya que el exceso de casos pendientes de un tribunal sobre otro, no tiene. nada que ver con la propensión a presentar un recurso de Certiori en el Tribunal de Apelaciones.

### III.  Proyecciones de la División de Estadísticas de la OAT sobre los casos a presentarse en el Tribunal Supremo y en el propuesto Tribunal de Apelaciones:

Las proyecciones realizadas para calcular los casos que se presentarían en el Tribunal Supremo y en el Tribunal de Apelaciones están basadas en la experiencia obsevada durante los últimos cuatro años.

### Metodología:

1.  En aquellos recursos como las apelaciones criminales de casos resueltos tanto en el Tribunal Superior como en el de Distrito, apelaciones civiles de casos del Tribunal de Distrito y revisiones civiles se obsevó la relación (proporción) con los casos resueltos del Tribunal apelado. En vista de que la relación mantiene una tendencia estable se promedió y se obtuvo una relación (proporción promedio) para el año de la proyección (1994–95).

2.  Se proyectó la cifra de casos resueltos (criminales y civiles) en el Tribunal Superior y Tribunal de Distrito y se le aplicó la relación correspondiente obtenida en el paso núm. 1. (véase tabla I) La proyección de los casos resueltos se obtuvo de la siguiente forma:

a–Se proyectaron los casos a presentarse por asunto y por sección del Tribunal por el método de regresión.

b–Se proyectaron Indices de Resolución esperados conforme la experiencia observada en años anteriores.

c–Se obtuvieron los casos a resolverse, multiplicando el Indice de Resolución por los casos a presentarse.

El análisis de regresión se utiliza para determinar la forma probable de la relación entre dos variables con el objetivo final de predecir el valor de una de éstas.

En nuestro caso, se utilizaron dos variables; X (años fiscales) y Y (casos). Dado el comportamiento probable de la relación entre nú-

mero de casos y los años fiscales anteriores, se proyectó el comportamiento de los casos para el año 1994–95.

3. Otros recursos como Revisiones Administrativas, Certiorari, Apelaciones civiles, (que envuelven cuestión constitucional), Revisiones bajo Leyes Especiales y Recursos de Jurisdicción original se proyectaron por el método de regresión.

4. Otros recursos en los que los valores observados son tan mínimos que incluso hay años donde no hay observaciones, se mantuvo la misma cifra que en 1992–93.

En estas proyecciones no se consideraron los recursos de Certiorari por:

●sentencias del Tribunal de Apelaciones
●resoluciones, ordenes y providencias del Tribunal de Apelaciones.

Tampoco se consideró el impacto (en las apelaciones civiles de casos del Tribunal Superior) que pudiera tener el hecho de que se instituya la apelación civil, como derecho. Por las consideraciones de costo que mencionamos anteriormente, este impacto no debería ser significativo.

Los resultados de estos ejercicios se presentan en la Tabla II (Tribunal Supremo) y Tabla III (Tribunal de Apelaciones).

Aunque la proyección de casos a presentarse para el 1994–95 en el Tribunal Supremo arroja una cifra de 1,571, esta cifra podría ser mayor, toda vez que algunos renglones no se pudieron proyectar (véase notas en el Tabla II). Sin embargo se descarta que el número de recursos a presentarse se magnifique de la forma que se presenta en el documento del Ejecutivo.

Preparado por: División de Estadísticas, Administración de Tribunales

29   de abril de 1994

TABLA I
PROYECCION DE CASOS A PRESENTARSE EN EL TRIBUNAL SUPREMO
RECURSOS SELECCIONADOS

| RECURSOS Y CASOS RESUELTOS | HISTORICO | | | | PROYECCION |
|---|---|---|---|---|---|
| | 1989-90 | 1990-91 | 1991-92 | 1992-93* | 1994-95 |
| 1. Revisiones civiles (Tribunal Supremo) | 773 | 661 | 650 | 622 | 478 |
| Casos civiles resueltos en el Tribunal Superior | 74,676 | 74,100 | 74,512 | 49,068 | 47,776** |
| Relación | 1.0 | 0.9 | 0.9 | 1.3 | 1.0 |
| 2. Casos civiles apelados al Tribunal Superior | 197 | 154 | 194 | 155 | 236 |
| Casos civiles resueltos en el Tribunal de Distrito | 56,358 | 59,551 | 75,669 | 82,088 | 78,824** |
| Relación | 0.3 | 0.3 | 0.3 | 0.2 | 0.3 |
| 3. Casos criminales apelados al Tribunal Superior | 265 | 230 | 215 | 170 | 261 |
| Casos criminales resueltos en el Tribunal de Distrito | 47,070 | 40,781 | 38,770 | 38,666 | 43,450** |
| Relación | .56 | .56 | .55 | .44 | 0.6 |
| 4. Apelaciones criminales en el Tribunal Supremo | 106 | 113 | 122 | 109*** | 170 |
| Casos criminales resueltos en el Tribunal Superior | 33,714 | 38,112 | 39,213 | 43,061 | 56,632** |
| Relación | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |

*Entró en vigor el cambio en competencia por lo que se reducen los casos civiles en el Tribunal Superior y aumentan en el Tribunal de Distrito.
**Proyección por el método de regresión.
***Incluye casos presentados en el Tribunal de Apelaciones
NOTA: Las relaciones para la proyección se obtuvieron promediando las observadas del 1989-90 al 1992-93.

Fuente: OAT, División de Estadísticas

29 de abril de 1994

TABLA II
CASOS PRESENTADOS POR RECURSO
AÑOS SELECCIONADOS

| RECURSOS | HISTORICO | | | | PROYECCION |
|---|---|---|---|---|---|
| | 1989-90 | 1990-91 | 1991-92 | 1992-93 | 1994-95 |
| Apelaciones | | | | | |
| Civiles | 62 | 41 | 49 | 76 | 57 1/ |
| Criminales | 106 | 113 | 122 | 109* | 431** |
| Certificaciones | - | - | 1 | 3 | 3 |
| Certiorari | 802 | 726 | 775 | 961* | 297 2/ |
| Jurisdicción original | | | | | |
| Auto Inhibitorio | 1 | 3 | 3 | - | 3 |
| Habeas Corpus | 9 | 6 | 6 | 4 | 11 |
| Mandamus | 13 | 3 | 16 | 4 | 9 |
| Injunction | - | - | 1 | - | - |
| Revisiones civiles 3/ | 773 | 661 | 650 | 622 | 714*** |
| Otros asuntos | | | | | |
| Conducta profesional | 37 | 18 | 16 | 26 | 31 |
| Formulación de cargos | - | - | - | - | - |
| Querellas Colegio Abogados | - | - | - | - | - |
| Expedientes personales de Abogados | - | - | - | 15 | 15 |
| Total | 1803 | 1571 | 1639 | 1805 | 1571 |

1/ Proyectado por el método de regresión.
2/ Se proyectaron los certiorari por el método de regresión. Al resultado (989) se le
aplicó un 70% que se estima son certiorari interlocutorios, que irían al Tribunal de
Apelaciones. El 30% son otro tipo de certiorari que irían al Tribunal Supremo. Se está
tratando de refinar este cálculo a través del examen de una muestra de casos. No están
considerados los certiorari por sentencias, resoluciones, órdenes y providencias
interlocutorias del Tribunal de Apelaciones.
3/ Las revisiones civiles se consideraran apelaciones.

*Incluye los recursos presentados en el Tribunal de Apelaciones.
** 170 casos provienen del Tribunal Superior y 261 casos provienen del Tribunal de
Distrito.
***478 casos provienen del Tribunal Superior y 236 casos provienen del Tribunal de
Distrito.

Fuente: OAT, División de Estadísticas

29 de abril de 1994

TABLA III
TRIBUNAL DE APELACIONES
CASOS A PRESENTARSE

| RECURSOS | HISTORICO | | | | PROYECCION |
|---|---|---|---|---|---|
| | 1989-90 | 1990-91 | 1991-92 | 1992-93 | 1994-95 |
| Revisiones Administrativas | 653 | 785 | 857 | 608 | 700 |
| Revisiones bajo Leyes Especiales | 87 | 68 | 42 | 36* | 57 |
| Recursos Gubernativos | 7 | 3 | 7 | 6 | 7 |
| Junta Azucarera | - | - | - | - | - |
| Junta de Salario Mínimo | - | - | - | - | - |
| Junta de Relaciones del Trabajo | 32 | 13 | 8 | 2 | 13 |
| Comisión Industrial | 48 | 52 | 27 | 4 | 37 |
| Certiorari Interlocutorios | | | | | 692** |
| Total | | | | | 1442 |

*Incluye 24 casos presentados en el Tribunal de Apelaciones. El desglose no está disponible.
*Véase proyección de casos a presentarse en el Tribunal Supremo, Nota 2.

Fuente: OAT, División de Estadísticas

29 de abril de 1994

ANEJO III

| Plan de Reorganización de la Rama Judicial | Rama Judicial Organización actual | Diferencias que hacen los cambios | Metas y Objetivos del Plan de Reorganización | Si plan de reorganización con cambios logra las metas |
|---|---|---|---|---|
| (Cambios Propuestos)<br><br>I. Consolidación –Tribunal de Primera Instancia<br>1. una sola categoría de Juez – Juez Superior<br>a) años de experiencia profesional uniforme<br>b) salarios uniformes<br>c) preparación uniforme<br>d) jurisdicción general uniforme<br>e) algunas competencias unificadas en cuanto a materia, cuantía y gravedad de delito – Rama Judicial establecerá normas de asignación de casos– flexibilidad en la celebración de sesiones en municipios | I. Tribunal de Primera Instancia<br>1. tres categorías de jueces:<br>Jueces Superiores<br>Jueces Distrito<br>Jueces Municipales<br>a) diferentes años de experiencia profesional<br>b) diferentes salarios<br>c) preparación uniforme<br>d) jurisdicción general uniforme<br>e) competencias– materia, territorio y gravedad de delito impuestas por la Asamblea Legislativa, al igual que las sedes | Jueces<br>1. años de experiencia uniforme<br>2. salarios uniformes<br><br>Competencias<br>1. ahora todas las establece la Asamblea Legislativa – después de la reorganización la Rama Judicial establecerá las verticales | I. Simplificar el sistema para lograr:<br>1. eficiencia al proveer mayor flexibilidad en la utilización de los recursos | no– en la actualidad hay prácticamente igual grado de flexibilidad que la que habría luego de los cambios – al no incluir en las competencias que se flexibilizan las territoriales y la reevaluación de las sedes, se frustra el propósito de mayor eficiencia |
| 2. Creación de una sola sección<br>a. jurisdicción general uniforme<br>b. competencia vertical unificada – normas asignación de casos impuestas por Rama Judicial | 2. Tres secciones<br>a) jurisdicción general uniforme<br>b) competencias –verticales y horizontales determinadas por la Asamblea Legislativa | Jurisdiccionales<br>Ninguno<br><br>Competencia<br>Diferencia estriba en que se le permite a la Rama Judicial establecer algunas normas de competencia | Metas y Objetivos<br>Iguales | A. En términos de lograr flexibilidad y eficiencia no hay cambio alguno en cuanto a jurisdicción<br><br>B. En cuanto a competencia solo se logra alguna flexibilidad adicional |

| Plan de Reorganización de la Rama Judicial | Rama Judicial Organización Actual | Diferencias que hacen los Cambios | Metas y Objetivos del Plan de Reorganización de la Rama Judicial | Si Plan de Reorganización con cambio logra metas |
|---|---|---|---|---|
| Cambios Propuestos (Cont)<br><br>Tribunal de Primera Instancia<br><br>3. Creación Juez Magistrado Y eliminación de Jueces Municipales<br><br>a) No es Juez<br><br>b) Tiene jurisdicción limitada<br><br>c) Podría entender en los asuntos que hoy atiende el Juez Municipal (Competencia)<br><br>d) Rama Judicial no los puede designar para actuar como Jueces Superiores, Distrito o Municipal<br><br>e) Funcionario supeditado a Juez Superior | Tribunal de Primera Instancia<br><br>Juez Municipal<br><br>a) Tiene jurisdicción general<br><br>b) Competencia limitada<br><br>c) Tiene flexibilidad al utilizarlo<br><br>e) Es un Juez | Juez Magistrado - no es Juez<br><br>a) Atenderá la mayor parte de los asuntos que el Juez Municipal atiende hoy<br><br>b) Se vuelven a introducir al sistema problemas de jurisdicción, al crear un funcionario con jurisdicción limitada<br><br>c) Se limita la flexibilidad de la Rama Judicial en la utilización de este recurso | I- Igual a la anterior<br><br>II- lograr justicia igual y fácil acceso a los tribunales- entiéndase por justicia igual el que todos los que acudan al tribunal tengan acceso a la misma categoría de Juez para que resuelvan sus casos | No - El Plan de Reorganización no hace posible esta meta, ya que habrá usuarios del sistema que no tendrán acceso ni siquiera a un Juez<br><br>No- la creación de la figura de Juez Magistrado complica el proceso y le resta flexibilidad, eficiencia y efectividad al sistema |
| Creación Tribunal Intermedio- Tribunal Apelativo<br>Amplía Competencia del Tribunal Supremo<br>Apelaciones tanto para casos Civiles como Criminales | Apelación Solo en Casos Criminales<br>No hay Tribunal Intermedio | Creación de Tribunal Apelativo derecho a apelar casos Civiles | Proveer derecho de apelaciones en casos civiles | Se logra esta meta |

COMPARACION ENTRE LAS FUNCIONES QUE EJERCE EL JUEZ
MUNICIPAL Y LAS QUE EJERCERA EL JUEZ MAGISTRADO SEGUN
EL PLAN DE REORGANIZACION DE LA RAMA JUDICIAL

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| El Juez Municipal conocerá de los siguientes asuntos: | Tendrá autoridad para resolver lo siguiente: |
| 1. De todo asunto que a la fecha de la vigencia de la Ley Núm. 21 de julio 13, de 1992, podía conocer exclusiva o concurrentemente. | 1. Procedimientos sobre estados provisionales de derecho (Ley 140 de 23 de julio de 1974. |
| 2. Procedimientos sobre estados provisionales de derecho (Ley 140 de 23 de julio de 1974). | 2. Petición al amparo de Ley 116 de 12 de junio de 1980 (Código de Salud Mental). |
| 3. De todo recurso de revisión relativo a un boleto administrativo expedido al amparo de las secs. 301 et. seq. de 9 L.P.R.A. conocidas como "Ley de Vehículos y Tránsito de Puerto Rico". | 3. Asuntos dispuestos en Ley 75 de 28 de mayo de 1980 (Ley de Protección de Menores según enmendada). |
| 4. Petición al amparo de la Ley 116 de 12 de junio de 1980 (Código de Salud Mental), concurrentemente con el Juez de distrito. | 4. En asuntos dispuestos en Ley 54 de 15 de agosto de 1989 (Ley para la Prevención e Intervención con la Violencia Doméstica). |
| 5. En asuntos dispuestos en la Ley 75 de 28 de mayo 1980 (Ley de Protección de Menores según enmendada). | |
| 6. En asuntos dispuestos en Ley 54 de 15 de agosto de 1989 (Ley para Prevención e Intervención con la Violencia Doméstica). | |
| 7. Celebrar matrimonios. | |
| 8. Funciones electorales bajo 16 L.P.R.A. 3029 | |
| II. Funciones Generales | |
| 1. Participar como árbitro y mediadores en la resolución informal de disputas menores. | |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 2. Ordenar la comparecencia de personas que hayan de prestar declaración en un procedimiento seguido por él ante los casos y en la forma dispuesta en las Reglas de Procedimiento Civil.<br><br>3. Recibir juramentos a las personas comprendidas en algún procedimiento que estuviere pendiente ante él y en los demás casos en que sea necesario en el ejercicio de sus facultades y deberes.<br><br>4. Realizar u ordenar cualquier acto que resulte necesario a fin de cumplir a cabalidad sus funciones.<br><br>5. Recibir y certificar la constancia del cumplimiento de la sentencia o fallo de un tribunal.<br><br>6. Un juez podrá ejercer fuera del estrado todas las facultades que como tal le están conferidas expresamente, con independencia de las conferidas al tribunal.<br><br>I. En lo Civil:<br><br>1. De todo asunto civil en que la cuantía en controversia no exceda de tres mil (3,000) dólares, incluyendo reposesiones, ejecuciones de hipoteca mobiliaria o cualquier otro gravamen sobre propiedad mueble cuya cuantía no exceda de tres mil (3,000) dólares y reclamaciones bajo Regla 60 de Procedimiento Civil. | I. En lo Civil:<br><br>a. Autoridad Judicial<br><br>Salvo lo dispuesto en el acápite sobre prohibiciones y limitaciones, el Juez Magistrado puede atender, considerar y resolver, dentro de la competencia del Tribunal Superior:<br><br>Los incidentes interlocutorios que disponga el Tribunal Supremo por Reglamento (Art. 5.204 del Plan) en o antes de la Conferencia con Antelación al Juicio o señalamiento de Vista en su Fondo. |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| II. En lo Criminal | II. En lo Criminal |
| a. Autoridad Judicial | a. Autoridad Judicial |
| Los jueces municipales tendrán autoridad judicial para atender, considerar y resolver los siguientes asuntos interlocutorios: | Los jueces magistrados tendrán autoridad judicial para atender, considerar y resolver los siguientes asuntos interlocutorios (no pueden intervenir en asuntos que envuelvan cuestiones constitucionales): |
| 1. Determinación causa probable para arresto en delito graves y menos graves. | 1. Determinación causa probable para arresto en delitos graves y menos graves. |
| 2. Determinación causa probable en faltas bajo Ley de Menores. | 2. Determinación causa probable en faltas bajo Ley de Menores. |
| 3. Dictar orden de arresto o detención. | 3. Dictar orden de arresto o detención. |
| 4. Dictar orden de registro o allanamiento. | 4. Dictar orden de registro o allanamiento. |
| 5. Determinación sobre prestación de fianza en delitos graves y menos graves previo a la Conferencia con antelación al juicio o a señalamiento de vista en su fondo. | 5. Determinación sobre prestación de fianza en delitos graves y menos graves previo a la Conferencia con antelación al juicio o a señalamiento de vista en su fondo. |
| 6. Admitir fianza hasta fallo o veredicto. | 6. Admitir fianza hasta fallo o veredicto. |
| 7. Dictar orden de encarcelación o excarcelación al que se le haya confiscado o dejado sin efecto fianza o en caso de prestación de fianza respectivamente. | 7. Dictar orden de encarcelación o excarcelación al que se le haya confiscado o dejado sin efecto fianza o en caso de prestación de fianza respectivamente. Excepción: Dictar órdenes similares en relación a fianzas en apelación. |
| 8. Dictar orden de arresto o citación defectuosa bajo la R. 9 de Procedimiento Criminal. | 8. Dictar orden de arresto o citación defectuosa bajo la R. 9 de Procedimiento Criminal. |
| 9. Dictar orden verbal de arresto bajo R. 14 de Procedimiento Criminal. | 9. Dictar orden verbal de arresto bajo R. 14 de Procedimiento Criminal. |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 10. Dictar providencias sobre transmisión de orden de arresto bajo R. 20 de Procedimiento Criminal. | 10. Dictar providencias sobre transmisión de orden de arresto bajo R. 20 de Procedimiento Criminal. |
| 11. Entender y dictar providencias bajo R. 22 de Procedimiento Criminal. | 11. Entender y dictar providencias bajo R. 22 de Procedimiento Criminal. |
| 12. Al ser jueces de primera instancia pueden entender en R. 23 por designación. | 12. Entender en celebración de Vista Preliminar bajo R. 23 de Procedimiento Criminal. |
| 13. Al ser jueces de primera instancia pueden entender en esta situación por designación. (ver núm. 13 del otro lado de la tabla) | 13. Celebrar acto de lectura de acusación bajo R. 52 de Procedimiento Criminal, excepto situación contemplada en R. 54 sobre lectura de acusación en casos de co-acusados. Si el acusado solicita desestimación de acusación en este acto, deberá remitirse el asunto al juez para resolución. El juez magistrado podrá, en dicho, aceptar la presentación de defensas u objeciones sin entrar en el caso en su fondo. |
| 14. Ordenar al funcionario que tenga al acusado bajo su custodia que conduzca a éste a su presencia para oír acusación. | 14. Ordenar al funcionario que tenga al acusado bajo su custodia que conduzca a éste a su presencia para oír acusación. |
| 15. Cumplir con deber de información y de impartir advertencias bajo R. 57 y R. 58 de Procedimiento Criminal. | 15. Cumplir con deber de información y de impartir advertencias bajo R. 57 y R. 58 de Procedimiento Criminal.. |
| 16. Aceptar alegaciones de inocencia y de culpabilidad. Puede negarse a admitir alegación de culpable y ordenar que se anote alegación de no culpable. | 16. Aceptar alegaciones de inocencia y de culpabilidad, excepto alegación de culpabilidad por delito menor o distinto al imputado que sea resultado de alegación preacordada. Puede negarse a admitir alegación de culpable y ordenar que se anote alegación de no culpable. |
| 17. Aceptar renuncia a derecho a juicio por jurado, por ser un juez de instancia de un Tribunal unificado. | 17. Aceptar renuncia a derecho a juicio por jurado. |
| 18. Al ser jueces de primera instancia puede entender con anuencia del juez y partes. | 18. Cualquier asunto sobre descubrimiento de prueba bajo Reglas 94, 95, 95A; 95B de Procedimiento Criminal. Excepción: no podrá dictar orden prohibiendo que evidencia no descubierta se presente en el juicio, ni pasar juicio sobre objeciones a la admisión total o parcial de evidencia de deposiciones. |
| 19. Solicitud suspensión de vista. | 19. Solicitud suspensión de vista con excepción del juicio en su fondo |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 20. Solicitud citación de testigos, peritos o deponentes en cualquier etapa. | o de las vistas señaladas en el acápite sobre prohibiciones y limitaciones. |
| 21. Imposición de sanciones o castigar por desacato civil a la parte o su abogado. | 20. Solicitud citación de testigos, peritos o deponentes en cualquier etapa. No podrá dejar sin efecto o modificar una de estas citaciones realizadas para vista en su fondo u otra vista evidenciaria ante el juez o para cualquier asunto pendiente contemplados en el acápite sobre prohibiciones y limitaciones, excepto orden y mandamiento de citación para deposición. |
| 22. Podrá inhibirse, a iniciativa propia por motivos señalados en la R. 76 de Procedimiento Criminal o causa justificada de conformidad con la R. 80 de Procedimiento Criminal. | 21. Imposición de sanciones o castigar por desacato civil a la parte o su abogado en la misma forma que el juez, ajustado a la autoridad del juez magistrado. |
| 23. Castigar por desacato criminal cuando el acto se cometa en su presencia y también en las demás ocasiones. | 22. Podrá inhibirse, a iniciativa propia por motivos señalados en la R. 76 de Procedimiento Criminal o causa justificada de conformidad con la R. 80 de Procedimiento Criminal. |
| 24. Solicitud de orden para que acusado se someta a examen mental luego de que éste invoque la defensa de incapacidad mental. | 23. Castigar por desacato criminal sólo cuando el acto se cometa en su presencia. |
| 25. Como Comisionado Especial en asuntos ante su consideración como un examinador o árbitro de conformidad con la R. 41 de Procedimiento Civil, excepto que no percibirá honorarios por este servicio. Como Comisionado Especial también podrá entender en recursos extraordinarios o especiales. | 24. Solicitud de orden para que acusado se someta a examen mental luego de que éste invoque la defensa de incapacidad mental. |
| 26. Resolver cualquier asunto sobre ejecución de sentencia. | 25. De todo lo demás dispuesto por Reglamento del Tribunal Supremo, excepto lo dispuesto en acápite sobre Prohibiciones y Limitaciones. |
| 27. Atender y decidir cualquier asunto cuando la parte o partes lo hayan estipulado por escrito. | El Juez Superior podrá expedir resolución para autorizar al Juez Magistrado a conocer en (Civil): |
| | 1. Como Comisionado Especial en asuntos ante su consideración como un examinador o árbitro de conformidad con la R. 41 de Procedimiento Civil, excepto que no percibirá honorarios por este servicio. Como Comisionado Especial también podrá entender en recursos extraordinarios o especiales. |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| | 2. Resolver cualquier asunto sobre ejecución de sentencia. |
| | 3. Atender y decidir cualquier asunto cuando la parte o partes lo hayan estipulado por escrito. Se exceptúa la intervención en recursos de mandamus, Injunction, Quo warranto, Auto Inhibitorio y Habeas Corpus o sentencia declaratoria cuando esté unido a injunction. |
| 28. Resolver asuntos relacionados con remedios provisionales conforme la R. 56 de Procedimientos Civil o cualquier disposición similar que tal asunto en recursos extraordinarios, especiales presentados post-sentencia, especiales presentados post-sentencia por ser un juez de primera instancia de Tribunal unificado. | 4. Resolver asuntos relacionados con remedios provisionales conforme la R. 56 de Procedimiento Civil o cualquier disposición similar que tal asunto en recursos extraordinarios, especiales presentados post-sentencia. |
| 29. Por ser un juez parte del tribunal de instancia unificado podría entender en la desinsaculación con anuencia del juez y las partes. | El Juez Superior podrá expedir resolución para asignar al Juez Magistrado a conocer en lo siguiente (criminal): |
| 30. Por ser un juez parte del tribunal de primera instancia unificado podría en esta situación a anuenia del juez y las partes. (ver núm. 2 al otro lado bajo delegación Juez superior) | 1. Dirigir desinsaculación del jurado cuando la defensa y Ministerio Público así lo hayan estipuladp por escrito. Las partes deberán renunciar expresamente con consejo y consentimiento expreso de su abogado a que este proceso esté dirigido por Juez Superior. |
| 31. Cualquier otrdo asunto, con estipulación escrita de partes y anuencia del Juez. | 2. Resolver solicitud de revocación de orden sobre suspensión de sentencia dictada por juez competente por incumplimiento de condiciones para conceder la suspensión. |
| 32. Todo otro asunto dispuesto por Reglamento del Tribunal Supremo. | 3. Cualquier otro asunto, con estipulación escrita de partes y consentimiento escrito del abogado, siempre que no comprenda disposición final o parcial de la causa criminal. |
| Podrán recibir juramentos en procedimientos pendientes ante ellos. | |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| | 4. Todo otro asunto dispuesto por Reglamento del Tribunal Supremo. |
| | Podrán recibir juramentos en procedimientos pendientes ante ellos de conformidad con su autoridad judicial. |
| | No tendrán autoridad judicial para considerar, atender y resolver lo siguiente (Civil): |
| 33. Solicitud de Traslado de caso de una sala a otra del Tribunal Superior por el principio de unificación, con anuencia del Juez y partes. | 1. Solicitud de Traslado de caso de una sala a otra del Tribunal Superior. |
| 34. Solicitud de desistimiento al amparo de la R. 39.1 de Procedimiento Civil. | 2. Solicitud de desistimiento al amparo de la R. 39.1 de Procedimiento civil. |
| 35. Solicitud de desestimación por medio de la R. 10.2 de Procedimiento Civil, de la demanda, reconvención, demanda contra tercero o demanda contra co-parte. | 3. Solicitud de desestimación por medio de la R. 10.2 de Procedimiento Civil, de la demanda, reconvención, demanda contra tercero o demanda contra co-parte. |
| 36. Desestimación por medio de R. 39.2 de Procedimiento Civil. Incluye solicitud de desestimación en recurso extraordinario o especial. | 4. Desestimación por medio de R. 39.2 de Procedimiento Civil. Incluye solicitud de desestimación en recurso extraordinario o especial. |
| 37. Solicitud bajo la R. 10.3 de las de Procedimiento Civil. | 5. Solicitud bajo la R. 10.3 de las de Procedimiento Civil. |
| 38. Entender en Vista preliminar contemplada por R. 10.4 de Procedimiento Civil. | 6. Entender en vista preliminar contemplada por R. 10.4 de Procedimiento Civil. |
| 39. Solicitud al amparo de la 10.6 .de Procedimiento Civil. | 7. Solicitud al amparo de la R. 10.6 de Procedimiento Civil. |
| 40. Solicitud al amparo de la 10.7 de Procedimiento Civil. | 8. Solicitud al amparo de la R. 10.7 de Procedimiento Civil. |
| 41. Solicitud para que se conceda juicio por separado o se vea una reclamación o causa de acción, separada o en conjunto con otra parte. | 9. Solicitud para que se conceda juicio por separado o se vea una reclamación o causa de acción, separada o en conjunto con otra parte. |
| 42. Solicitud de consolidación o acumulación de 2 o más casos. | 10. Solicitud de consolidación o acumulación de 2 o más casos. |
| 43. Solicitud de nombramiento de defensor judicial a menor o incapacitado que sea parte en el caso. | |
| 44. Solicitud de orden al amparo de la R. 16.2 de Procedimiento Civil. | |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 45. Solicitud de autorización para transacción o estipulación que disponga final o parcialmente de la controversia. | 11. Solicitud de nombramiento de defensor judicial a menor o incapacitado que sea parte en el caso. |
| 46. Solicitud de eliminación o adición de partes en un pleito. | 12. Solicitud de orden al amparo de la R. 16.2 de Procedimiento Civil. |
| 47. Solicitud para que el pleito se sostenga como uno de clase. | 13. Solicitud de autorización para transacción o estipulación que disponga final o parcialmente de la controversia. |
| 48. Solicitud de desistimiento o transacción de pleito de clase. | 14. Solicitud de eliminación o adición de partes en un pleito. |
| 49. Solicitud de intervención al amparo de la R. 21 Procedimiento Civil. | 15. Solicitud para que el pleito se sostenga como uno de clase. |
| 50. Emitir sentencia de cualquier clase dentro de su competencia o por anuencia del juez y partes. | 16. Solicitud de desistimiento o transacción de pleito de clase. |
| | 17. Solicitud de intervención al amparo de la R. 21 de Procedimiento Civil. |
| 51. Solicitud de retiro de fondos consignados o depositados en el Tribunal. | 18. Emitir sentencia de clase alguna excepto que se le haya conferido autoridad por el Reglamento del Tribunal Supremo o que el Juez Superior lo haya autorizado a considerar y resolver, por Resolución y sentencia, cuando las partes lo hayan así estipulado por escrito. |
| 52. Solicitud para enajenar o disponer de la propiedad de un menor de edad. | 19. Solicitud de retiro de fondos consignados o depositados en el Tribunal. |
| 53. Asuntos interlocutorios que requieran vista evidenciaria. | 20. Solicitud para enajenar o disponer de la propiedad de un menor de edad. |
| 54. Emitir órdenes para nombrar Comisionados especiales en relación a los casos que entendiere. | 21. Asuntos interlocutorios que requieran vista evidenciaria excepto los dispuestos por Reglamento del Tribunal Supremo. |
| | 22. Emitir órdenes para nombrar Comisionados especiales en relación a los casos que entendiere. |
| | 23. La vista en su fondo excepto los casos en los que el Juez Superior |

- 9 -

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 55. La vista en su fondo. | les dé la autoridad mediante resolución con la estipulación escrita de las partes. |
| 56. Emitir resolución final en procedimientos de jurisdicción voluntaria y para perpetuar hechos. | 24. Emitir resolución final en procedimientos de jurisdicción voluntaria y para perpetuar hechos. |
| 57. Solicitud de costas después de dictada sentencia. | 25. Solicitud de costas después de dictada sentencia. |
| 58. No hay disposición alguna que le prohíba entender en esta situación. (ver núm. 26 al otro lado de la tabla) | 26. Solicitud para dejar sin efecto anotación de rebeldía. |
| 59. Solicitud de nuevo juicio. | 27. Solicitud de nuevo juicio. |
| 60. Ordenar acumulación o separación de delitos y/o acusados con anuencia del juez y partes. | **Prohibiciones y limitaciones (Criminal)** |
| 61. Dictar orden sobre enmiendas a acusación, denuncia, escrito de especificaciones bajo R. 38 de Procedimiento Criminal. | El juez magistrado no tendrá autoridad judicial para en los siguientes asuntos: |
| | 1. Ordenar acumulación o separación de delitos y/o acusados. |
| 62. Lectura de denuncia en delitos menos graves. | 2. Dictar orden sobre enmiendas a acusación, denuncia, escrito de especificaciones bajo R. 38 de Procedimiento Criminal, excepto orden para subsanar defectos de forma. |
| 63. Lectura de acusación en casos de co-acusados; por ser parte del tribunal de primera instancia unificada. | 3. Lectura de denuncia en delitos menos graves. |
| | 4. Lectura de acusación en casos de co-acusados; no podrá realizar determinación sobre celebración separada o conjunta del acto de lectura de acusación en esos casos. |
| 64. Solicitud al amparo de R. 63 de Procedimiento Criminal para presentación de defensa u objeción a la acusación, que no fue presentada en acto de lectura de acusación. | 5. Solicitud al amparo de R.63 de Procedimiento Criminal para presentación de defensa u objeción a la acusación, que no fue presentada en acto de lectura de acusación. |
| 65. Entender en moción de desestimación, archivo y sobreseimiento de cargos sometidos. | 6. Entender en moción de desestimación, archivo y sobreseimiento de cargos sometidos. |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 66. Moción que plantea defensas u objeciones a la acusación o denuncia. | 7. Moción que plantea defensas u objeciones a la acusación o denuncia. |
| 67. Mociones antes del juicio bajo R. 66 de Procedimiento Criminal. | 8. Mociones antes del juicio bajo R. 66 de Procedimiento Criminal. |
| 68. Expedir orden antes del juicio permitiendo que la alegación de culpable se retire y se cambie. | 9. Expedir orden antes del juicio permitiendo que la alegación de culpable se retire y se cambie. |
| 69. Intervención con aprobación de alegaciones preacordadas entre defensa y Ministerio Público. | 10. Intervención con aprobación de alegaciones preacordadas entre defensa y Ministerio Público. |
| 70. Por el concepto de la unificación puede entender en esto por anuencia del juez y partes. (ver núm. 11 del otro lado de la tabla) | 11. Solicitud para que se permita presentación de defensa de incapacidad mental o defensa de coartada por haberse omitido tal presentación dentro de los términos de la R. 74 de Procedimiento Criminal. |
| 71. Solicitud de inhibición de Juez bajo Reglas de Procedimiento Criminal. | 12. Solicitud de inhibición de juez magistrado o Juez bajo Reglas de Procedimiento Criminal. |
| 72. Solicitud de traslado de una o más causas criminales contra uno o más acusados, presentada por la defensa o el Ministerio Público por el principio de unificación de los tribunales. | 13. Solicitud de traslado de una o más causas criminales contra uno o más acusados, presentada por la defensa o el Ministerio Público. |
| 73. El juez municipal puede entender en esto por designación. (ver núm. 14 del otro lado de la tabla) | 14. Solicitud de juicio por separado o en conjunto de acusados y/o causas. |
| 74. El juez municipal puede entender en esto por designación. (ver núm. 15 del otro lado de la tabla) | 15. Moción de supresión de evidencia, entendiéndose a los asuntos que puede delegar el Juez Superior al Juez Magistrado por Resolución. |
| 75. Asuntos interlocutorios que requieran para resolución vista evidenciaria. | 16. Asuntos interlocutorios qué requieran para resolución vista evidenciaria, incluyendo los asuntos bajo su autoridad judicial o dispuestos por Reglamento del Tribunal Supremo. |
| 76. Presidir Conferencias con Antelación al juicio. | 17. Presidir Conferencias con Antelación al juicio. |
| 77. Juicio en su fondo. | 18. Juicio en su fondo. |

| JUEZ MUNICIPAL | JUEZ MAGISTRADO |
|---|---|
| 78. Dictar sentencia final o parcial. | 19. Dictar sentencia final o parcial. |